**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

FAUSTO GOMEZ,
9315 Oak White Rd.,
Nottingham, MD 21236
(Baltimore County)

        Plaintiff

**USDC-BALTIMORE
'26 APR 14 PM3:21**    v.

YISROEL ARYEH SCHAFFEL,
2814 Hanson Ave
Baltimore City, MD 21209

VERTEX TL LLC,
C/O Registered Agents Inc
5000 Thayer Center, Ste C
Oakland, MD 21550
(Garrett County)

STEVEN TESSLER,
C/O Tess Law
2833 Smith Ave., #138
Baltimore City, MD 21209

SAMUEL COGEN, Baltimore City Sheriff
1725 S Charles St
Baltimore City, MD 21230

XAVIER CONAWAY,
Elijah E. Cummings Courthouse, Room 412
111 North Calvert Street
Baltimore City, MD 21202

GLENDA HOLMAN,
Fiscal Technician Fines and Costs,
Baltimore City Sheriff's Office
100 N. Calvert St., Room 104
Baltimore City, MD 21202

EARL McQUEEN,
Baltimore City Sheriff's Office
Field Services Division
111 N. Calvert St.
Baltimore City, MD 21202

Rcv'd by: _____

**HD**

:

:

Civil Action No.:

MJM 2 6 CV 1 4 4 5

:

:

:

:

:

:

:

NICHOLAS BLENDY,
Assistant Sheriff and Legal Advisor,                    :
3566 Poole St.
Baltimore City, MD 21211

YITZCHOK ISAAC "YITZY" SCHLEIFER,
6712 Westbrook Rd                                        :
Baltimore City, MD 21215

RONALD WILHEIM,
2606 Fair Oaks Lane
Cincinnati, OH 45237                                     :

        Defendants.

                                                         :

# TABLE OF CONTENTS

**Section**                                                                               **Page**

PRELIMINARY STATEMENT ........................................................................................................... 1

JURISDICTION AND VENUE............................................................................................................ 2

THE PARTIES....................................................................................................................................... 2

    Plaintiff .............................................................................................................................................. 2

    Defendants ........................................................................................................................................ 2

BACKGROUND .................................................................................................................................... 6

    I.   The Baltimore City Tax Sale System ....................................................................................... 6

    II.  The Enterprise's Methods of Operation.................................................................................... 6

    III. The Enterprise's Methods as Applied to Plaintiff................................................................... 8

    IV.  The Pattern Across Cases ......................................................................................................... 12

    V.   The Enterprise and Its Finances............................................................................................... 13

    VI.  Ronald Wilheim's Political Network ....................................................................................... 14

    VII. Defendant Sheriff Cogen, His Relationships & the Sheriff's Office..................................... 15

    VIII. Summary of Enterprise Relationships.................................................................................... 16

    IX.  Pleading Standard and Discovery............................................................................................. 16

    X.   Damages to Plaintiff.................................................................................................................. 17

COUNT I — CIVIL RICO (18 U.S.C. § 1962(c)) .............................................................................. 17

    Incorporation................................................................................................................................... 18

    Statutory Framework ...................................................................................................................... 18

    Element One: The Enterprise.......................................................................................................... 18

    Element Three: Pattern of Racketeering Activity .......................................................................... 24

          A. Mail and Wire Fraud and Honest Services Fraud (18 U.S.C. §§ 1341, 1343, 1346) ......................... 25

          B. Extortion Under Color of Official Right (18 U.S.C. § 1951) .............................................................. 26

          C. Money Laundering (18 U.S.C. §§ 1956–1957) .................................................................................. 27

          D. Relatedness and Continuity ................................................................................................................ 29

    Element Four: Causation and Injury............................................................................................... 29

COUNT II — CIVIL RICO CONSPIRACY (18 U.S.C. § 1962(d))................................................. 30

COUNT III — DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS OF LAW (42 U.S.C. § 1983)............................................................................................................................................ 35

COUNT IV — UNLAWFUL SEIZURE OF PROPERTY (42 U.S.C. § 1983) ............................... 38

COUNT V — CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS (42 U.S.C. § 1985)... 40

COUNT VI — NEGLECT TO PREVENT CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS (42 U.S.C. § 1986)........................................................................................................... 42

COUNT VII — INTERFERENCE WITH FAIR HOUSING RIGHTS (42 U.S.C. §§ 3604, 3617)45

**COUNT VIII — MARYLAND CONSTITUTIONAL TORT (Declaration of Rights, Arts. 19, 24, 26)**..................................................................................................................................... 47

**COUNT IX — COMMON LAW FRAUD** ......................................................................... 50

**COUNT X — TORTIOUS INTERFERENCE WITH PROPERTY RIGHTS** ............................. 51

**COUNT XI — UNJUST ENRICHMENT**........................................................................... 52

**COUNT XII — CIVIL CONSPIRACY**.............................................................................. 54

**PRAYER FOR RELIEF** ................................................................................................... 55

   I.  Relief Sought from the Jury................................................................................................. 55

   II. Relief Sought from the Court................................................................................................ 56

**JURY TRIAL DEMAND**.................................................................................................. 58

## COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND DECLARATORY JUDGMENT

## DEMAND FOR A JURY TRIAL

## PRELIMINARY STATEMENT

This is a civil action arising from a coordinated scheme by public officials and private actors to deprive Plaintiff Fausto Gomez of his constitutionally protected property rights at 229 N. Monroe Street, Baltimore, Maryland. Defendants exploited Maryland's tax sale system — a mechanism designed to protect municipal revenue — as an instrument of unlawful property seizure, personal enrichment, and public corruption at the expense of Plaintiff Gomez and Baltimore residents.

The scheme operated through a network of interlocking relationships: a tax sale investor (Vertex TL LLC and its principals) with extraordinary access to and preferential treatment from Baltimore City officials; a Clerk of the Court who routinely issued writs of possession before Vertex had legal entitlement to them; a Sheriff who executed unlawful evictions through unofficial channels and in direct contradiction of assurances given to property owners; and elected officials who received financial benefits from individuals connected to this enterprise. In short, Defendants conspired to and actually did steal properties from Baltimore City residents.

Plaintiff Fausto Gomez was a victim of their scheme, and was dispossessed of his property on March 18, 2026, even after official assurances that no eviction would occur on that date. Plaintiff brings this action to redress those wrongs and to expose and dismantle the corrupt enterprise that made them possible.

## JURISDICTION AND VENUE

1. This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, as this action arises under the Constitution and laws of the United States, including 42 U.S.C. §§ 1983, 1985, and 1986, 18 U.S.C. § 1962 (civil RICO), and 42 U.S.C. §§ 3604 and 3617 (Fair Housing Act).

2. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as those claims form part of the same case or controversy as the federal claims.

3. Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to this action occurred within this district, and the property that is the subject of this action is situated within this district.

## THE PARTIES

### Plaintiff

4. Plaintiff Fausto Gomez is an individual resident of Baltimore County, Maryland, and at all relevant times was the lawful owner and occupant of the property located at 229 N. Monroe Street, Baltimore City, Maryland 21223 (hereinafter "the Property"), which he used both as the premises for his business operations and as a personal residence.

5. Plaintiff Fausto Gomez alleges the following defendants, with the exception of Defendant Blendy, compose an unlawful enterprise which illegally exploits Baltimore's tax sale system for profit ("The Enterprise").

### Defendants

2

6. **Defendant Vertex TL LLC** ("Vertex") is a Maryland limited liability company that operates as a tax sale investor in Baltimore City. At all relevant times, Vertex was engaged in the business of acquiring tax sale certificates, pursuing foreclosure of redemption in Baltimore City Circuit Court, pursuing physical possession of the properties via lockouts and evictions, and flipping/selling the properties. In 2024, Vertex acquired approximately 26 tax sale properties for which they paid approximately $20,000 in outstanding taxes to Baltimore City and sold those properties for approximately $1.4 million in aggregate. (*See* Exhibit 1)

7. **Defendant Yisroel Aryeh "Ari" Schaffel** ("Schaffel") is an individual who, at all relevant times, served as the chief executive or controlling member of Vertex TL LLC. In 2019, Schaffel purchased the personal residence of Defendant Yitzchok Isaac "Yitzy" Schleifer. (*See* Exhibit 2). By Schaffel's own admission he worked for Maryland tax sale businesses controlled by Ronald Wilheim and operated by Wilheim's family members. (*See* Exhibit 3 which is from Schaffel's complaint from *Schaffel v. Real Property Investment Partners, LLC., et al* No. 1:25-cv-00721 (D. Md. Mar. 5, 2025)). Upon information and belief, Schaffel continues to work for Defendant Wilheim via Vertex.

8. **Defendant Steven Tessler** ("Tessler") is an attorney licensed to practice in the State of Maryland, admitted to the Maryland Bar in April 2024. Despite his recent admission, Tessler is the attorney of record in approximately 300 tax sale cases in Baltimore City for Vertex TL LLC. (*See* Exhibit 4).

9. **Defendant Yitzchok Isaac "Yitzy" Schleifer** ("Schleifer") is an elected member of the Baltimore City Council representing the Fifth District. He is sued in both his individual and official capacities. Schleifer is the second-largest donor to Defendant Cogen's campaign. (*See* Exhibit 5). In 2014 Schleifer bought a personal residence for $226,000. In 2019, Schleifer sold his personal

residence to Defendant Schaffel for $379,000. (*See* Exhibit 2) Defendant Ronald Wilheim, and his family members, are also among Schleifer's top campaign donors. (*See* Exhibit 6) An individual identified as "Yitzchok" appears in a WhatsApp group communication involving Defendant Schaffel and members of the Wilheim enterprise discussing tax sale dealings, and Plaintiff alleges on information and belief that this individual is Defendant Schleifer. (*See* Exhibit 7).

10. **Defendant Ronald Wilheim** ("Wilheim") upon information and belief, was and is a principal of business entities in which members of the Wilheim family and associates are engaged in the Maryland tax sale business. The members of the Wilheim family, including Ronald, are substantial political donors to Maryland elected officials, including Defendant Schleifer, through both personal contributions and contributions routed through healthcare businesses including Communicare and Health Care Facility Management LLC. (*See* Exhibit 6)

11. **Defendant Samuel Cogen** ("Cogen") is the elected Sheriff of Baltimore City, having assumed office in 2022. He is sued in both his individual and official capacities. Cogen's second-largest campaign donor is Defendant Schleifer. (*See* Exhibit 5) Among Cogen's other notable donors are individuals and entities directly implicated in the federal prosecution of Maryland State Senator Dalya Attar for conspiracy and extortion, including Attar's codefendants Kalman Finklestein, Joseph Attar (through Attar Enterprises LLC), and separately included in the matter Ronald Rosenbluth. Finklestein also donated to Defendant Schleifer. (*See* Exhibit 8). And Rosenbluth is Schleifer's cousin. According to press reports, Cogen hired Mr. Rosenbluth to handle "landlord-tenant" matters for the Sheriff's department which, upon information and belief, means evictions.

12. **Defendant Glenda Holman** ("Holman") is an employee of the Baltimore City Sheriff's Office who served as an operational liaison between the Sheriff's Office and Vertex TL LLC in

4

connection with the scheduling of property evictions in Baltimore City. Vertex was afforded direct access to Holman for the purpose of scheduling evictions at Vertex's convenience. (*See* Exhibit 9) She is sued in her individual and official capacities.

13. **Defendant Earl McQueen** ("McQueen") is a Deputy Sheriff employed by the Baltimore City Sheriff's office. He is sued in both his individual and official capacities. He delivered a notice of eviction to Plaintiff Gomez based on a quashed writ of possession, and executed an actual eviction using a quashed writ of possession, enabling Vertex to take possession of the Property. (*See* Exhibit 10)

14. **Defendant Xavier Conaway** ("Conaway") is the elected Clerk of the Circuit Court for Baltimore City. He is sued in both his individual and official capacities. Conaway's office has, in at least seven documented cases, issued Writs of Possession to Vertex prior to Vertex having established legal entitlement to such writs. Conaway has failed to respond to written communications raising these issues. Conaway and Cogen are allies running for re-election on the same slate. (*See* Exhibit 11)

15. **Defendant Nicholas Blendy** ("Blendy") is the Assistant Sheriff and Legal Advisor of the Baltimore City Sheriff's Office. He is sued in both his individual and official capacities. He is implicated in only one count, namely Count VI Neglect to Prevent to Conspiracy to Interfere with Civil Rights.

16. **Defendants John Does 1–10** are individuals and entities whose identities and full extent of participation are not yet known to Plaintiff but who, on information and belief, participated in the Baltimore Tax Sale Enterprise and the conspiracy described herein as members, associates, or instruments of the Enterprise. Plaintiff will seek leave to amend this Complaint pursuant to Federal

5

Rule of Civil Procedure 15(a) to substitute the true names and capacities of John Does 1–10, and to add additional defendants as warranted, upon ascertaining their identities and the nature of their participation through discovery and other investigative

## BACKGROUND

### I. The Baltimore City Tax Sale System

17.    Maryland law authorizes Baltimore City to sell tax sale certificates on properties with delinquent property taxes. An investor who purchases a tax sale certificate acquires a lien on the property. To convert that lien into ownership, the investor must file a foreclosure of redemption action in the Circuit Court, provide proper notice to the property owner, and satisfy specific statutory conditions before obtaining a final judgment, deed, and Writ of Possession for the property. The body of law governing tax sale foreclosures in Maryland is found in the Tax-Property Article, Title 14, Subtitle 8, §§ 14-801 through 14-870.

18.  The statutory scheme is designed to protect property owners by requiring statutory compliance with a variety of requirements before any transfer of property occurs. Issuance of a Writ of Possession — which authorizes physical eviction from the property — is a remedy a tax sale plaintiff is only entitled to after it has fulfilled the requisite statutory obligations.

19.    In the case involving the Property at 229 N. Monroe Street, statutory and constitutional protections were systematically bypassed through the coordinated actions of Defendants.

### II. The Enterprise's Methods of Operation

20.  The Baltimore Tax Sale Enterprise ("The Enterprise") operated through a set of interlocking methods, each dependent on the participation of both private actors and public officials,

and each designed to convert the tax sale process into an instrument of unlawful wealth extraction:

(a) **Premature Writ Issuance.** The Enterprise exploited the writ issuance function of the Clerk of the Circuit Court to obtain Writs of Possession for Vertex before the statutory prerequisites for such writs had been satisfied. These premature writs served a multiple function: they generated facially official eviction notices capable of inducing property owners to vacate without a legal obligation to do so, they created time pressure that overwhelmed property owners' capacity to mount legal defenses, and they served as ostensible cover for unlawful evictions.

(b) **Preferential Eviction Scheduling and Unlawful Dispossessions.** The Enterprise utilized a non-standard channel within the Baltimore City Sheriff's Office — specifically, direct personal access to Defendant Holman — to schedule evictions at Vertex's convenience, circumventing the standard scheduling protocols applicable to other tax sale investors and litigants. This preferential access gave Vertex operational control over the timing of evictions in a manner unavailable to other parties and inconsistent with the lawful administration of the Sheriff's Office's functions. (*See* Exhibit 9) And Sherrif's department agents, including Defendant McQueen, physically executed unlawful evictions on behalf of the Enterprise.

(c) **Conversion of Process Into Accomplished Fact.** The Enterprise's methods were designed to ensure that dispossession occurred before judicial intervention could prevent it. By combining premature writs with preferential eviction scheduling, the Enterprise was able to schedule and execute evictions on the basis of legally

7

defective process, presenting property owners and courts with accomplished facts rather than pending actions susceptible to remedy.

**(d) Litigation as Attrition.** Independent of and in addition to the writ and eviction methods described above, the Enterprise employed a strategy of aggressive, high-volume motion practice designed not to obtain legitimate judicial relief but to exhaust property owners' financial and legal resources before they could mount an effective defense. By Defendant Schlaffer's own admission, the previous attorneys for the Enterprise were criticized by Ronald Wilhem and Schlaffer for their "tactical" decisions to litigation (*See* Exhibit 12). Apparently, Tessler is willing to employ the tactics Schlaffer and Wilheim prefer.

21.    The financial and political relationships among Enterprise members provided the infrastructure that made this coordination possible and which sustains it.

## III. The Enterprise's Methods as Applied to Plaintiff Gomez

22. The following sequence of events illustrates the Enterprise's methods of operation as applied to Plaintiff Fausto Gomez and the Property at 229 N. Monroe Street.

23. The Property at 229 N. Monroe Street is a mixed-use building comprising a commercial space on the ground floor, where Plaintiff Fausto Gomez operated his deli and grocery business, which is his primary source of income, and a residential apartment on the upper floor, which Gomez used as a place of residence. Gomez held a lawful possessory interest in both components of the Property. A tax sale certificate on the Property was acquired by Vertex TL LLC following the 2024 Baltimore City tax sale.

8

24. Vertex, through its attorney Tessler, filed a foreclosure of redemption action in the Circuit Court for Baltimore City, in December 2024, assigned case number C-24-CV-24-004451.

25. On March 6 2025, the Court granted Vertex a judgement foreclosing Gomez's right of redemption.

26. Gomez argues, in that case and on an appeal filed October 17, 2025, that Vertex did not fulfill the statutory requirements, including multiple notice requirements, that are required by the Maryland Tax Property articles and as such Defendant is entitled to the Property.

27. On March 17, 2025, the Baltimore City Law Department signed a deed to the property for Vertex. (*See* Exhibit 13). According to Maryland Tax Property Article 14-818(a)(2) the City is prohibited from executing a deed until the full purchase price is paid by a tax sale plaintiff, and at this time the purchase price, by Vertex's own admission, had not been paid.

28. On May 4, 2025 Vertex requested a Writ of Possession from the Clerk of the Court of Baltimore City Circuit Court. On May 5, 2025 they received the Writ of Possession. Shortly therafeter, Vertex scheduled an eviction for May 28, 2025.

29. On May 23, 2025 a Judge ordered the Writ of Possession Quashed for reasons including that Vertex did not show they possessed a deed to the property, a requirement of Maryland Tax Property article §14-850. (*See* Exhibit 14)

30. On May 27, 2025 Vertex requested that the Sheriff cancel the eviction, 4 days after the Writ of Possession was quashed and only one day before the eviction was to take place. (*See* Exhibit 15)

9

31. On October 21, 2025 Vertex filed an "Emergency Motion to Strike Notice of Appeal". In that motion, they requested the Court grant plaintiff a Writ of Possession.

32. On December 3, 2025 Vertex recorded its tax sale deed from the City, and on the same day conveyed the deed to Hadaf Anwar Alsamet, Mohamed Abdo Alnisafi, Mohammed Dahan Shahbain in exchange for $190,000. (*See* Exhibit 16)

33. On January 13, 2026 Honorable Judge Fletcher-Hill denied Vertex's request for a writ of possession because Vertex did not demonstrate they possessed a deed to the property. (*See* Exhibit 17)

34. On January 23, 2026 Vertex ignored the Judge's ruling and obtained another Writ of Possession from the Clerk of the Court. They obtained the writ the very same day. Gomez found out about this via a proactive search of MDEC filings, and not via notice by Vertex. Strangely, this writ is on letterhead from a different address than the Clerk's office and also does not have a docketing/MDEC entry with an "e-served" filing stamp. (*See* Exhibit 18)

35. On February 5, 2026 Gomez filed an Emergency Motion to Quash the most recent Writ of Possession, and brought to the Court's attention for the first time that Vertex had conveyed the deed to third parties.

36. On or around March 1, 2026 Gomez found out an eviction had been scheduled for March 18, 2026, using the soon-to-be Quashed Writ of Possession.

37. On March 4, 2026 the Honorable Judge Lazerow quashed the second writ of possession because Vertex did not have a deed to the property. (*See* Exhibit 19) On the same day, a representative of Gomez informed the Sheriff's department that the writ was quashed, and the Sheriff's department emailed that the eviction was cancelled. (*See* Exhibit 20).

10

38. On March 4, 2026, the very same day, Vertex requested a third writ of possession and obtained it within two hours. (*See* Exhibit 21) Shortly thereafter, now more keen of Vertex tactics, Gomez filed another emergency motion to quash this writ of possession.

39. On March 6, 2026 Sheriff Earl McQueen delivered a notice of eviction to defendant Gomez at the Property which cited the writ that was granted on January 23 and quashed on March 4. (*See* Exhibit 22)

40. On March 6, 2026 a representative of Gomez was told by the Sheriff's department that Sheriff McQueen delivered the notice of eviction because it was "already a part of his case load", and that the March 18 eviction was still canceled. (*See* Exhibit 16)

41. Between March 6, 2026 and March 18, 2026 the Sheriff's department gave multiple additional reassurances the eviction would not take place on March 18.

42. On March 18, 2026 Gomez was evicted from the Property by Sheriff Earl McQueen. McQueen presented Gomez with the Jan 23, 2026 Writ of Possession that had been Quashed. (*See* Exhibit 23)

43. On March 19, 2026 Honerable Judge Lazerow denied Gomez's Emergency Motion to Quash the Third Writ of Possession, essentially enabling Vertex to secure a Writ of Possession on behalf of third parties who were not part of the tax sale process. However, in another order issued that day, Honorable Judge Lazerow stated Vertex had "not shown that they made a demand for possession after obtaining lawful entitlement to possession". (*See* Exhibit 24) *Moreover*, Maryland Tax Property Article 14-836(b)(7)(i) requires at least 30 day notice prior to a tax sale Plaintiff taking possession of a property, so at minimum the Writ

Honorable Judge Lazerow approved could not have resulted in an eviction until 30 days after March 19.

44. On March 30, 2026 Gomez filed Motion to Amend or Alter as Judge Lazerow's denying Gomez's Emergency Motion to Quash the Third Writ of Possession. Judge Lazerow's decision was based on legal error, since it allowed a party other than a tax sale certificate holder to become a plaintiff in the case and be issued a Writ of Possession. Maryland Tax Property Article 14-836 states only tax sale certificate holders can be plaintiffs in a tax sale case, and the third parties were never tax sale certificate holders. (*See* Exhibit 25)

45. Throughout all the above, Gomez faced systematic litigation-by-attrition tactics by Vertex through its attorney Tessler. These tactics included: repeated threats to move for sanctions if Gomez continued to defend himself in court; multiple actual sanctions motions filed against Gomez (all of which were denied); and successive waves of motions restating previously rejected claims or advancing legal positions without good-faith basis, each of which required Gomez and his counsel to respond at cost and confused the record.

### IV. The Pattern Across Cases

46. The sequence of events described above was not unique to Plaintiff's case. It reflects a repeated practice by which Defendants systematically exploited the tax sale system by obtaining premature writs, scheduling evictions through unofficial channels, litigation-by-attrition and executing dispossessions before property owners' legal rights were exhausted.

47. By Vertex's own admission, they had or have a practice of using agents to "secure" properties prior to legal entitlement. (*See* Exhibit 26).

12

48. Vertex routinely obtained Writs of Possession from the Clerk of the Court's office, without legal entitlement and in defiance of judicial orders, and pursued unlawful evictions. (*See* Exhibit 27)

49. In at least one such case, upon information owner and belief, a property owner vacated their property upon receipt of the premature eviction notice, after which Vertex locked the property — even though a judge subsequently ruled that the Writ of Possession had been issued improperly.

50. In one case Vertex lost, they requested sanctions which the Court denied with Honorable Judge Fletcher-Hill stating "Plaintiff failed to act in good faith after the entry of judgement".

## V. The Enterprise and Its Finances

51. Vertex's business model in Baltimore City produced extraordinary returns. From the 2024 tax sale alone, Vertex acquired tax sale certificates on 26 properties by paying approximately $18,000 in delinquent taxes. Vertex submitted bid prices of approximately $355,000, which Vertex did not pay to the City until they had cash in hand from a buyer. Vertex sold those properties for approximately $1.4 million in aggregate. (*See* Exhibit 1)

52. These returns, represent profits inconsistent with legitimate market activity.

53. The sale of the Property at 229 N. Monroe Street is independently notable. Vertex sold the Property to Colorado residents for $190,000 against a State Department of Assessments and Taxation assessed value of $80,000 — a ratio that, in the context of the scheme alleged herein, is consistent with the use of real property transactions for money laundering purposes.

54. A previous attempt at selling of the Property also belies money laundering. On April 28, 2025, Ashland Auction Group auctioned the Property on Vertex's behalf; bidding reached $120,000. 14 days later Vertex, according to its own filings, entered a contract of sale for $209,000, providing the court with an Ashland contract as evidence. Four days later Ashland conducted a second auction, with a starting price of $85,000 and there were no bidders. (*See* Exhibit 28)

55. On information and belief, Defendant Schleifer is a participant in the financial benefits of the enterprise, as suggested by identification of "Yitzchok" in the WhatsApp group chat referenced above, in addition to the political and financial relationships documented in this Complaint. (*See* Exhibit 7)

### VI. Ronald Wilheim's Political Network

56. Ronald Wilheim, and his family members, are principals in Maryland tax sale investment entities and substantial donors to Maryland elected officials. Their political contributions flow through personal donations and through healthcare businesses including Communicare and Health Care Facility Management LLC.

57. The Wilheim family are among Defendant Schleifer's top campaign donors. (*See* Exhibit 6).

58. At the federal level, the Wilheim family have also made substantial contributions to the Republican National Committee and conservative political action committees, giving the enterprise connections across the political spectrum. (*See* Exhibit 29).

59. On information and belief, Defendants Schaffel and Schleifer, and members of the Wilheim family enterprise, communicated regarding tax sale dealings through a WhatsApp group in which an individual identified as "Yitzchok" — the first name of Defendant Schleifer —

14

participated. (*See* Exhibit 7). The content of those communications, to the extent obtainable through discovery, will help establish the coordinated nature of the enterprise. Schaffel stated Wilheim informs "litigation tactics" for the tax sale business. (*See* Exhibit 12). Moreover, Schaffel identified Wilheim as a manager with "dominion" over "finances, policies, and business practices". (*See* Exhibit 3)

60. Additionally, on information and belief, Schaffel obtained and retains material capable of exposing the Wilheim family's involvement in conduct that could give rise to civil and criminal liability. Schaffel previously filed a federal lawsuit implicating the Wilheim enterprise but subsequently dismissed it. On information and belief, the dismissal reflected an agreement in which the Wilheim enterprise gave Vertex control over some or all of Baltimore City's tax sale operations; in exchange, Schaffel dropped his lawsuit and received the cooperation of city officials through the corrupt political relationships the Wilheim family had cultivated.

## VII. Defendant Sheriff Cogen, His Relationships & the Sheriff's Office Pattern of Conduct

61. On March 18, 2026, the Baltimore City Sheriff's Office executed the eviction of Plaintiff Gomez through a series of procedurally irregular and bad-faith acts: the eviction proceeded despite an explicit prior assurance that none would occur, was not listed on the Sheriff's Office website, and was carried out by Sheriff McQueen using a Writ of Possession that had been quashed. Defendant Holman conducted communications with Vertex outside ordinary procedural channels, and on information and belief both Holman and McQueen acted pursuant to direction from or with the knowledge of Defendant Cogen.

15

62. Defendant Cogen assumed office as Baltimore City Sheriff in 2022. His second-largest campaign donor is Defendant Schleifer. His donor list also includes Kalman Finklestein and Joseph Attar (through Attar Enterprises LLC) — both co-defendants in the federal prosecution of Maryland State Senator Dalya Attar for conspiracy and extortion— and Ronald Rosenbluth, who is separately implicated in that matter. Finklestein and Joseph Attar are also donors to Defendant Schleifer, and, according to press reports, Rondal Rosenbluth is Schleifer's cousin. Upon information and belief, Cogen hired Rosenbluth to the Sheriff's department to facilitate evictions.

## VIII. Summary of Enterprise Relationships

63. Plaintiff alleges Schaffel is an operator and manager of Vertex, the business entity executing the scheme. Tessler is the lawyer who uses abuse of process to fulfil the Enterprises objectives. Cogen is "the muscle", whose department executes evictions. Holman is the eviction scheduler and McQueen is the on-the-ground agent that carries out evictions for the Enterprise, under Cogen's directive. Conaway is the political ally that enabled the Enterprises scheme by issuing erroneous writs of possession for the Enterprise and upon information and belief other improper behavior via the Clerks office. Schleifer is the political broker and a financial beneficiary - a bridge between Schaffel, Wilheim, Cogen and Conaway. Wilheim is the rich person who buys political capital to further the Enterprise, benefits financially from its scheme and operates through agents as the de facto leader of the organization.

## IX. Pleading Standard and Discovery

64. Plaintiff's allegations are based on observable conduct and publicly available documents. The internal communications, financial arrangements, and coordination mechanisms that would establish the full scope of the conspiracy — including communications among Defendants regarding the specific transactions at issue, scheduling arrangements, and financial flows — are in Defendants' exclusive possession. Plaintiff respectfully requests that the Court permit this matter to proceed to discovery, where the evidence necessary to establish the full scope of Defendants' coordinated conduct may be obtained.

## X. Damages to Plaintiff

65. As a direct and proximate result of Defendants' acts and omissions, Plaintiff Fausto Gomez has suffered damages including but not limited to loss of his business premises and residential apartment and all property therein; the costs of displacement; loss of the economic value of the Property; emotional distress, humiliation, and harm to dignity arising from the unlawful eviction; the costs of legal proceedings necessitated by Defendants' conduct; and such other damages as will be proven at trial.

66. Defendants' conduct was willful, malicious, and undertaken with deliberate indifference to Plaintiff's federally protected rights, entitling Plaintiff to punitive damages against the individual Defendants.

## COUNT I

## CIVIL RICO — CONDUCTING AN ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY

## 18 U.S.C. § 1962(c)

17

(Against Vertex TL LLC, Yisroel Schaffel, Steven Tessler, Samuel Cogen, Xavier Conaway, Glenda Homan, Earl McQueen, Yitzchok Isaac "Yitzy" Schleifer, and Ronald Wilheim)

## INCORPORATION

67. Plaintiff incorporates by reference each allegation set forth in paragraphs 1 through 66 as if fully restated herein.

## STATUTORY FRAMEWORK

68. 18 U.S.C. § 1962(c) makes it unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. A prevailing civil plaintiff is entitled to treble damages and attorney's fees. 18 U.S.C. § 1964(c).

69. A civil RICO claim under § 1962(c) requires: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing injury to plaintiff's business or property. Each element is satisfied here.

## ELEMENT ONE: THE ENTERPRISE

70. An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise requires a purpose, relationships among those associated with the enterprise, and longevity sufficient to pursue that purpose. *Boyle v. United States, 556 U.S. 938, 946 (2009).*

71. Defendants, together with persons presently identified as John DOES 1–10, constitute an association-in-fact enterprise (the "Baltimore Tax Sale Enterprise" or "Enterprise") within the meaning of 18 U.S.C. § 1961(4). The Enterprise consists of:

    (a) Vertex TL LLC;

    (b) Yisroel "Ari" Schaffel;

    (c) Steven Tessler;

    (f) Isaac "Yitzy" Schleifer;

    (g) Ronald Wilheim;

    (d) Samuel Cogen;

    (g) Glenda Holman;

    (g) Earl McQueen; and

    (e) Xavier Conaway

72. Vertex TL LLC is a RICO "person" that conducted the Enterprise's affairs. It is legally distinct from the Enterprise as a whole, which includes the public official defendants and the Wilheim Entities, satisfying the distinctness requirement of § 1962(c).

73. **Common Purpose.** The Enterprise's common purpose is to exploit Baltimore City's tax sale system for the financial enrichment of its members by: (i) acquiring tax sale properties through insider access and preferential treatment; (ii) using public office and official authority to dispossess property owners before their legal rights are exhausted; (iii)

19

generating extraordinary profits from the resale of those properties; and (iv) upon information and belief using real property transactions as vehicles for money laundering.

74. **Relationships Among Members.** The relationships among Enterprise members are established by: (a) Schaffel's 2019 purchase of Schleifer's personal residence; (b) Schleifer's status as the second-largest donor to Cogen's campaign; (c) Ronald Wilheim and his family's status as top donors to Schleifer; (d) Cogen and Schleifer's shared donor relationships with individuals including Kalman Finkelstein and Joseph Attar, who have been charged in *United States v. Dalya Attar*, No. SAG-25-324 (D. Md.), with conspiracy and extortion arising from the corruption of public officials in Baltimore City — situating Cogen and Schleifer within a broader network alleged to have systematically exploited public institutions for corrupt gain, consistent with the Enterprise's alleged use of the Sheriff's and Clerk's offices as instruments of the scheme herein; (e) WhatsApp communications among Schaffel, upon information and belief Schleifer (identified as "Yitzchok"), and Wilheim family members and agents regarding tax sale dealings; (f) Conaway's office's pattern of issuing writs of possession to Vertex with unusual speed and without the procedural prerequisites required by Maryland law, reflecting a working relationship with Vertex that exceeded ministerial duties; (g) McQueen's direct operational involvement in executing the March 18, 2026 eviction of Fausto Gomez using instruments they knew or should have known were procedurally defective; (h) Holman scheduling Vertex evictions outside of standard channels (h) Cogen's authorization and supervision of the eviction execution, and his political alliance with Schleifer and shared donor network, demonstrating that his office's actions reflected coordinated enterprise activity rather than routine law enforcement; (i) Cogen's hiring of Ronald Rosenbluth — Schleifer's cousin —

to handle evictions within the Sheriff's Office; Rosenbluth's subsequent appearance in filings in *United States v. Dalya Attar et al.*; and his departure from the Sheriff's Department — a sequence evidencing the operational integration of the Cogen-Schleifer relationship and the placement of a Schleifer family associate within the precise institutional function the Enterprise exploited; and (j) Schaffel previously working for Wilheim's tax sale business, and upon information and belief, Schaffel and Vertex now leading Wilheim's tax sale operations in Baltimore.

75. **Longevity.** The Enterprise operated with sufficient continuity to establish longevity. Tessler's filed approximately 300 cases since his April 2024 bar admission, which presupposes an established support structure. The premature writ pattern across at least six documented cases reflects a regularized practice. The financial and political relationships among Enterprise members substantially predate the 2024 tax sale cycle.

76. The foregoing relationships are established by the publicly available evidence; discovery is expected to further corroborate and expand them, including as to communications among Enterprise members, processing of Vertex-related filings, and coordination surrounding the March 18, 2026 and other evictions.

77. The Enterprise affects interstate commerce. Vertex sells Baltimore City properties to out-of-state buyers, as evidenced by the sale of the Property to Colorado residents. The Wilheim family conducts multi-state business operations. Political contributions flow through interstate financial networks. Electronic communications in furtherance of the scheme constitute interstate wire use.

## ELEMENT TWO: EACH DEFENDANT'S ROLE IN CONDUCTING THE ENTERPRISE

78. To satisfy § 1962(c), a defendant must participate in the operation or management of the enterprise. Reves v. Ernst & Young, 507 U.S. 170, 179 (1993).

79. **Vertex TL LLC** is a financial beneficiary and operational driver of the Enterprise. Vertex directed the filing of foreclosure actions, the scheduling of evictions through unofficial channels, and the resale of properties. On information and belief, Vertex coordinated with public official defendants to obtain favorable treatment in writ issuance and eviction scheduling. Vertex conducted the Enterprise's affairs directly and is liable as the central operational entity.

80. **Schaffel** is the leading operator of Vertex. He directed Vertex's operations, leveraged the political and financial relationships with Schleifer and the Wilheim family that enabled the Enterprise, and participated in WhatsApp communications through which Enterprise members coordinated. Schaffel conducted the Enterprise's affairs directly as Vertex's principal.

81. **Tessler** served as the legal instrument through which Vertex's foreclosure actions were filed. He filed the pleadings and obtained the judgments and writs that enabled Vertex to dispossess property owners, conducting the Enterprise's affairs as its primary litigation vehicle. Tessler's litigation conduct falls outside Noerr-Pennington protection as sham litigation under *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60–61 (1993).

22

82. **Conaway** participated in the Enterprise's operation through his office's systematic issuance of Writs of Possession to Vertex before the statutory prerequisites were satisfied — documented in at least six cases in addition to the case at bar. This pattern is consistent with deliberate facilitation of the Enterprise.

83. **Cogen** participated in the Enterprise through his office's preferential eviction scheduling for Vertex outside standard protocols, and through the execution of the March 18, 2026 eviction in direct contradiction of assurances given to Gomez's representative. On information and belief, Cogen directed or acquiesced in the use of his office as an instrument of the Enterprise in exchange for political and financial support.

84. **Holman** participated in the Enterprise's operation as an operational link between Vertex and the Baltimore City Sheriff's Office for the scheduling of evictions. Documentary evidence establishes that Holman afforded Vertex the ability to schedule evictions at its convenience through direct personal access. Upon information and belief, by scheduling the March 18, 2026 eviction through this non-standard channel, Holman conducted the Enterprise's affairs with at least deliberate indifference to the constitutional rights of property owners affected by the Enterprise's scheme.

85. **McQueen** participated in the Enterprise's operation as the executing officer who personally carried out the dispossession of property owners on Vertex's behalf. On March 6, 2026 McQueen delivered a notice of eviction to Plaintiff Gomez, that was based on a Quashed Writ of Possession. On March 18, 2026, McQueen personally presented and executed the eviction of Plaintiff Gomez using the quashed writ. A reasonable officer in McQueen's position would have known that executing an eviction under these circumstances was unlawful. McQueen thereby conducted the Enterprise's affairs as its instrument of physical

23

enforcement, completing the chain of official acts through which the Enterprise's scheme produced its intended result.

86. **Schleifer,** upon information and belief, participated in the Enterprise by using his position as a City Council member to facilitate, protect, and advance the Enterprise's interests, and by receiving financial benefits from Enterprise members in connection with that facilitation. Schleifer's believed participation in WhatsApp communications with Schaffel and Wilheim family members reflects direct coordination regarding the Enterprise's tax sale activities, and his political relationship with  Cogen gave the Enterprise influence over the Sheriff's Office.

87. **Ronald Wilheim** upon information and belief participated in the Enterprise in three capacities. (1) As the source of political capital — routed through personal contributions, family contributions and healthcare business — that enabled public-official Enterprise members to act in Vertex's interest. (2) As the manager of direct participants in WhatsApp communications including Schaffel, Wilheim's son, and Schleifer coordinating tax sale activities. Schaffel further stated Wilheim had "dominion" over "finances, policies, and business practices" and gave direction on "litigation tactics". (3) Wilheim is also a party with a direct financial stake in the Enterprise.

### ELEMENT THREE: PATTERN OF RACKETEERING ACTIVITY

95. "Racketeering activity" includes mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), money laundering (18 U.S.C. §§ 1956–1957), and Hobbs Act extortion (18 U.S.C. § 1951). A "pattern" requires at least two related acts of racketeering activity within ten years. 18

U.S.C. § 1961(5). Acts must amount to or pose a threat of continued criminal activity. H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989).

**A. Mail and Wire Fraud and Honest Services Fraud — 18 U.S.C. §§ 1341, 1343, and 1346**

88. Mail and wire fraud require: (1) a scheme to defraud; (2) use of the mails or interstate wire facilities in furtherance of the scheme; and (3) materiality. The Enterprise's scheme to defraud Gomez and other Baltimore property owners of their property interests satisfies each element.

89. Section 1346 provides that the term "scheme or artifice to defraud" in §§ 1341 and 1343 includes a scheme or artifice to deprive another of the intangible right of honest services. As narrowed by Skilling v. United States, 561 U.S. 358 (2010), § 1346 covers bribery and kickback schemes in which a public official receives a thing of value in exchange for the performance of official acts. Defendants Cogen, Conaway, and Schleifer, in their capacities as public officials, owed the citizens of Baltimore City the intangible right to their honest and faithful services. Each Defendant deprived the public of that right by entering into corrupt exchanges — receiving campaign contributions, favorable property transactions, or other benefits — in return for the exercise of official authority in furtherance of the Enterprise. Each such corrupt exchange, communicated or facilitated through the mails or interstate wire facilities, constitutes a predicate act of mail, wire and/or honest services fraud under §§ 1341, 1343, and 1346.

90. Specific predicate acts of mail and wire fraud include, without limitation:

   (a)  Each eviction notice transmitted to Gomez with a writ prematurely issued by Conaway's office; (e.g. May 2025, March 2026)

(b)  Each court filing by Tessler, on behalf of Schaffel and Vertex, seeking or obtaining a writ of possession in a case where statutory prerequisites had not been satisfied, transmitted through the court's electronic filing system; (e.g. May 2025, Sep 2025, Jan 2025 & March 2025)

(c)  Each electronic scheduling communication between Vertex and the Sheriff's Office referencing non-standard scheduling arrangements; (e.g. May 7, 2025; May 8, 2025; & May 23, 2025)

(d)  Electronic or written communications among Enterprise members, including through WhatsApp, coordinating the Enterprise's activities.

(e)  Each e-mail communication between the Sheriff's office, in March 2026, including Cogen & Blendy, with Gomez's representative assuring Gomez the March 18 eviction would not occur and proceeding with it anyway

91.  The predicate acts of mail and wire fraud alleged herein are numerous. The six documented premature writ cases, together with the case at bar, each involved multiple electronic court filings, eviction notices, and official communications transmitted through interstate wire facilities. These writ-related communications alone account for a minimum of seven distinct transactions, each generating one or more predicate acts. When combined with the WhatsApp communications and Sheriff's Office scheduling communications the total number of predicate acts of mail and wire fraud alleged herein far exceeds the statutory minimum of two and reflects a pervasive and sustained pattern of fraudulent communications in furtherance of the Enterprise's scheme.

**B. Extortion Under Color of Official Right — 18 U.S.C. § 1951**

92. The Hobbs Act prohibits extortion "under color of official right" — obtaining property from another with consent induced by the wrongful use of official authority. Liability attaches when a public official obtains a benefit knowing it is given in return for the exercise of official authority.

93. Defendants obtained things of value — including campaign contributions, political support, and, upon information and belief, private compensation — in exchange for the exercise of official authority in furtherance of the Enterprise. Each instance of official action taken in exchange for a benefit constitutes a separate predicate act of Hobbs Act extortion.

94. On information and belief, Defendant Schleifer similarly obtained things of value — including the 2019 property sale to Schaffel at inflated value, campaign support from the Wilheim family, and participation in the Enterprise's financial benefits — in exchange for using his political relationships and official influence to protect and advance the Enterprise.

**C. Money Laundering — 18 U.S.C. §§ 1956–1957**

95. Section 1956 prohibits conducting financial transactions involving proceeds of specified unlawful activity with intent to promote the unlawful activity or to conceal its nature or source. Section 1957 prohibits monetary transactions exceeding $10,000 in property derived from specified unlawful activity. Mail fraud, wire fraud, bribery, and Hobbs Act extortion are specified unlawful activities under § 1956(c)(7).

96. On information and belief, Vertex TL LLC functions not merely as a real estate investment vehicle but as a financial intermediary through which proceeds of unlawful activity — including activity by the Wilheim family and associated persons extending beyond the tax sale scheme — are layered and integrated into apparently legitimate commerce. The

systematic acquisition of distressed Baltimore properties at nominal cost, followed by rapid resale at multiples of assessed value to out-of-state buyers with no apparent connection to the Baltimore market, is consistent with the classic placement-layering-integration structure of money laundering operations.

97. For example, upon information and belief, the sale of the Property to Colorado residents for $190,000 — against an assessed value of $80,000 — is a financial transaction involving proceeds of the Enterprise's racketeering activity, conducted through mechanisms designed in part to layer and integrate those proceeds into apparently legitimate commerce, constituting a predicate act of money laundering under § 1956. Moreover, the Colorado Residents collectively use the address of a vape store as their mailing address for Baltimore City taxes and collectively are officers for many LLCs, further suggesting money laundering.

98. A previous attempt at selling of the Property also belies money laundering. On April 28, 2025, Ashland Auction Group auctioned the Property on Vertex's behalf; bidding reached $120,000. 14 days later Vertex, according to its own filings, entered a contract of sale for $209,000, providing the court with an Ashland contract as evidence. Four days later Ashland conducted a second auction, with a starting price of $85,000 and there were no bidders.

99. The sale of a different property by Vertex, 2918 E Madison, to a New York entity for $71,500 — against an assessed value of $32,000 — suggests another predicate act of money laundering. The New York business entity search for the buyer, "AX FLIP INVESTEMENTS", yields no results.

28

100. Additional Vertex property transactions in the 2024 tax sale — generating aggregate proceeds of approximately $1.4 million from certificates purchased for approximately $18,000 in delinquent taxes — are similarly consistent with money laundering and constitute additional predicate acts to the extent they involved proceeds of the scheme.

101. To the extent proceeds of Vertex's transactions were distributed to, or otherwise benefited, public officials including Defendants Schleifer or Cogen — whether characterized as returns on investment, consulting fees, or otherwise — constitute financial transactions designed to promote continued unlawful activity and to compensate those whose official acts facilitated the Enterprise, in violation of § 1956(a)(1)(A).

**D. Relatedness and Continuity**

102. **Relatedness.** All predicate acts share the same participants, the same victims, the same methods, and the same purpose — enrichment of Enterprise members through exploitation of the Baltimore City tax sale system and Baltimore's residents.

103. **Continuity.** The pattern satisfies both closed-ended and open-ended continuity. The predicate acts span multiple calendar years. Tessler's approximately 300 tax sale cases represent fraud extending over time. The Enterprise's ongoing financial and political relationships and Vertex's and Tessler's continued operations demonstrate a threat of continued criminal conduct.

## ELEMENT FOUR: CAUSATION AND INJURY

104. Section 1964(c) requires that plaintiff be injured "by reason of" the RICO violation. Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268 (1992). Injury to "business or

property" is required; emotional harm standing alone is insufficient, but property loss qualifies directly.

105.   Plaintiff Gomez suffered injury to property directly and proximately caused by the Enterprise's racketeering activity: the loss of property at 229 N. Monroe Street through an unlawful eviction. But for the Enterprise's predicate acts — the premature writ, the preferential eviction scheduling, the unlawful March 18 eviction — Gomez would not have lost his property.

106.   Plaintiff is entitled to treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

## COUNT II

## CIVIL RICO CONSPIRACY

## 18 U.S.C. § 1962(d)

(Against Vertex TL LLC, Yisroel Schaffel, Steven Tessler, Samuel Cogen, Xavier Conaway, Glenda Homan, Earl McQueen, Yitzchok Isaac "Yitzy" Schleifer and Ronald Wilheim)

107.   Plaintiff incorporates by reference each allegation set forth in paragraphs 1 through 106 as if fully restated herein.

108.   Section 1962(d) makes it unlawful for any person to conspire to violate § 1962(c). A § 1962(d) defendant need not have personally committed predicate acts — agreement to participate in the Enterprise with knowledge that the Enterprise engaged in racketeering activity is sufficient.

30

109. Each Defendant agreed to participate in the Baltimore Tax Sale Enterprise and agreed that the Enterprise would be conducted through a pattern of racketeering activity, as described above. The agreement is evidenced by: (a) the coordinated pattern of premature writ issuance by the Clerk of the Court's office and preferential eviction scheduling across multiple cases and over multiple years; (b) the financial relationships among Enterprise members including the Schaffel-Schleifer property transaction, and the Wilheim family donation network; (c) WhatsApp communications among Schaffel, Schleifer, and Wilheim Entity members relating to tax sale business (d) the written communications between Holman and Vertex via Tessler, reflecting Holman's knowing agreement to afford Vertex preferential access to the Sheriff's Office's eviction process and (e) McQueen physically carrying out delivering a notice of eviction and the actual eviction using a quashed writ of possession.

110. The conspiracy alleged herein crystallized into its current form no later than March 5, 2025, when Defendant Schaffel voluntarily dismissed his federal lawsuit against Wilheim tax sale entities. On information and belief, that dismissal was conditioned on an agreement that Wilheim would entrust Vertex with more control of and profit from its Baltimore City tax sale operations. And Vertex would continue to enjoy the benefit of the corrupt official relationships that the Wilheim family's political investments had cultivated. The underlying business and political relationships among Enterprise members substantially predate March 5, 2025 (Schaffel by his own account started working for Wilheim in 2021) establishing that the conspiracy was active, albeit in a more nascent form, much earlier.

111. Defendant-by-Defendant Agreement Allegations

31

(a) **Schaffel directed Vertex's operation.** Schaffel is referenced as "client" in Tessler's filings on behalf of Vertex. In a different federal lawsuit, Schaffel asserts he was working for Ronald Wilheim. Upon information and belief, he dismissed his lawsuit against Ronald Wilheim and his tax sale entities on terms that resulted the Wilheim family effectively entrusting Vertex to leads its Baltimore City tax sale operations. In 2019, Schaffel bought his personal residence from Defendant Schleifer for $150,000 more than Schleifer paid for it just five years earlier, suggesting a quid pro quo relationship.

(b) **Tessler** agreed to serve as Vertex and the Enterprise's litigation instrument. His willingness to file approximately 300 tax sale cases within two years of his April 2024 bar admission reflects knowing participation in the Enterprise's scheme rather than ordinary legal representation. His repeated filing of writ applications in cases where statutory prerequisites had not been met, documented across at least seven cases, including after judges told him he was not entitled to writ of possessions without a deed, reflects a knowing agreement to use the court's writ issuance process as an instrument of the scheme.

(c) **Conaway** upon information and belief agreed to facilitate the Enterprise's writ issuance function. His office issued premature writs to Vertex in at least seven cases, despite multiple judicial orders stating tax sale plaintiffs are not entitled to writ of possessions prior to acquiring a deed to the property. Moreover, Conaway did not respond to written communications highlighting the improper writ issuance, and to best of Plaintiff's knowledge this behavior is still permitted by his office for Vertex. Conaway's behavior is consistent with a knowing agreement to afford Vertex preferential writ access. Additionally, the issuance March 4 issuance of a third replacement writ to Vertex, within a couple hours of a judge quashing the prior writ, further evidences knowing facilitation

32

rather than coincidence. Additionally, Conaway's joint electoral slate with Cogen reflects an institutional alignment with the Enterprise's public-official members.

(d) **Cogen,** upon information and belief, agreed to place the Sheriff's Office at the Enterprise's operational disposal. His office's preferential eviction scheduling for Vertex, through Holman, would not have operated as a regularized practice without Cogen's consent or direction. Additionally, Cogen was on the emails that informed Plaintiff Gomez's representative that the eviction would not take place on March 18, and Cogen was on emails that informed that the eviction did take place on March 18 anyway. Cogen did nothing, which is consistent with using his office to further the Enterprise's scheme. His receipt of political support from Schleifer, further establishes the knowing nature of his participation. He shares political donors with Schleifer, including Kalman Finklestein and Joseph Attar, who are currently charged with conspiracy in the Government's prosecution of State Senator Dalya Attar, demonstrating he operates within a network of relationships in which corrupt exchanges between political actors and law enforcement are accepted. His hiring of Schleifer's cousin Ronald Rosenbluth to deal with "landlord-tenant" matters, and who was cited in the Attar matter, further suggest that Cogen had knowing agreement with Schleifer to use the eviction powers of the Sheriff's department to benefit the Enterprise.

(e) **Holman** agreed to serve as Vertex's personal scheduling liaison within the Sheriff's Office. This agreement is established by documentary evidence: written electronic communications between Holman and Vertex reflecting a regularized, non-standard practice of direct scheduling access that circumvented the protocols other parties. The

33

existence of this arrangement over time reflects a deliberate agreement rather than a series of independent accommodations.

(f) **McQueen** agreed to execute the Enterprise's evictions, including the March 18, 2026 eviction using a writ he knew or should have known had been quashed fourteen days prior. Additionally, his delivery of an eviction notice on March 6, based on a quashed Writ of Possession, establishes knowing participation in the Enterprise's scheme. Upon information and belief, McQueen executed other evictions and/or lockouts on the Enterprise's behalf, which Sheriff's records will reveal in discovery.

(g) **Schleifer,** upon information and belief, agreed to provide political protection and facilitation to the Enterprise. In 2014 he purchased his private residence for $226,000. Only five years later, he sold it to Defendant Schaffel for $379,000. This sale establishes a direct financial relationship with the Enterprise's operational principal. The significant contributions he's received from Ronald Wilheim and his family members, establishes another direct connection. On information and belief, Schleifer's political relationship with and donations to Cogen gave the Enterprise influence over the Sheriff's Office, and his participation in the WhatsApp group chats with Schaffel and Wilheim agents, reflects a knowing agreement to coordinate Enterprise operations.

(h) **Ronald Wilheim,** upon information and belief, agreed to provide the political capital that enabled the Enterprise's public-official relationships, and received financial benefit from the tax sale operations. His financial contributions to Schleifer constitutes financial transactions made pursuant to a mutual understanding that official facilitation would follow. The WhatsApp group with Schaffel, Schleifer and other Wilheim agents reflects

34

Ronald Wilheim's leadership role regarding the Enterprise's operations, and that Wilheim receives financial benefits from the operation.

112. Each Defendant's participation in the conspiracy was a direct and proximate cause of Plaintiff's injury. Plaintiff is entitled to treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

## COUNT III

## DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS OF LAW

### 42 U.S.C. § 1983 — Fourteenth Amendment

(Against Defendants Cogen, Conaway, McQueen, and Holman)

113. Plaintiff incorporates by reference each allegation set forth in paragraphs 1 through 111 as if fully restated herein.

114. 42 U.S.C. § 1983 provides a cause of action against any person who, under color of state law, deprives another of rights, privileges, or immunities secured by the Constitution or laws of the United States.

115. The Fourteenth Amendment prohibits any state from depriving a person of property without due process of law. A protected property interest exists where a person has a legitimate claim of entitlement to a benefit under state law.

116. Plaintiff Gomez had a constitutionally protected property interest in 229 N. Monroe Street, further secured by Maryland's tax sale statutory scheme, which prescribes specific procedural requirements before any property interest may be extinguished.

117. Defendant Conaway, acting under color of state law in his capacity as Clerk of the Circuit Court, deprived Gomez of his protected property interest by issuing a Writ of Possession before Vertex had established statutory entitlement to such relief. Maryland's tax sale statutory scheme — specifically §§ 14-836(a) and 14-850 — expressly conditions issuance of a Writ of Possession on satisfaction of statutory prerequisites, including acquisition of a deed. By issuing the writ without confirming those prerequisites, Conaway set in motion the chain of events leading to the unlawful eviction and denied Gomez the procedural protections to which he was entitled. This violation was clearly established: Conaway's office had issued premature Writs of Possession to Vertex in at least six prior cases, each subsequently found improper by a judge, and issued a replacement writ within two hours of a judge quashing the prior writ on March 4, 2026. That pattern establishes actual notice that the office's conduct was constitutionally and statutorily impermissible. No reasonable official in Conaway's position could have believed otherwise.

118. Defendant Cogen, acting under color of state law in his capacity as Baltimore City Sheriff, deprived Gomez of his protected property interest by permitting — and upon information and belief, directing — the regularized practice through which Vertex obtained preferential eviction scheduling access outside standard protocols, eliminating the procedural buffer that ordinary scheduling processes provide to property owners. Defendant Cogen also, upon information and belief, ordered the unlawful March 18 eviction executed by Defendant McQueen.

119. Defendant McQueen, acting under color of state law, deprived Gomez of procedural due process by presenting eviction notice on March 6, 2026 under a quashed writ of possession, and by executing the March 18, 2026 eviction using that same quashed writ. The

constitutional violations of both Cogen and McQueen were clearly established. No reasonable officer could believe that executing a writ a judge had already nullified was constitutionally permissible — McQueen's conduct admits no good-faith defense. Cogen's supervisory liability is equally outside qualified immunity: the pattern of preferential scheduling and the specific sequence of events surrounding March 18 reflects deliberate indifference to clearly established rights, not a mistaken judgment made in good faith.

120. Defendant Holman, acting under color of state law in her capacity as an employee of the Baltimore City Sheriff's Office, deprived Gomez of his protected property interest by scheduling the March 18 eviction through a standing, non-standard arrangement with Vertex that circumvented the procedural protections applicable to all other parties. No reasonable Sheriff's Office employee could have believed that providing a private tax sale investor with such preferential access was consistent with her constitutional obligations to the property owners those evictions affected.

121. The deprivations described in this Count were not isolated or unauthorized acts. Defendant Holman's provision of direct personal scheduling access to Vertex was a standing practice. Defendant Conaway's office issued premature Writs of Possession to Vertex in at least six documented cases prior to the matter at bar. These facts reflect an established institutional pattern within both the Baltimore City Sheriff's Office and the Office of the Clerk of the Circuit Court of affording Vertex preferential treatment and access to official processes unavailable to other parties.

122. Each Defendant's conduct was willful, intentional, and undertaken with deliberate indifference to Gomez's constitutionally protected rights.

37

123. As a direct and proximate result, Plaintiff suffered the loss of property, displacement, emotional distress, and economic harm. Plaintiff is entitled to compensatory damages, punitive damages against the individual defendants, and attorney's fees pursuant to 42 U.S.C. § 1988.

**COUNT IV**

**UNLAWFUL SEIZURE OF PROPERTY**

**42 U.S.C. § 1983 — Fourth Amendment**

(Against Defendants Cogen, McQueen, Holman and Conaway)

124. Plaintiff incorporates by reference each allegation set forth in paragraphs 1 through 124 as if fully restated herein.

125. The Fourth Amendment protects against unreasonable seizures of property. A seizure of property occurs when the government meaningfully interferes with an individual's possessory interests in that property.

126. The March 18, 2026 eviction constituted a seizure of Gomez's property and all property contained therein. The seizure was unreasonable because: (a) it was executed after an explicit assurance from the Sheriff's Office that no eviction would occur on that date; (b) it was executed without lawful notice (c) it was executed outside of standard protocols and (d) Sheriff McQueen executed the eviction using a quashed Writ of Possession.

127. Defendant Cogen, as the elected Sheriff of Baltimore City, is responsible for the policies, practices, and official acts of the Sheriff's Office. On information and belief, the actions of Holman and McQueen were approved by Sheriff Cogen. The March 18, 2026 eviction —

38

executed after the eviction was removed from the Sheriff's Office public schedule, and in direct contradiction of multiple written assurances given to Gomez's representative — is consistent with a directive to act in Vertex's interest outside ordinary legal and procedural channels.

128. Defendant McQueen, acting under color of state law in his capacity as the deputy sheriff who personally presented and executed the March 18, 2026 eviction, is directly liable for the unreasonable seizure. McQueen executed the eviction using a Writ of Possession that had been quashed on March 4, 2026 and was void on the date of the eviction. A reasonable officer in McQueen's position would have known that executing an eviction using a writ that had been quashed, was constitutionally impermissible.

129. Defendant Holman, acting under color of state law, participated in the unreasonable seizure by scheduling the eviction through a non-standard, preferential channel outside ordinary Sheriff's Office protocols. Holman's scheduling of the eviction was the operational mechanism by which the March 18, 2026 eviction was arranged and executed at Vertex's convenience, in circumvention of the procedures applicable to all other parties. Holman thereby participated meaningfully in the government action that constituted an unreasonable seizure of Gomez's property.

130. Defendant Conaway, acting under color of state law, participated in the unreasonable seizure through his office's issuance of Writs of Possession to Vertex without legal justification. Moreover, as previously alleged, on March 4, 2026 Conaway's office issued a new Writ of Possession to Vertex within hours of a writ just being quashed. This was not an isolated occurrence: Conaway's office issued premature writs to Vertex in at least six other

documented cases before statutory prerequisites had been satisfied, and Conaway failed to respond to written communications raising these violations

131.  As a direct and proximate result, Plaintiff was wrongfully dispossessed of his property. Plaintiff is entitled to compensatory damages, punitive damages, and attorney's fees pursuant to 42 U.S.C. § 1988.

## COUNT V

## CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS

## 42 U.S.C. § 1985(3)

(Against Defendants Vertex, Schaffel, Tessler, Cogen, Conaway, McQueen, Holman, Wilheim, and Schleifer)

132.  Plaintiff incorporates by reference each allegation set forth in paragraphs 1 through 131 as if fully restated herein.

133.  Section 1985(3) prohibits two or more persons from conspiring to deprive any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, where the conspiracy is motivated by class-based discriminatory animus.

134.  Defendants named in this Count conspired with one another to deprive Gomez of his constitutionally protected property rights through the coordinated acts described herein — the issuance of premature writs, the execution of an unlawful eviction, the premature transfer of deed, and the use of official authority to advance Vertex's interests against Gomez.

40

135. The conspiracy was motivated by class-based discriminatory animus directed at minority property owners in Baltimore City. This animus is established by the following allegations, taken together:

(a) **Targeted geographic concentration.** Every single property Vertex acquired in the 2024 tax sale is in a majority-minority census tract. The Black population in each of those tracts ranges from 88% to 97%, although Blacks only comprise 63% of the Baltimore City population. Vertex systematically targets the most heavily Black neighborhoods in Baltimore.

(b) **Plaintiff's membership in a protected class.** Plaintiff Fausto Gomez is a Latino individual, protected from discriminatory housing practices under 42 U.S.C. § 3604. The Enterprise's selection of his property is consistent with the Enterprise's pattern of targeting minority property owners.

(c) **Awareness of discriminatory impact.** The discriminatory impact of Baltimore City's tax sale system on minority property owners has been the subject of public litigation, advocacy, and press coverage, including the federal constitutional challenge in *Edmondson Community Organization v. Mayor and City Council of Baltimore*. Schleifer, Cogen, and Conaway, knew or should have known about this documented disparate impact and on information and belief chose to exploit and amplify it through the Enterprise's operations rather than remediate it.

(d) **Systematic denial of procedural protections.** The Enterprise's practice of issuing premature writs, executing evictions through non-standard channels, and litigation designed to intimidate and overwhelm defendants were executed to deny minority property

41

owners the procedural protections that Maryland's tax sale statute expressly provides. The systematic circumvention of these protections, concentrated in minority neighborhoods, reflects discriminatory purpose.

136. The conspiracy involved both state actors (Cogen, Conaway, Holman, and McQueen) and private parties (Vertex, Schaffel, Tessler, and the Wilheim Entities) acting in concert, satisfying the requirement that § 1985(3) reach mixed public-private conspiracies.

137. Defendant Schleifer participated in the § 1985(3) conspiracy through his financial and political relationships with Enterprise members and his exercise of official influence to protect and advance the Enterprise's operations. His direct financial relationship with Schaffel (the 2019 property sale), his political relationship with Cogen (whose office was the instrument of the eviction), his receipt of financial benefits from Ronald Wilheim and family, and his participation on information and belief in the WhatsApp communications coordinating tax sale activities collectively establish his agreement to participate in the conspiracy. As with Count II, Schleifer's § 1985(3) liability attaches upon proof of his agreement to the conspiracy's object — the deprivation of minority property owners' equal protection rights through the coordinated scheme.

138. As a direct and proximate result of the conspiracy, Gomez was deprived of his property and equal protection of the laws. Plaintiff is entitled to compensatory damages, punitive damages, and fees pursuant to 42 U.S.C. § 1988.

## COUNT VI

## NEGLECT TO PREVENT CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS

## 42 U.S.C. § 1986

42

(Against Defendants Cogen, Conaway, McQueen, and Blendy)

139. Plaintiff incorporates by reference each allegation set forth in paragraphs 1 through 138 as if fully restated herein.

140. Section 1986 imposes liability on any person who, having knowledge that any of the wrongs conspired to be done and mentioned in § 1985 are about to be committed, and having the power to prevent or aid in preventing the commission of the same, neglects or refuses to do so.

141. Defendant Cogen had actual, documented knowledge of the § 1985 conspiracy and of the specific acts about to be committed against Gomez. Cogen was copied on the notification that the Writ of Possession had been quashed and the eviction confirmed as cancelled, on the subsequent notification that a void eviction notice had been delivered to Gomez, and on the reconfirmation that the eviction was cancelled — giving him actual notice that the March 18, 2026 eviction was unlawful. As the elected Sheriff of Baltimore City with direct command authority over all Sheriff's Office personnel, Cogen had the power to prevent the eviction with a single instruction to his subordinates. Cogen neglected and refused to take any corrective action, and the eviction proceeded using a quashed writ as its stated legal authority.

142. Defendant Conaway, on information and belief, had knowledge of the § 1985 conspiracy described in Count V through: (a) his awareness of the systematic pattern of premature writ issuance by his office across at least six documented cases; (b) his receipt of written communications raising these issues to which he failed to respond; (c) his political and institutional relationships with the other public official defendants; and (d) his office's

43

issuance of a third writ to Vertex within approximately ninety minutes of the second being quashed on March 4, 2026. This pattern is consistent with knowing participation in or willful blindness to the coordinated scheme.

143. As the elected Clerk of the Circuit Court for Baltimore City, Conaway had the power to prevent the conspiracy by directing his office to cease issuing Writs of Possession to Vertex before the statutory prerequisites were satisfied. Despite that power, Conaway neglected and refused to do so.

144. Defendant McQueen had actual, firsthand knowledge that the March 18, 2026 eviction was being executed using a quashed Writ of Possession. As the Sheriff's deputy who personally presented and executed the writ on March 18, 2026, McQueen was in direct possession of the instrument he knew or should have known had been quashed on March 4, 2026. Although McQueen acted as a subordinate within the Sheriff's Office chain of command, he retained the power and authority to refuse to execute a facially invalid writ — an authority that inheres in every law enforcement officer as a matter of constitutional obligation and that no superior officer can lawfully abrogate. Despite that authority, McQueen proceeded with the eviction, physically removing Gomez from the Property using a writ that provided no lawful basis for that action.

145. Defendant Blendy, Assistant Sheriff and Legal Advisor, Baltimore City Sheriff's Office had actual, documented knowledge that the March 18, 2026 eviction had been executed using a quashed Writ of Possession as its stated legal authority. On March 19, , Blendy received written electronic communications documenting in detail that: (a) the writ McQueen presented had been quashed on March 4, 2026; (b) the eviction had been confirmed as cancelled on multiple occasions; and (c) the eviction had proceeded on March 18, 2026

44

notwithstanding all of the above. As Assistant Sheriff, Blendy held supervisory authority within the Baltimore City Sheriff's Office and had the power to initiate corrective action, order an investigation, restore Gomez's access to the Property, or refer the matter to appropriate authorities. Despite receiving this documentation and possessing that authority, Blendy responded only with "I confirm receipt of this email" and apparently took no corrective action of any kind.

146.   As a direct and proximate result of each named Defendant's neglect to prevent the conspiracy, Gomez suffered the wrongs described herein. Plaintiff is entitled to compensatory damages and attorney's fees pursuant to 42 U.S.C. § 1988 against each Defendant named in this Count.

## COUNT VII

## INTERFERENCE WITH FAIR HOUSING RIGHTS

**Fair Housing Act — 42 U.S.C. §§ 3604 and 3617**

(Against Vertex TL LLC, Yisroel Schaffel, Steven Tessler, Samuel Cogen, Xavier Conaway, Glenda Homan, Earl McQueen, Yitzchok Isaac "Yitzy" Schleifer, and Ronald Wilheim)

147.   Plaintiff incorporates by reference each allegation set forth in paragraphs 1 through 146 as if fully restated herein.

148.   The Fair Housing Act prohibits discrimination in the sale, rental, or terms and conditions of housing on the basis of race, color, national origin, or other protected characteristics. 42 U.S.C. § 3604. Section 3617 separately prohibits coercing, intimidating, threatening, or interfering with any person in the exercise or enjoyment of rights granted or protected by

45

the FHA. The right protected here is Plaintiff's right under § 3604(a) not to have his dwelling made unavailable on account of his national origin, and his right under § 3604(b) to equal terms and conditions in the administration of the tax sale process.

149. Plaintiff Gomez is a member of a protected class. As a Latino individual, he is protected from discriminatory housing practices on the basis of national origin under 42 U.S.C. § 3604.

150. **Disparate Impact — Systemic.** Baltimore City's tax sale system has a disparate impact on minority homeowners. An analysis of ATTOM and U.S. Census Bureau data found that approximately 92% of the nearly 44,000 Baltimore properties listed at municipal tax sales from 2019 through 2021 were located in majority-nonwhite neighborhoods — which account for only 70% of parcels citywide. Independent investigations by the Baltimore Banner and Maryland Volunteer Lawyers Service confirm this pattern, the latter characterizing the system as resulting in wealth extraction from Baltimore's Black communities. This disproportionate impact constitutes discriminatory effect under the FHA. *Texas Dep't of Housing & Community Affairs v. Inclusive Communities Project, Inc.,* 576 U.S. 519 (2015).

151. **Disparate Impact — Vertex Specifically.** The disparate impact of Baltimore's tax sale system is not only systemic but is reproduced and amplified in Vertex TL LLC's specific acquisition pattern. 100% of the properties acquired by Vertex TL LLC in the 2024 Baltimore City tax sale are in majority-minority neighborhoods, higher than the City average of 92%. 20 of those 26 properties are in census tracts where the non-white population exceeds 90%. The geographic concentration of Vertex's acquisitions in

46

communities of color is not coincidental — it is the operational signature of a predatory enterprise that specifically targets minority homeowners.

151.A.

Intentional Discrimination. Alternatively, and independently of the disparate impact theory, the evidence supports an inference of intentional discrimination under the *Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252 (1977)*. Vertex, through Tessler, has filed approximately 300 foreclosure actions, concentrated in majority-minority neighborhoods. Vertex does not passively receive whatever certificates the City auctions — it selects, bids, and acquires strategically. Its legal model is specifically targeted at majority-minority neighborhoods because those neighborhoods were and are subject to racist policies that have left residents with diminished financial reserves, reduced access to legal counsel, and weakened capacity to mount effective defenses.

152. Section 3617 — Interference and Retaliation. Independently of the disparate impact and intentional discrimination theories, Defendants violated 42 U.S.C. § 3617 by interfering with Plaintiff Gomez's exercise of his FHA-protected rights. Gomez was exercising his right under § 3604(a) to retain his dwelling.

153. As a direct and proximate result of Defendants' FHA violations, Gomez suffered the loss of his property and all associated harms. Plaintiff is entitled to actual damages, punitive damages, injunctive relief, declaratory relief, and attorney's fees pursuant to 42 U.S.C. § 3613 and 28 U.S.C. § 2201.

## COUNT VIII

### MARYLAND CONSTITUTIONAL TORT

**Maryland Declaration of Rights, Articles 19, 24, and 26**

47

(Against Defendants Cogen, Conaway, Schleifer, McQueen, and Holman)

154. Plaintiff incorporates by reference each allegation set forth in paragraphs 1 through 153 as if fully restated herein.

155. The Maryland Declaration of Rights guarantees fundamental protections against governmental deprivation of life, liberty, and property. Article 19 provides that every person, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the Land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay. Article 24 provides that no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land. Article 26 provides that all warrants, without oath or affirmation, to seize any person or property, are grievous and oppressive, and that seizures executed without lawful basis are illegal and ought not to be granted.

156. These constitutional guarantees are enforceable through a common law action for damages. Under Article 5 of the Maryland Declaration of Rights, the inhabitants of Maryland are entitled to the Common Law of England. Under the English common law, violations of rights preserved by fundamental documents were treated as trespasses giving rise to traditional actions for damages. Accordingly, where an individual is deprived of his liberty or property interests in violation of Articles 24 and 26, he may enforce those rights by bringing a common law action for damages.

157. Article 19 independently supports a damages remedy on the facts presented here. Article 19's guarantee of remedy "fully without any denial, and speedily without delay, according to

48

the Law of the Land" is substantive, not merely procedural — it prohibits official conduct structured to ensure that a constitutional deprivation is consummated before judicial redress becomes available. By executing an eviction on a void writ after explicit assurances that no eviction would occur, and through scheduling arrangements that circumvented standard procedures, Defendants did not merely injure Gomez: they destroyed his ability to obtain remedy before suffering irreversible harm.

158. No defendant named herein is entitled from immunity liability, because their actions were outside of the scope of lawful public duties, constituted malice and/or gross negligence and to the extent any Defendant is characterized as a local government official rather than state personnel subject to the MTCA, local governmental entities and their agents have no immunity from Maryland constitutional tort claims.

159. Defendant Conaway violated Articles 19 and 24 by issuing Writs of Possession before the statutory prerequisites were satisfied, depriving Gomez of his protected property interest without due process and without any adequate remedy.

160. Defendant Cogen violated Articles 19, 24, and 26 by allowing, and upon information and belief ordering, the March 18, 2026 eviction on the basis of a quashed writ and after an explicit assurance that no eviction would occur, constituting an unreasonable seizure of property and a deprivation of property without due process.

161. Defendant Schleifer violated Article 19 by using his official position to facilitate a scheme that caused injury to Gomez's property, and by neglecting to exercise his official authority to prevent the constitutional violations described herein when he had knowledge and power to do so.

49

162. Defendant McQueen violated Articles 19 and 26 of the Maryland Declaration of Rights by personally executing an unreasonable seizure of Gomez's property on March 18, 2026 using a quashed Writ of Possession as his stated legal authority.

163. Defendant Holman violated Article 19 of the Maryland Declaration of Rights by causing injury to Gomez's property through her role as the operational facilitator of the unlawful eviction. Holman's non-standard scheduling arrangement with Vertex was an indispensable link in the causal chain that produced Gomez's dispossession.

164. As a direct and proximate result, Plaintiff suffered the harms described herein. Plaintiff is entitled to compensatory and punitive damages under Maryland law.

### COUNT IX

### COMMON LAW FRAUD

**Maryland Common Law**

(Against Defendants Vertex, Schaffel, Tessler and McQueen)

165. Plaintiff incorporates by reference each allegation set forth in paragraphs 1 through 164 as if fully restated herein.

166. Under Maryland law, fraud requires: (1) a false representation of a material fact; (2) its falsity; (3) the defendant's knowledge of its falsity or reckless disregard for its truth; (4) intent to deceive; (5) the plaintiff's right to rely on it; and (6) resulting damages.

167. **Defendants Tessler, Vertex, and Schaffel** made false representations of material fact directly to Plaintiff Gomez, and other property owners, by causing eviction notices to be

50

served upon them representing that Vertex possessed valid legal authority to take possession of the Property when no such authority existed.

168. **Defendant McQueen** made false representations of material fact directly to Plaintiff Gomez, and, on information and belief, other property owners, by using a quashed writ of possession as an instrument to legitimize an eviction.

169. Plaintiff's loss of his property was a direct and foreseeable result of Defendants' fraudulent conduct. Plaintiff is entitled to actual damages and punitive damages reflecting the willful and malicious nature of the fraud.

## COUNT X

## TORTIOUS INTERFERENCE WITH PROPERTY RIGHTS

### Maryland Common Law

(Against Defendants Cogen, Conaway, McQueen, Holman, Vertex, Schaffel, and Tessler)

170. Plaintiff incorporates by reference each allegation set forth in paragraphs 1 through 169 as if fully restated herein.

171. Maryland law recognizes a cause of action for tortious interference with property rights where a defendant, without legal justification or privilege, intentionally interferes with a plaintiff's lawful possessory or ownership interest in property, causing damage.

172. Plaintiff Gomez had a lawful possessory interest in 229 N. Monroe Street, protected by Maryland's tax sale statutory scheme. That interest was a recognized property right entitled to legal protection.

51

173. Defendants Vertex, Schaffel, and Tessler intentionally interfered with that property interest by: (a) obtaining a Writ of Possession before Vertex had established statutory entitlement; (b) scheduling an eviction through unofficial channels outside standard protocol; (c) proceeding with the March 18, 2026 eviction despite the above; and (d) locking and securing the Property following the eviction, preventing Gomez from re-accessing his property while his legal rights remained unresolved.

174. These acts were without legal justification. No valid, enforceable legal right to possession existed on March 18, 2026.

175. Defendants Cogen, Conaway, McQueen, and Holman, acting under color of state law and in concert with private Enterprise members, also intentionally interfered with Gomez's lawful possessory interest in the Property. Their acts were intentional, calculated to cause damage to Gomez's property interests, and done without legal justification constituting malice. Each named official Defendant acted with evil or wrongful motive, deliberate wrongdoing, and ill will toward Gomez's property rights, as established by the facts alleged throughout this Complaint. No common law qualified immunity, MTCA immunity, or municipal official immunity shields these Defendants from liability for intentional tortious conduct of this character.

176. As a direct and proximate result, Plaintiff suffered the loss of his property, displacement, loss of personal property, and all associated economic and emotional harm. Plaintiff is entitled to actual damages and consequential damages.

## COUNT XI

## UNJUST ENRICHMENT

## Maryland Common Law

### (Against Defendants Vertex and Schaffel)

177. Plaintiff incorporates by reference each allegation set forth in paragraphs 1 through 176 as if fully restated herein.

178. Under Maryland law, unjust enrichment requires: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) acceptance or retention of the benefit by the defendant under circumstances that make it inequitable to retain the benefit without payment of its value.

179. Plaintiff Gomez conferred a benefit upon Vertex and Schaffel — specifically, the property interest in 229 N. Monroe Street and the economic value of that property — through the involuntary and unlawful dispossession described herein. Vertex and Schaffel were aware of and appreciated this benefit, having deliberately orchestrated the scheme to acquire it.

180. Vertex and Schaffel accepted and retained the benefit by selling the Property to Colorado residents for $190,000, generating proceeds to which they were not legally entitled given that the eviction and property acquisition were accomplished through unlawful means.

181. It is inequitable and unjust for Vertex and Schaffel to retain the proceeds of the Property sale — or any portion thereof representing the benefit wrongfully obtained from Gomez — without compensating Gomez for the value of which he was deprived.

182. Plaintiff is entitled to disgorgement of the proceeds of the Property sale, or such portion thereof as the Court determines reflects the unjust enrichment of Vertex and Schaffel at Gomez's expense, together with any profits derived therefrom.

## COUNT XII

## CIVIL CONSPIRACY

### Maryland Common Law

(Against Vertex TL LLC, Yisroel Schaffel, Steven Tessler, Samuel Cogen, Xavier Conaway, Glenda Homan, Earl McQueen, Yitzchok Isaac "Yitzy" Schleifer and Ronald Wilheim)

183.  Plaintiff incorporates by reference each allegation set forth in paragraphs 1 through 182 as if fully restated herein.

184.  Under Maryland law, civil conspiracy requires: (1) a confederation of two or more persons; (2) by whose concerted action; (3) an unlawful act is done or a lawful act is done by unlawful means; (4) causing damage to the plaintiff.

185.  All Defendants named herein entered into a confederation to accomplish the unlawful scheme described throughout this Complaint — the exploitation of Baltimore City's tax sale system to dispossess property owners, including Gomez, of their constitutionally and statutorily protected property rights, for the financial enrichment of Enterprise members.

186.  The confederation is evidenced by: (a) the coordinated, multi-party pattern of premature writ issuance and preferential eviction scheduling; (b) the financial relationships among Defendants; (c) the WhatsApp communications among Schaffel, Schleifer, and Wilheim family members; and (d) the regularity and consistency of the pattern across multiple cases, which is inconsistent with coincidence and consistent with coordinated action.

187.  By their concerted action, Defendants committed the unlawful acts described herein — including fraud, unconstitutional seizure, extortion under color of official right, and

violations of Maryland statutes governing the tax sale process — causing Gomez the loss of his property and all associated damages.

188. Plaintiff is entitled to compensatory and punitive damages from all Defendants, jointly and severally.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Fausto Gomez respectfully requests the following relief:

### I. Relief Sought from the Jury

(A) Damages in an amount to be determined at trial, reflecting Plaintiff's loss of his property, displacement costs, emotional distress, loss of sense of security from victimization through unlawful acts of law enforcement, lost economic opportunity, and all other actual damages caused by Defendants' conduct;

(B) Treble damages caused by Defendants' racketeering activity, pursuant to 18 U.S.C. § 1964(c);

(C) Punitive damages against the individual Defendants in amounts sufficient to punish their willful, malicious, and recklessly indifferent conduct and to deter similar misconduct in the future;

(D) Punitive damages under the Fair Housing Act on Count VII, in an amount reflecting the severity and pattern of Defendants' discriminatory conduct;

(E) Actual damages under the Fair Housing Act on Count VII pursuant to 42 U.S.C. § 3613(c)(1), including: loss of Plaintiff's dwelling and all economic harm flowing therefrom; damages for humiliation, embarrassment, and emotional distress arising from Defendants'

discriminatory interference with Plaintiff's federally protected housing rights; and damages reflecting the indignity and dignitary harm suffered by Plaintiff as a Latino property owner subjected to a predatory scheme that systematically targeted minority property owners;

## II. Relief Sought from the Court

(F) A constructive trust imposed on Vertex, Tessler and Schaffel's proceeds from the sale of 229 N. Monroe Street and from any other property transactions since April 2024, including any such proceeds distributed or payable to members, equity investors, private entities, or profit participants in Vertex TL LLC in their capacity as such, including YAS Consulting LLC, as a preservative measure to maintain the availability of those assets pending the jury's determination of Plaintiff's legal claims and the Court's subsequent resolution of any equitable remedies;

(G) An order pursuant to 18 U.S.C. § 1964(a) enjoining Vertex TL LLC, Yisroel Schaffel & Steven Tessler from acquiring any further tax sale certificates or interests in real property pending the resolution of this action and satisfaction of any judgment entered herein;

(H) An order restoring Plaintiff Fausto Gomez to possession of 229 N. Monroe Street, which relief is sought independently of and without prejudice to Plaintiff's rights in the pending state appellate proceedings, or, to the extent restoration of possession is not practicable due to the pending nature of those proceedings, an order directing Defendants Vertex and Schaffel pay to Plaintiff fair-value of rents, profits, and proceeds from the Property since March 18, 2026;

56

(I) A preliminary and permanent injunction prohibiting Defendants Vertex, Schaffel, and Tessler from scheduling, pursuing, or executing any further evictions of property owners in connection with tax sale proceedings pending the resolution of this action;

(J) A preliminary and permanent injunction prohibiting Defendant Conaway and the Office of the Clerk of the Circuit Court for Baltimore City from issuing Writs of Possession in tax sale foreclosure cases to any party that has not demonstrated satisfaction of all statutory prerequisites under Maryland Tax-Property Article §§ 14-836 and 14-850, and requiring the Clerk's Office to implement written procedures sufficient to ensure compliance with those prerequisites prior to writ issuance;

(K) Injunctive relief under the Fair Housing Act, 42 U.S.C. § 3613(c)(1), including an order requiring Defendants to provide written notice to all persons dispossessed through the Enterprise's operations from April 2024 to the present of the pendency of this action and of their right to seek relief;

(L) A preliminary order pursuant to 18 U.S.C. § 1964(a) requiring Defendant Ronald Wilheim, and any entity in which he holds, directly or indirectly, an ownership interest of five percent or more, a management role, or a right to share in profits or distributions, to disclose to the Court, all existing relationships with any company or entity that engages in tax sale certificate acquisitions, tax sale foreclosure proceedings, or tax-sale-related property dispositions in the State of Maryland, including: (i) the identity and corporate structure of each such entity; (ii) the nature and extent of the disclosing party's ownership, management, or financial interest therein; (iii) the identity of all other principals, members, and investors; and (iv) the geographic scope of the entity's intended or actual operations; and further requiring disclosure to the Court within thirty days of the formation or acquisition of any

new relationship with any such entity after the date of judgment; such disclosure obligations to continue for a period of not less than five years from the date of judgment;

(M) A declaratory judgment that the March 18, 2026 eviction of Plaintiff from 229 N. Monroe Street was unlawful and without legal authority and that Plaintiff's possessory interest in the Property was not lawfully extinguished by the eviction or by any act of Defendants in connection therewith;

(N) Costs of suit pursuant to 28 U.S.C. § 1920, and, to the extent Plaintiff is represented by counsel at any stage of this proceeding, reasonable attorney's fees pursuant to 42 U.S.C. § 1988, 18 U.S.C. § 1964(c), and 42 U.S.C. § 3613;

(O) Pre- and post-judgment interest at the maximum rate permitted by law; and

(P) Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff respectfully demands a trial by jury on all issues triable of right by jury, including without limitation all claims for compensatory damages, treble damages, and punitive damages under Counts I through XII. Plaintiff does not demand a jury trial on claims for injunctive relief, declaratory judgment, constructive trust, or the disclosure order sought in paragraph (L), which Plaintiff submits to the Court for determination. Plaintiff further requests that the Court act on the preliminary relief sought in paragraphs (F), (G), (I), (J), and (L), without awaiting the jury's resolution of Plaintiff's legal claims, as such relief is sought to preserve assets, prevent ongoing harm, and maintain the availability of information necessary to the just resolution of this action. To the extent any equitable and legal claims involve overlapping factual issues, Plaintiff requests

that the Court submit those factual issues to the jury before resolving any permanent equitable relief.

Respectfully submitted,

Fausto Gomez

9315 Oak White Rd., Nottingham, MD 21236

443-627-0201

FaustoGomez3080@hotmail.com

Dated: 04 / 14 / 2026