## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MARYLAND

**HD**

Rcv'd by: _____

FAUSTO GOMEZ,

      Plaintiff,

USDC- BALTIMORE
'26 AUG 4 AM 10:10

                          Civil Action No. 1:26-cv-01445-MJM

v.

YISROEL ARYEH SCHAFFEL, et al.,

      Defendants.

# SECOND AMENDED COMPLAINT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

FAUSTO GOMEZ
9315 Oak White Rd.
Nottingham, MD 21236

*Plaintiff,*

—v—

YISROEL ARYEH "ARI" SCHAFFEL
2814 Hanson Ave
Baltimore City, MD 21209

and

VERTEX TL LLC
C/O Registered Agents Inc
5000 Thayer Center, Ste C
Oakland, MD 21550

(Garrett County)

and

STEVEN TESSLER
2833 Smith Ave., #138
Baltimore City, MD 21209

and

EARL McQUEEN
Baltimore City Sheriff's Office
111 N. Calvert St.
Baltimore City, MD 21202

and

GLENDA HOLMAN
Baltimore City Sheriff's Office
100 N. Calvert St., Room 104
Baltimore City, MD 21202

and

XAVIER CONAWAY
Baltimore City Circuit Court Clerk
Elijah E. Cummings Courthouse, Room 412
111 North Calvert Street
Baltimore City, MD 21202

and

KENYATTA WASHINGTON
Baltimore City Sheriff's Office
111 N. Calvert St.

Civil Action No. 1:26-cv-01445-MJM

1

Baltimore City, MD 21202

and

YITZCHOK ISAAC "YITZY" SCHLEIFER
6712 Westbrook Rd
Baltimore City, MD 21215

and

MOHAMED DAHAN SHAHBAIN
4225 S Buckley Rd
Aurora, CO 80013

and

HADAF ANWAR ALSAMET
4225 S Buckley Rd
Aurora, CO 80013

and

MOHAMED ABDO ALNISAFI
4225 S Buckley Rd
Aurora, CO 80013

and

JOHN DOES 1–10

*Defendants.*

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Fausto Gomez, pro se, files this Second Amended Complaint against the Defendants and states as follows:

## INTRODUCTION

1. Plaintiff Fausto Gomez was the lawful occupant and possessor of 229 N. Monroe Street, Baltimore, Maryland 21223 ("the Property"). He operated a deli and convenience store on the ground floor, maintained an apartment on the upper floor, and used the basement as a living space.

2. On March 18, 2026, employees of the Baltimore City Sheriff's Office evicted Plaintiff from the Property at the direction of "the private Defendants": Vertex TL LLC (the tax-sale investor); Yisroel Aryeh "Ari" Schaffel (its principal); Steven Tessler (attorney for Vertex TL

2

LLC and for the buyers named below); and Mohamed Dahan Shahbain, Hadaf Anwar Alsamet, and Mohamed Abdo Alnisafi (the individuals to whom the investor sold the Property before the eviction). The eviction dispossessed Plaintiff of the building, its contents, and his ability to operate his business.

3. The eviction was unlawful for at least three reasons. First, the eviction occurred without the notice required by Md. Code, Tax-Prop. § 14-836(b)(7). Second, the eviction occurred without the notice required by Baltimore City Code Article 13 § 8B-2. Third, the Defendants executed the eviction on a writ of possession a judge had quashed.

4. The eviction was also unlawful because it was carried out by surprise. Prior to the eviction, Sheriff's Office personnel gave Plaintiff multiple assurances that no eviction would occur on March 18. They also removed the Property from the Sheriff's Office's official eviction website, which Baltimore residents rely on to track scheduled evictions. Plaintiff did not know the eviction would occur on March 18.

5. Because the eviction was a surprise, all of Plaintiff's personal and business property was still inside the building when the sheriff arrived. Plaintiff lost merchandise, cash, and refrigeration units. He lost furniture, electronics, and items of sentimental value. He lost personal documents, including tax returns bearing his Social Security number. He was also left exposed to liability for property inside the building that he did not own but was responsible for, including a point-of-sale system and an ATM.

6. When Plaintiff asked for his belongings back, Defendant Tessler, the private Defendants' attorney, refused. Tessler stated he would return Plaintiff's property only if Plaintiff dismissed

3

his pending appeal to reclaim title to the Property and waived all future legal claims relating to the Property.

7. As of August 3, 2026, the Sheriff's Office has not filed the legally required post-eviction paperwork with the Baltimore City Circuit Court. Plaintiff believes the paperwork has not been filed because the Sheriff's Office employees know the eviction was illegal and do not want a record of it in publicly accessible court files.

## JURISDICTION AND VENUE

8. This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiff's federal civil-rights claims, and under 18 U.S.C. § 1964 over his civil RICO claims. The Court has supplemental jurisdiction over his related state-law and Maryland constitutional claims under 28 U.S.C. § 1367.

9. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred here.

## THE PARTIES

10. Plaintiff Fausto Gomez is an individual who was the possessor and occupant of 229 N. Monroe Street, Baltimore, Maryland, where he operated his deli and convenience store and maintained a residential apartment.

11. Defendant Vertex TL LLC ("Vertex") is a private entity that acquires Baltimore City tax-sale certificates and pursues foreclosure and eviction of the affected property owners, including Plaintiff. Upon information and belief, Vertex employees receive bonuses for achieving quarterly or annual revenue targets.

4

12. Defendant Yisroel Aryeh "Ari" Schaffel is a principal and operator of Vertex. Upon information and belief, Defendant Schaffel directs the strategy and actions of Vertex and Defendant Tessler.

13. Defendant Steven Tessler is the attorney for Vertex and for Defendants Shahbain, Alsamet, and Alnisafi, the individuals who bought the deed to the Property from Vertex. Tessler obtained an unlawful writ of possession for the Property from the Clerk's office and, together with the Sheriff's Office, executed the unlawful eviction on behalf of his clients. Upon information and belief, Tessler is paid a percentage of Vertex's profits.

14. Defendant Earl McQueen is a Deputy Sheriff of Baltimore City who executed the March 18, 2026 eviction using a writ of possession that a judge had quashed. He is sued in his individual capacity.

15. Defendant Glenda Holman is an employee of the Baltimore City Sheriff's Office who served as Vertex's point of contact for scheduling evictions. She afforded Vertex preferential eviction scheduling, which aided it in scheduling and executing evictions before notice requirements were met. She is sued in her individual capacity.

16. Defendant Xavier Conaway is the Clerk of the Circuit Court for Baltimore City. Under Conaway's leadership, the Court Clerk's office unlawfully issued numerous writs of possession. He is sued in his individual capacity.

17. Defendant Kenyatta Washington is a Lieutenant with the Baltimore City Sheriff's Office. He is Defendant McQueen's supervisor. Washington gave Plaintiff multiple assurances that the eviction would not take place on March 18 and refused to stop the eviction when it was underway, even though it was within his power. Washington is sued in his individual capacity.

5

18. Defendant Yitzchok Isaac "Yitzy" Schleifer is an elected member of the Baltimore City Council. Upon information and belief, Schleifer facilitated and quarterbacked the corrupt, favorable treatment of Vertex by the Baltimore City Sheriff's Office and others, and he is named as a Defendant in the conspiracy claims on that basis. He is sued in his individual capacity.

19. Defendants Mohamed Dahan Shahbain, along with Defendants Alsamet and Alnisafi, purchased the deed for 229 N. Monroe from Vertex on December 3, 2025.

20. Defendant Hadaf Anwar Alsamet, along with two other Defendants, purchased the deed for 229 N. Monroe from Vertex on December 3, 2025.

21. Defendant Mohamed Abdo Alnisafi, along with two other Defendants, purchased the deed for 229 N. Monroe from Vertex on December 3, 2025.

22. John Does 1–10 are unknown persons who may have participated in the unlawful acts and conspiracy, and whose identities may be uncovered in discovery. After discovery, Plaintiff may seek leave to add them to the suit under Rule 15.

**Maryland Tax-Sale Law and Baltimore City Code: Notice Requirements for Taking Possession**

23. In 2024, Defendant Vertex acquired a tax-sale certificate for 229 N. Monroe Street and on March 6, 2025 obtained a judgment foreclosing Plaintiff's right of redemption. Under Maryland and Baltimore City law, a judgment alone does not entitle a party to take possession of a property.

6

24. To take possession, a tax-sale foreclosure plaintiff like Vertex must first pay certain costs to the Baltimore City Department of Finance. Upon payment, the Department conveys a deed to the investor. Only then does the investor become entitled to a writ of possession.

25. With a writ in hand, the tax-sale investor must then provide the property owner with notice, in accordance with the law, before the writ may be executed.

26. Baltimore City Code Article 13 § 8B-2 states the tax-sale "foreclosure purchaser shall notify any occupant of the property of the date on which the writ of possession is first scheduled to be executed by the Sheriff." That notice must be mailed at least 14 days before the scheduled eviction and posted on the property at least 7 days before. The notice must state the eviction date. Under § 8B-3, a sheriff is prohibited from executing a writ of possession if the sheriff "reasonably believes" that the notice requirements were not met.

27. Separately, Md. Code, Tax-Prop. § 14-836(b)(7) requires the tax-sale foreclosure plaintiff give at least 30 days' written notice before taking possession of property. Within 5 days of mailing that notice, another notice must be physically posted on the property.

28. These laws were broken to evict Plaintiff.

### The Eviction

29. On December 3, 2025, Vertex obtained a deed to the Property. That same day, it conveyed the deed and title to Mohamed Dahan Shahbain, Hadaf Anwar Alsamet, and Mohamed Abdo Alnisafi. From that moment, Vertex had no possessory rights to the Property.

30. Despite holding no deed, Vertex obtained a writ of possession from the Baltimore City Court Clerk's office on January 23, 2026, and used it to schedule an eviction for March 18, 2026.

7

31. On March 4, 2026, the Circuit Court quashed the writ because Vertex was not the deed holder. That same day, Plaintiff's representative emailed Defendants Holman, Washington, and the head of the Baltimore City Sheriff's Office, Sheriff Samuel Cogen, informing them the writ had been quashed and asking that the March 18 eviction be cancelled. Defendant Holman replied: "cancelled."[1]

32. Within an hour of being served the March 4, 2026 order quashing the writ, Defendant Tessler filed a new writ application, this time purporting to act on behalf of the current deed holders (i.e., Defendants Shahbain, Alsamet and Alnisafi). The Clerk's office issued the new writ roughly 90 minutes later, at 4:17 PM on March 4.

33. On March 4, Plaintiff's representative emailed Defendants Washington and Holman and Sheriff Cogen asking whether the newly issued writ would affect the eviction schedule. They did not respond. The next day, Plaintiff's representative noticed the eviction still appeared on the Sheriff's Office website and sent another email: "Yesterday you cancelled the March 18 eviction. However, according [to] the Baltimore City Sheriff website, the eviction is still scheduled for March 18. May you please advise on if the eviction is cancelled or scheduled?" Defendant Washington replied: "our system was updated showing the warrant was quashed. I recommend refreshing the browser then selecting it again. For some reason if you don't see it removed please call me direct." Within the hour, the eviction was removed from the website.

34. On March 6, Defendant McQueen arrived at the Property and delivered a written eviction notice which referenced the January 23 writ that the court had already quashed. Plaintiff's

---

[1] This was not the first instance Vertex obtained an unlawful writ for the Property, only to have it quashed and the eviction cancelled. Specifically, on May 4, 2025, Vertex applied for a writ of possession for the Property and the Clerk issued the writ the next day. On May 7, Defendants Tessler and Holman scheduled an eviction for May 28. On May 14, a deputy sheriff posted an eviction notice on the Property stating a May 28, 2025 eviction date. On May 23, the writ was quashed. The eviction was cancelled and no eviction occurred on May 28, 2025.

representative again emailed Defendants Washington, Holman and Sheriff Cogen. On March 9, Washington replied: "that posting had already been assigned to the deputy's workload but yes that Writ of Possession has been canceled. We apologize for any confusion this may have caused."

35. On March 9, Plaintiff received a letter from Defendant Tessler stating that his clients intended to take possession of the Property. The letter was postmarked March 6, only twelve days before the March 18 eviction. That was two days short of the fourteen days' notice required by Baltimore City Code Article 13 § 8B-2 and eighteen days short of the thirty days' notice required by Md. Code, Tax-Prop. § 14-836(b)(7). The letter also failed to state the eviction date.

36. The only eviction-related papers Plaintiff received leading up to the March 18 eviction were McQueen's March 6 delivery citing a quashed writ and Tessler's letter postmarked that same day.

37. Between March 9 and March 18, Defendant Washington gave Plaintiff's representative additional assurances by phone that the eviction would not proceed on March 18. He stated that his office controlled the scheduling and that he would not allow a March 18 eviction to happen.

38. Plaintiff relied on the Sheriff's Office employees' emails and assurances and was convinced no eviction would occur on March 18.

39. On March 18, 2026, the Sheriff's Office executed the eviction anyway. Defendant McQueen arrived in uniform and armed. A representative of the private entity taking possession was present; upon information and belief, that representative was Defendant Tessler.

40. Defendant McQueen presented Plaintiff with the quashed January 23 writ as the purported legal basis for the eviction. That choice was not an accident. Proceeding under the

9

March 4 writ would have exposed the notice violations on the face of the documents. A sheriff is legally prohibited from executing a writ of possession when the sheriff "reasonably believes" the notice requirements have not been met. (Baltimore City Code Art. 13 § 8B-3.) A writ issued at 4:17 PM on March 4 and executed on March 18 makes compliance with the 30-day notice requirement of Md. Code, Tax-Prop. § 14-836(b)(7) mathematically impossible, and compliance with the 14-day requirement of Baltimore City Code Art. 13 § 8B-2 virtually impossible. By using the quashed January 23 writ instead, McQueen could carry out the eviction and later claim he did not know the notice requirements had not been met.

41. While the eviction was underway, Plaintiff called his representative and then handed the phone to Defendant McQueen. Plaintiff's representative told Defendant McQueen the eviction was a mistake – that Defendant Washington had assured them it would not take place on March 18. Defendant McQueen stated Defendant Washington was aware of the eviction, and that Defendant McQueen would stop the eviction upon orders from Defendant Washington.

42. Plaintiff's representative then called Defendant Washington and asked him to reschedule the eviction. Washington refused, stating he could not intervene because Deputy McQueen and the Vertex representative were already on site. Washington stated he could stop the eviction only upon a court order, which Plaintiff could not possibly have obtained in time because the eviction was already underway.

43. The eviction was a surprise. Because the Defendants convinced Plaintiff the eviction was cancelled, never provided the legally required notice, and never provided an official eviction date, Plaintiff had no opportunity to remove his belongings from the Property before they were seized.

44. As of August 3, 2026, the Sheriff's Office had still not filed the required post-eviction paperwork with the Baltimore City Circuit Court. Upon information and belief, the Sheriff's Office has not filed the paperwork because its employees know the eviction was unlawful and do not want it memorialized in publicly accessible court records.

**Corrupt Favors for Vertex by Public Officials**

45. The corrupt favorable treatment for Vertex extends beyond the Sheriff's Office.

46. Under Defendant Conaway's leadership, the Clerk's office issued writs of possession to Vertex on at least seven occasions when Vertex held no deed, in violation of clearly established law. (Baltimore City Circuit Court cases C-24-CV-24-004386, -004422, -004451, -004454, -004719, -004740, and -004747.) In most of these instances Vertex did not even claim to have a deed. Moreover, multiple "no-deed" writs were issued after the Court published orders that such writs were unlawful. Upon information and belief, Defendant Conaway directed the practice of unlawfully issuing "no-deed" writs of possession to Vertex. In the alternative, he acted with deliberate indifference to his employees' misconduct. Maryland Public Information Act ("MPIA") requests for employee logs relating to writs issued to Vertex were denied; the specific employees involved may be established through discovery.

47. The unlawfully issued "no-deed" writs are sometimes quashed before a property owner is dispossessed, but not always. A property owner must know to file a motion to quash, file it in time, and hope the judge rules before the eviction date arrives. In case C-24-CV-24-004747, for example, the Clerk unlawfully issued a writ of possession; Vertex used it to schedule an eviction, the property owner in that case vacated, and Vertex changed the locks, all before the writ was eventually quashed.

11

48. Defendants Vertex, Tessler, and Schaffel appear to have even cultivated favorable treatment from the bench. On September 16, 2025, Defendant Tessler emailed the presiding trial court judge ex parte, asking for "any assistance [the judge] can render" on pending motions. The judge ruled the next day. Tessler replied: "An order was issued today. Both I and my client are grateful for the prompt response." **(Exhibit 1.)**

49. On March 19, 2026, a second trial court judge denied a motion to quash the writ of possession issued to the third-party deed purchasers, Defendants Shahbain, Alsamet and Alnisafi. His ruling was plainly at odds with the governing statute; to reach it, the judge treated a key clause of the statute as if it did not exist. **(Exhibit 2.)** Sheriff Cogen and Defendant Schleifer appear to be political allies of that judge. **(Exhibit 3** shows Sheriff Cogen and Defendant Schleifer as two of the only recognizable elected officials at the judge's inauguration party.)

50. Additionally, Defendant Holman provided preferential scheduling for the private Defendants, as evidenced by private emails between her and Defendant Tessler. **(Exhibit 7.)** Holman's special treatment helped the private Defendants schedule and execute evictions before notice requirements were met, including Plaintiff's March 18 eviction. Her preferential treatment for Vertex was in direct violation of COMAR 01.01.2023.01F which states, "Employees shall act impartially in all their affairs and shall not give preferential treatment to any private organization or individual."

51. Plaintiff alleges that Defendants Schaffel, Tessler, and Vertex cultivated relationships with public officials who used their offices to unlawfully bend the rules in exchange for financial and political benefits. Defendants Schaffel, Tessler, and Vertex took these unlawful actions for their own benefit and for the benefit of Defendants Shahbain, Alsamet, and Alnisafi.

12

### Statement of Compliance with Maryland Statutes

52. Plaintiff has complied with the Maryland Tort Claims Act and the Local Government Tort Claims Act, having mailed the required notice letters on June 9, 2026.

53. Plaintiff asserts that damages for all counts exceed $75,000, in an amount to be determined at trial, making Plaintiff compliant with Maryland Rule 2-305.

### COUNT I
### UNREASONABLE SEIZURE OF PROPERTY
*42 U.S.C. § 1983 — Fourth Amendment*
### (Against Defendants McQueen, Holman, Conaway, Washington, Vertex, Schaffel, Tessler, Shahbain, Alsamet and Alnisafi)

54. The allegations set forth in all previous paragraphs are incorporated herein by reference.

55. Plaintiff had protected property interests in the real property at 229 N. Monroe Street, in the deli and convenience store business he operated there, and in the personal and business property within the building.

56. The March 18, 2026 eviction was a seizure of that property under color of law.

57. The private Defendants (Vertex, Schaffel, Tessler, Shahbain, Alsamet and Alnisafi) acted under color of state law by organizing the unlawful eviction with State officials, namely the Sheriff's Office Defendants (Washington, Holman and McQueen). While the Sheriff's Office assured Plaintiff the eviction was cancelled, the private Defendants and the Sheriff's Office planned the eviction behind Plaintiff's back. Their coordination is evidenced by, among other things, the coordinated arrival of the private Defendants' agent, Defendant Tessler, and Defendant McQueen at the eviction.

13

58. The seizure was unreasonable. Plaintiff did not receive the notice required by Md. Code, Tax-Prop. § 14-836(b)(7); Plaintiff did not receive the notice required by Article 13 § 8B-2 of the Baltimore City Code; the eviction was scheduled on a writ of possession the Clerk unlawfully issued when Vertex held no deed; the eviction was carried out under a writ of possession which had been quashed; and the eviction came as a surprise because the Sheriff's Office employees told Plaintiff the eviction would not take place on that day. As professional tax-sale investors, court officers, and law enforcement, every Defendant knew or should have known that carrying out an eviction under these conditions violated Plaintiff's constitutional and statutory property rights.

59. Upon information and belief, the Sheriff's Office personnel who scheduled and executed the eviction acted with malice and without reasonableness as described below.

60. Defendants Washington and Holman, as well as Baltimore City Sheriff Samuel Cogen, knew Plaintiff believed the eviction had been cancelled. Any of them could have corrected that belief before March 18, including the day before. Instead, they chose to evict Plaintiff by surprise, to ensure he would not remove his personal and business property beforehand. Defendant Tessler then used that property as leverage to pressure Plaintiff into dropping his appeal in the Appellate Court of Maryland, where Plaintiff is seeking to recover title to the Property.

61. Defendant Holman acted with malice by affording Vertex preferential eviction scheduling, in clear violation of State law including COMAR 01.01.2023.01F.

14

62. Defendant Washington acted with malice by repeatedly assuring Plaintiff the eviction would not happen on March 18, then allowing it to proceed anyway, and refusing to reschedule it when it was underway.

63. Defendant McQueen acted with malice by presenting a writ of possession he knew had been quashed as the pretext for the eviction.

64. The Sheriff's Office Defendants acted with malice by removing the eviction listing from the official public website that Baltimore City residents rely on to know when evictions will occur, then proceeding with the eviction anyway.

65. The Sheriff's Office Defendants acted with malice by willfully violating Baltimore City Code Article 13 § 8B-3(a) which requires them not to execute a writ of possession if they reasonably believe the City's notice requirements have not been met.

66. The Sheriff's Office Defendants executed the eviction in the manner most damaging to Plaintiff not out of legal necessity, but for two reasons: to retaliate against him for his advocacy against the private Defendants, and to help the private Defendants use his personal and business property as leverage to force him to drop his legal claims related to the Property, including his pending appeal to recover title.

67. The retaliatory and ill-willed character of the eviction is consistent with a documented culture within the Sheriff's Office. The Sheriff's own union, the Fraternal Order of Police, has stated that retaliation is a significant part of the Office's culture under Baltimore City Sheriff Samuel Cogen. Sheriff Cogen is currently a defendant in three other lawsuits alleging that he abused his office in a malicious and retaliatory manner.

15

68. Upon information and belief, based on the unlawful preferential treatment Vertex received, Sheriff Cogen received or was promised political favors and campaign contributions from Vertex's financiers, and rank-and-file Sheriff's Office employees received or were promised career advancement from Cogen, cash from Vertex, or both. The Sheriff's Office has refused MPIA requests for communications related to Plaintiff's eviction; those records could provide concrete evidence of motive and will be sought in discovery.

69. Upon information and belief, Defendant Conaway acted with malice by knowingly facilitating the issuance of improper writs of possession to Vertex by his office. In the alternative, Defendant Conaway acted with deliberate indifference to his office's many instances of improperly issuing writs of possession, including the writ used against Plaintiff.

70. Defendant Tessler is liable as the private Defendants' agent who directly participated in carrying out the unlawful eviction.

71. Defendant Schaffel is liable as the principal and lead operator of Vertex; he directs Vertex's and Tessler's strategy and operations.

72. Defendants Shahbain, Alsamet and Alnisafi are liable because the unlawful property seizure was carried out with their knowledge and on their behalf, as shown by Defendant Tessler's acknowledgment in Baltimore City Circuit Court that he was acting as their agent.

73. As a direct result, Plaintiff lost his real property, his deli and convenience store business, and his chattels, and he suffered economic harm and severe emotional distress.

## COUNT II
## UNREASONABLE SEIZURE OF PROPERTY
*Maryland Constitutional Tort — Declaration of Rights, Articles 19 and 26*

16

**(Against Defendants McQueen, Holman, Conaway, Washington, Vertex, Schaffel, Tessler, Shahbain, Alsamet and Alnisafi)**

74. The allegations set forth in all previous paragraphs are incorporated herein by reference.

75. Article 26 of the Maryland Declaration of Rights prohibits unreasonable seizures. Article 19 guarantees a remedy for injuries to person or property. Maryland recognizes a direct cause of action for damages arising from violations of the Declaration of Rights.

76. The seizure of Plaintiff's property as described herein was unreasonable for the same reasons set forth in Count I, and violated Article 26, entitling Plaintiff to damages under Article 19.

## COUNT III
### DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS OF LAW
*42 U.S.C. § 1983 — Fourteenth Amendment*
**(Against Defendants McQueen, Holman, Conaway, Washington, Vertex, Schaffel, Tessler, Shahbain, Alsamet and Alnisafi)**

77. The allegations set forth in all previous paragraphs are incorporated herein by reference.

78. Under Maryland law, the Baltimore City Court Clerk may issue a writ of possession in a tax-sale case without a judge's order. That ministerial power carries a due process obligation: the Clerk must issue writs only to parties legally entitled to them. When the Clerk issues writs to parties who are not entitled to them, property owners face the loss of their homes and businesses without due process of law.

79. Under Defendant Conaway, the Baltimore City Court Clerk's office has routinely issued writs of possession to Vertex in violation of the law, i.e., when Vertex had no deed. This occurred at least seven times. In at least five of these instances, Vertex had not even claimed to the Clerk's office that it held a deed.

17

80. Some of the unlawfully issued writs are quashed before the property owner is dispossessed, but not necessarily all. The property owner must file a motion to quash and hope the judge acts in time.

81. For example, in Baltimore City Circuit Court case C-24-CV-24-004747, the Clerk unlawfully issued a writ of possession to Vertex, Vertex used it to schedule an eviction, the property owner vacated, and Vertex changed the locks, all before the writ was eventually quashed.

82. In Plaintiff's case, the Clerk's office issued a writ to Vertex on January 23, 2026. Vertex used it to schedule the March 18 eviction before any judge had reviewed its validity. When a court finally reviewed the writ, it was quashed, but the eviction proceeded on that scheduled date anyway. If not for the improperly issued writ, Plaintiff would not have been evicted on March 18.

83. Defendant Conaway is liable for his malice or deliberate indifference to his office's repeated unlawful issuances of writs of possession.

84. The Sheriff's Office Defendants also denied Plaintiff due process by concealing the true eviction date, removing the eviction from the public website residents rely on, and carrying out the eviction under a void writ of possession.

85. Plaintiff's due process rights were also violated because he was never given the opportunity to challenge the eviction on the ground that Defendants failed to comply with the statutory pre-eviction notice requirements. The Sheriff's Office's own published materials state

18

that at a warrant of restitution[2] eviction, "[t]he Sheriff's Office representative will verify that the landlord provided sufficient notice to tenants. Tenants may challenge whether the appropriate notices were properly sent." In Plaintiff's case, the Sheriff's Office employees knew the eviction was a surprise to Plaintiff but did not stop it. And they never asked Plaintiff if he received proper notice.

86. The issuance of writs to parties not entitled to them, the use of those writs to schedule and execute evictions, and the denial of any opportunity to challenge notice failures together deprived Plaintiff, and similarly situated property owners, of their property without due process of law.

87. The private Defendants (Vertex, Schaffel, Tessler, Shahbain, Alsamet and Alnisafi) are liable as state actors because they invoked the State's processes to violate Plaintiff's Fourteenth Amendment rights. They obtained writs of possession through the Court Clerk's office despite being legally prohibited from doing so, and they executed the eviction through the Sheriff's Office before satisfying the mandatory pre-eviction notice requirements.

**COUNT IV**
**DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS**
*Maryland Constitutional Tort — Declaration of Rights, Articles 19 and 24*
**(Against Defendants McQueen, Holman, Conaway, Washington, Vertex, Schaffel, Tessler, Shahbain, Alsamet and Alnisafi)**

88. The allegations set forth in all previous paragraphs are incorporated herein by reference.

---

[2] A warrant of restitution is the court order directing the Sheriff to execute an eviction in a landlord-tenant case. A writ of possession is its counterpart that enforces a judgment awarding possession of real property, as in mortgage and tax-sale foreclosure cases. Both direct the Sheriff's Office to remove a property's occupants and deliver possession.

89. Article 24 of the Maryland Declaration of Rights guarantees that no person shall be deprived of property except by due process of the law of the land. Article 19 guarantees every person a remedy for injuries to their person or property. For the reasons stated in Count III, Defendants deprived Plaintiff of his property in violation of Article 24, entitling Plaintiff to damages under Article 19.

## COUNT V
## TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONS
### *Maryland Common Law*
### (Against Defendants McQueen, Holman, Conaway, Washington, Vertex, Schaffel, Tessler, Shahbain, Alsamet and Alnisafi)

90. The allegations set forth in all previous paragraphs are incorporated herein by reference.

91. Plaintiff operated a going-concern deli and convenience store at 229 N. Monroe Street with a regular customer base and established vendor relationships. Those relationships had economic value.

92. The private and Sheriff's Office Defendants knew Plaintiff operated a deli and convenience store at the Property. That the Property housed an active business was evident from the underlying tax-sale foreclosure litigation and from a cursory visual inspection: the awning reads "Deli & Grocery." Defendant McQueen and Defendant Schaffel had each visited the Property before the eviction.

93. The private and Sheriff's Office Defendants knew that Plaintiff, like any deli and convenience store owner, depended on vendor relationships and customer sales to operate his business. They sought to destroy those relationships, to harm Plaintiff financially and to weaken

20

his ability to fund his litigation pending in the Appellate Court of Maryland where he seeks to recover title to the Property.[3]

94. Before the eviction, Plaintiff was actively exploring a move to a nearby location at 200 N. Monroe Street. Had Defendants provided the legally required notice, he could have relocated, preserved his vendor and customer relationships, and limited his losses. But because the eviction came without warning, he had none of those opportunities.

95. The damage is not undone by restoration. Even if Plaintiff were restored to the Property tomorrow, he would have to rebuild his customer base and repair his standing with vendors who once regarded him as a reliable partner. One vendor, whose point-of-sale system remains locked inside the building, has already threatened to fine him for failure to return the equipment he cannot reach.

96. The unlawful interference caused Plaintiff substantial damages.

97. All Defendants named in this count are liable because they jointly caused the tortious interference to occur.

## COUNT VI
## CONVERSION
*Maryland Common Law*
**(Against Defendants McQueen, Holman, Conaway, Washington, Vertex, Schaffel, Tessler, Shahbain, Alsamet and Alnisafi)**

98. The allegations set forth in all previous paragraphs are incorporated herein by reference.

---

[3] Defendants succeeded in weakening Plaintiff's ability to fund his appeal to recover title. Plaintiff cannot afford counsel for oral argument at the appeal hearing and intends to proceed pro se.

21

99. Plaintiff owned and possessed business-related and personal property inside 229 N. Monroe Street and on the day of the eviction was operating his business as usual. The surprise eviction dispossessed Plaintiff of his property and placed it within Defendants' control.

100. Defendant Tessler expressly conditioned the return of Plaintiff's personal and business property on Plaintiff waiving all future legal claims. Defendants acted maliciously, willfully, and with reckless disregard for Plaintiff's rights, intending to punish Plaintiff for exercising those rights and to leverage his property as a means of coercing Plaintiff to abandon his legal claims.

101. By retaining Plaintiff's belongings without legal justification, Defendants engaged in conversion of Plaintiff's property.

102. All Defendants named in this count are liable because they jointly caused the conversion to occur.

## COUNT VII
## TRESPASS TO CHATTELS
### *Maryland Common Law*
**(Against Defendants McQueen, Holman, Conaway, Washington, Vertex, Schaffel, Tessler, Shahbain, Alsamet and Alnisafi)**

103. The allegations set forth in all previous paragraphs are incorporated herein by reference.

104. Plaintiff owned perishable goods consistent with operating a deli and convenience store, as well as household and business property. By dispossessing Plaintiff without notice and taking control of the building's contents, Defendants intentionally interfered with that property. As a result, Plaintiff's property spoiled, was lost, or was stolen.

105. All Defendants named in this count are liable because they jointly caused the trespass to chattels to occur.

22

## COUNT VIII
## UNJUST ENRICHMENT
*Maryland Common Law*
**(Against Defendants Vertex, Schaffel, and Tessler, or, in the alternative, against Defendants Tessler, Shahbain, Alsamet, and Alnisafi)**

106. The allegations set forth in all previous paragraphs are incorporated herein by reference.

107. Through the March 18, 2026 eviction, Defendants Vertex, Schaffel, and Tessler took possession of Plaintiff's real property and of all property inside it. In the alternative, Defendants Shahbain, Alsamet, Alnisafi and Tessler took possession of Plaintiff's real property and all property inside it.

108. Defendants obtained a concrete benefit at Plaintiff's expense: premature possession of the real property and the value of everything inside it. The surprise eviction was carried out on an ordinary business day while Plaintiff was operating normally, ensuring the property and its contents would be there for the taking. Defendants knew and appreciated that benefit.

109. Defendants have retained that benefit under circumstances that make keeping it inequitable. They gave Plaintiff nothing in return and have conditioned the return of his seized personal and business property on his waiving all legal claims relating to the property.

110. It would be unjust to allow Defendants to retain that benefit without compensating Plaintiff.

## COUNT IX
## TRESPASS TO LAND
*Maryland Common Law*
**(Against Defendants McQueen, Holman, Conaway, Washington, Vertex, Schaffel, Tessler, Shahbain, Alsamet and Alnisafi)**

111. The allegations set forth in all previous paragraphs are incorporated herein by reference.

112. Defendants Tessler and McQueen entered 229 N. Monroe Street and dispossessed Plaintiff using a quashed writ of possession as their purported authority. Because the writ had been quashed, it conferred no legal right to enter.

113. The entry was also a trespass on the independent ground that Defendants failed to provide the statutorily required pre-possession notice, which was a prerequisite to any lawful right to enter.

114. All Defendants named in this count are liable because they jointly caused the trespass to occur.

## COUNT X
## COMMON LAW FRAUD
### *Maryland Common Law*
**(Against Defendants McQueen, Holman, Conaway, Washington, Vertex, Schaffel, Tessler, Shahbain, Alsamet and Alnisafi)**

115. The allegations set forth in all previous paragraphs are incorporated herein by reference.

116. Defendants Holman and Washington misled Plaintiff into believing the eviction would not occur on March 18, 2026, through repeated assurances to that effect.

117. The Sheriff's Office's removal of the eviction from its official public website reinforced that deception and independently constitutes fraud.

118. Defendant McQueen used a fraudulent instrument, the quashed writ of possession, to justify the eviction and seize the property and its contents.

119. Under Defendant Conaway's leadership, the Clerk's office issued the unlawful writ of possession used to schedule the eviction. His malice or deliberate indifference enabled the fraud, and the issuance of an unlawful writ is itself a fraudulent act.

24

120. Defendants Vertex, Tessler, Schaffel, Shahbain, Alsamet and Alnisafi, acting jointly with the Sheriff's Office, falsely represented to Plaintiff that they had lawful authority to take possession of the property on March 18.

121. Defendants made these false representations knowingly, intending for Plaintiff to rely on them. Plaintiff did rely on them and was harmed as a result. The purpose of the fraud was to remove Plaintiff from the real property so Defendants could take possession of it and everything inside.

## COUNT XI
## GROSS NEGLIGENCE
### *Maryland Common Law*
**(Against Defendants McQueen, Holman, Conaway, Washington, Vertex, Schaffel, Tessler, Shahbain, Alsamet and Alnisafi)**

122. The allegations set forth in all previous paragraphs are incorporated herein by reference.

123. Each Defendant identified in this Count failed to perform a manifest duty in reckless disregard of the consequences to Plaintiff's property rights as described below.

124. Defendant Conaway owed a duty to ensure his office issued writs of possession only to parties who held a deed to the property. Allowing his office to routinely issue unlawful writs constitutes gross negligence and reckless disregard for Plaintiff's property rights.

125. Defendant McQueen, as a Deputy Sheriff, owed a duty to execute only lawful process. He acted with gross negligence by executing the eviction under a quashed writ and in the absence of notice required by law.

126. Defendant Washington, as a Sheriff's Office supervisor, owed a duty to ensure evictions were carried out lawfully and with proper notice. He acted with gross negligence by ordering, or

failing to prevent, the unlawful eviction, and by repeatedly assuring Plaintiff the eviction was cancelled and then allowing it to proceed.

127. Washington and McQueen each acted with gross negligence by failing to inquire if the notice requirements had been met before executing the eviction.

128. Defendant Holman was responsible for scheduling evictions for the Sheriff's Office and had a duty to schedule them lawfully and transparently. She acted with gross negligence by telling Plaintiff the March 18 eviction was cancelled, then letting it proceed on that date anyway.

129. Defendants Vertex, Tessler, Schaffel, Shahbain, Alsamet, and Alnisafi owed a duty to refrain from procuring and acting on writs they knew were invalid and to comply with the statutory notice requirements. They acted with gross negligence by procuring invalid writs and scheduling and executing an eviction in defiance of notice requirements.

130. Each Defendant's gross negligence was a direct and proximate cause of Plaintiff's injuries, including the loss of his real property, his business, his personal and business property, and the financial and emotional harm resulting from the unlawful eviction.

## COUNT XII
## ABUSE OF PROCESS
### *Maryland Common Law*
**(Against Defendants McQueen, Holman, Conaway, Washington, Vertex, Schaffel, Tessler, Shahbain, Alsamet and Alnisafi)**

131. The allegations set forth in all previous paragraphs are incorporated herein by reference.

132. Defendants Vertex, Tessler, Schaffel, Shahbain, Alsamet, and Alnisafi used the eviction and writ of possession processes in ways the law does not permit. They scheduled and executed an eviction on a quashed writ and in defiance of the statutory notice requirements. Their goal

26

was to make it harder for Plaintiff to defend his pending legal claims to reclaim title to the Property: by holding his seized belongings hostage to coerce him to abandon those claims, and by stopping his business to damage him financially so he could not effectively pursue his legal claims.

133. Under Defendant Conaway's leadership, the Clerk's office repeatedly issued writs of possession to Vertex when Vertex held no deed, enabling the unlawful eviction.

134. Defendant McQueen executed the eviction using a writ he knew had been quashed, and under conditions he knew did not satisfy the statutory notice requirements.

135. Defendants Holman and Washington used the eviction scheduling process to deceive Plaintiff into believing the eviction had been cancelled, then allowed it to proceed on a quashed writ of possession. They removed the eviction from the official website residents rely on as part of the deception. They also scheduled an eviction that could not satisfy the statutory notice requirements.

136. Upon information and belief, the Sheriff's Office Defendants participated in the unlawful eviction in exchange for career favors from their superiors, cash from Vertex, or both.

137. The Sheriff's Office's failure to file the legally required post-eviction paperwork is itself an abuse of process and reflects consciousness of guilt. It suggests the Office knows the eviction was unlawful and is avoiding the creation of a public record.

## INTRODUCTION TO CONSPIRACY CLAIMS

138. Plaintiff's eviction was no mistake. Upon information and belief, it was the product of a coordinated scheme involving the Baltimore City Court Clerk's office, Sheriff Samuel Cogen

27

and his subordinates, Councilmember Yitzchok Isaac "Yitzy" Schleifer, the private Defendants, and other individuals not yet identified but ascertainable through discovery.

139. Defendant Schleifer sits at the center of the scheme as the political broker who connected the private Defendants to the public officials whose cooperation made it work. Upon information and belief, he encouraged those officials and their staff to act in furtherance of the scheme.

140. Schleifer was motivated by the financial and political backing of Ronald Wilheim. Wilheim is a major donor to State Senate President Bill Ferguson, Governor Wes Moore, and President Donald Trump, giving him influence across the political spectrum. From July 2021 through September 2024, Wilheim, members of his family, and his employer CommuniCare donated approximately $23,100 to Schleifer.

141. Schleifer attempted to deliver a return on Wilheim's investment. Starting in 2022, Schleifer pushed to demolish Grove Park Elementary School to make way for a CommuniCare facility. He pressed the project for years despite the sustained opposition of his constituents. The facility was never built, and in October 2024 Schleifer publicly conceded defeat. If he wanted Wilheim's support in the future, Schleifer needed to prove he could deliver results.

142. Fortunately for Defendant Schleifer, Ronald Wilheim's interests extend beyond CommuniCare. Wilheim had cofounded a real estate investment business with his son, Sholom Tibor Wilheim. Defendant Schaffel served as the CEO of that company's tax-sale business and held a 20% ownership stake.

143. In December 2024, despite CommuniCare's business having nothing to do with tax-sale investing, its Government Relations lead brokered a meeting between Defendant Schleifer,

28

Sholom Tibor Wilheim, and others to discuss Wilheim's tax-sale business. The meeting took place on January 6, 2025. **(Exhibit 4.)** With the CommuniCare deal dead, tax sales became Schleifer's chance to prove himself worthy of Wilheim's financial and political support.

144. Shortly after the meeting, an individual named "Yitzchok," Defendant Schleifer's first name, appeared in a group chat with Sholom Tibor Wilheim and Defendant Schaffel. The chat is titled "Tax Lien Tachlis," meaning "the Tax Lien Bottom Line." Among the topics discussed are conversations with Baltimore City court clerks. **(Exhibit 5.)**

145. Defendant Schleifer's ties to Defendant Schaffel go beyond the tax-sale business. In 2014, Schleifer purchased a home for $226,000. In 2019, he sold it to Defendant Schaffel for $379,000.

146. Upon information and belief, Defendant Schleifer's relationship with Baltimore City Sheriff Cogen was an asset he put to work for the scheme. Schleifer is one of Cogen's largest donors. And Cogen employed Schleifer's cousin, Ronald Rosenbluth, in the Sheriff's Office to manage "landlord-tenant" matters, which upon information and belief means evictions. (Rosenbluth later resigned after his name surfaced in filings in *United States v. Attar* (1:25-cr-00324), a federal prosecution for corruption and extortion involving a State Senator, a law enforcement officer, and a private businessman.)

147. Cogen and Defendant Xavier Conaway are also directly connected; they are political allies who ran on the same re-election slate. **(Exhibit 6.)**

148. In summary, upon information and belief: Schaffel operates and manages Vertex, the business entity executing the scheme. Tessler is the lawyer who abuses court process to advance it. Cogen is "the muscle": his department executes evictions. Holman schedules them; McQueen

carries them out on the ground. Washington is the supervisor who provides cover, insulating Cogen from issuing direct commands. Conaway is the political ally who enabled the scheme by allowing his office to issue unlawful writs of possession. Schleifer is the political broker and quarterback, a bridge between Schaffel, Wilheim, Cogen, and Conaway. Wilheim is the scheme's financier: he purchases political influence and reaps the financial rewards. The scheme also serves as a vehicle for money laundering.

149. Cogen and Wilheim are not named as Defendants because Plaintiff lacks documentary evidence of their direct participation in the scheme. Plaintiff may seek to add them as defendants if such evidence surfaces during discovery.

## COUNT XIII
## CIVIL CONSPIRACY
*Maryland Common Law*
**(Against All Defendants)**

150. The allegations set forth in all previous paragraphs are incorporated herein by reference.

151. The surprise eviction could not have occurred without the private Defendants and the Sheriff's Office Defendants acting in concert. As the Sheriff's Office Defendants assured Plaintiff no eviction would take place on March 18, they planned the eviction with the private Defendants behind Plaintiff's back. Defendant McQueen and Defendant Tessler arrived at and executed the eviction together.

152. Overt acts in furtherance of the conspiracy include, but are not limited to: the Clerk's unlawful issuance of a writ of possession; Holman's preferential scheduling of an eviction on that writ; Holman and Washington assuring Plaintiff the eviction was cancelled; Defendants proceeding with the eviction anyway even though Holman and Washington knew Plaintiff

30

believed the eviction was cancelled; the coordinated arrival of Defendant McQueen and Defendant Tessler on the day of the eviction; and Defendant Washington's refusal to stop the eviction once it was underway despite having the legal authority to do so.

153. Upon information and belief, Defendant Schleifer brokered and quarterbacked the relationships that enabled Vertex to secure unlawful Writs of Possession and to receive preferential treatment from the Sheriff's Office. Schleifer used his influence over Cogen, and Cogen used his influence over the Sheriff's Office employees.

154. The desire to conceal the conspiracy is evident in the Sheriff's Office's response to public-records requests. The Sheriff's Office has produced nothing in response to multiple Maryland Public Information Act requests for records related to the eviction. It also has not filed the legally required post-eviction return paperwork with the Baltimore City Circuit Court.

155. The object of the conspiratorial agreement was to launder money and generate financial returns for Vertex, Wilheim and his agents. In exchange, upon information and belief, Wilheim provided and would continue to provide campaign contributions and political support to Schleifer and Cogen, who used their respective influence to keep the scheme running. Rank-and-file Sheriff's Office employees participated in exchange for career favors from Cogen, cash from Vertex, or both.

156. As a direct result of Defendants' conspiracy, Plaintiff suffered the damages described herein, including the loss of his real property, his business, and his personal and business property.

## COUNT XIV
## CONSPIRACY TO DEPRIVE CIVIL RIGHTS, FOURTH AND FOURTEENTH AMENDMENTS

31

*42 U.S.C. § 1983*
**(Against All Defendants)**

157. The allegations set forth in all previous paragraphs are incorporated herein by reference.

158. The same conduct alleged in Count XIII constitutes a conspiracy to deprive civil rights under 42 U.S.C. § 1983.

159. The Sheriff's Office Defendants (Holman, McQueen, and Washington), Court Clerk Conaway and Councilmember Schleifer are state actors; the private Defendants (Vertex, Schaffel, Tessler, Shahbain, Alsamet, and Alnisafi) acted under color of state law because they acted jointly with the state to deprive Plaintiff of his rights.

## COUNT XV
## CIVIL RICO — CONDUCTING AN ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY
*18 U.S.C. § 1962(c)*
**(Against Defendants McQueen, Holman, Washington, Vertex, Schaffel, Tessler, Shahbain, Alsamet, Alnisafi and Schleifer)**

160. The allegations set forth in all previous paragraphs are incorporated herein by reference.

161. Section 1962(c) prohibits any person associated with an enterprise affecting interstate commerce from conducting that enterprise's affairs through a pattern of racketeering activity. To state a civil claim, a plaintiff must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) that caused injury to the plaintiff's business or property.

162. Each Defendant named in this Count is a "person" under 18 U.S.C. § 1961(3), meaning an individual or entity capable of holding a legal or beneficial interest in property. Each is distinct from the RICO enterprise whose affairs they conducted.

32

163. The Defendants named in this Count, together with Ronald Wilheim, Samuel Cogen, and unknown persons identified as John Does 1 through 10, form an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4). The Enterprise has the three required structural features. First, a common purpose: exploiting Baltimore City's tax-sale system for the financial and political enrichment of its members and the laundering of money. Second, relationships among its members: the financial and political ties among Wilheim, Schleifer, Cogen, Conaway, the Sheriff's Office Defendants, and the private Defendants, as alleged above. Third, longevity sufficient to pursue that purpose: the Enterprise has operated across hundreds of tax-sale cases and continues to the present.

164. The Enterprise's activities affect interstate commerce: Vertex sells properties to out-of-state buyers; Vertex draws capital from out-of-state investors; and, on information and belief, Defendant Schaffel receives payment through YAS Consulting, an Illinois-registered entity he owns.

165. The Defendants conducted the Enterprise's affairs through a pattern of racketeering activity consisting of repeated, related acts of mail fraud, wire fraud, honest-services fraud, extortion under color of official right, extortion under Maryland law, transportation of stolen goods and money laundering, as set forth below.

**A. Mail and Wire Fraud — 18 U.S.C. §§ 1341, 1343**

166. The Enterprise furthered its scheme to defraud through repeated use of the mails and interstate wires. The communications identified below are those within Plaintiff's knowledge or available in public court records; communications in Defendants' exclusive possession will be sought in discovery.

167. Defendants committed wire fraud through the request and issuance of unlawful writs of possession. This occurred at least twice in Plaintiff's Baltimore City Circuit Court case and at least once in each of the following Baltimore City Circuit Court cases: C-24-CV-24-004386, C-24-CV-24-004422, C-24-CV-24-004454, C-24-CV-24-004719, C-24-CV-24-004740, and C-24-CV-24-004747.

168. Defendants committed mail fraud by causing the transmission of at least six eviction notices based on these unlawful writs of possession.

169. Defendants Holman and Tessler committed wire fraud by scheduling evictions based on those unlawful writs through private one-on-one emails. **(Exhibit 7.)**

170. Defendants Washington and Holman committed wire fraud through emails and phone conversations designed to convince Plaintiff he would not be evicted on March 18. These were lulling communications: they kept Plaintiff passive and forestalled protective action while the scheme to take his property proceeded to completion. **(Exhibit 8.)**

171. Defendant McQueen aided and abetted the Enterprise's mail and wire fraud by executing the March 18, 2026 eviction on a writ he knew had been quashed.

172. Defendants Vertex and Schaffel committed wire fraud when they recorded deeds for 26 properties obtained through the Enterprise's scheme, transmitting those deeds into Maryland's electronic land records database by wire.

173. As attorney of record in roughly 300 Vertex tax-sale cases, Tessler caused hundreds, if not thousands, of emails, physical mailings, and electronic filings in furtherance of the scheme. Tessler's conduct does not merit Petition Clause immunity because it was made in furtherance of a fraudulent scheme.

## B. Honest Services Fraud — 18 U.S.C. §§ 1341, 1343, 1346

174. In the alternative and in addition, Defendants Holman and Washington committed honest services fraud through the communications described in ¶¶ 169–170. Upon information and belief, Holman and Washington received financial benefits from Vertex and/or preferential career treatment from Sheriff Cogen in exchange for depriving the public of their honest services as sheriff's office employees.

175. Defendant Schleifer committed wire and honest services fraud by using his City Council position to benefit the Enterprise. Upon information and belief, he did so in exchange for political and financial benefits from Wilheim. Wires in furtherance include: (1) his participation in a tax-sale strategy Zoom meeting with one or more Wilheim tax-sale agents; and (2) his messages in the "Tax Lien Tachlis" WhatsApp group with Defendant Schaffel and other Enterprise agents.

## C. Extortion Chargeable Under Maryland Law — Md. Code, Crim. Law §§ 3-701 and 3-702

176. Racketeering activity includes any act of extortion chargeable under state law and punishable by more than one year's imprisonment. 18 U.S.C. § 1961(1)(A). Maryland prohibits obtaining property from another person where consent is induced by the wrongful use of actual or threatened force, violence, or economic injury (§ 3-701), or by a public officer acting under color of official right (§ 3-702). Because the value of the Property exceeds $100,000, the offense is a felony punishable by up to twenty-five years' imprisonment and qualifies as a predicate act. No state charge or conviction is required.

177. On March 18, 2026, Defendant McQueen, acting as a Deputy Sheriff under color of official right, obtained Plaintiff's surrender of 229 N. Monroe Street by presenting a writ of

35

possession as state authority and directing Plaintiff to leave. Plaintiff was lawfully present on his property and complied because he believed McQueen was acting with lawful authority. He was not told, and did not know, he was being evicted on a quashed writ of possession. McQueen had no lawful right to compel the surrender. That wrongful taking of property under color of official right constitutes extortion under § 3-702 and a predicate act of racketeering.

178. The same conduct independently constitutes extortion under § 3-701. Plaintiff surrendered possession because he feared the consequences of defying an armed state officer presenting what appeared to be valid legal process. Because the writ was void, using that fear to obtain Plaintiff's property was wrongful and violated § 3-701.

179. Vertex, Schaffel, Tessler, Shahbain, Alsamet and Alnisafi caused, or aided and abetted, these extortionate acts by procuring a writ to which they were not entitled and by coordinating and helping execute the eviction.

180. This conduct is not limited to Plaintiff's case. Upon information and belief, in Baltimore City Circuit Court case C-24-CV-24-004747, the property owner in that case vacated his property based on an improperly issued writ of possession and a Sheriff's Office-scheduled eviction. The writ was eventually quashed, but only after Vertex had locked him out.

### D. Hobbs Act Extortion — 18 U.S.C. § 1951

181. The extortionate acts listed in ¶¶ 177–178 also constitute Hobbs Act Extortion.

### E. Transportation of Stolen Goods — 18 U.S.C. § 2314

182. Upon information and belief, Vertex distributed to its investors proceeds from fraudulently obtained properties, including Plaintiff's, through interstate wire transfers. Between 2024 and 2025, Vertex bought and sold 26 properties.

36

## F. Money Laundering — 18 U.S.C. §§ 1956, 1957

183. Section 1956 prohibits conducting financial transactions involving proceeds of specified unlawful activity with intent to promote that activity or conceal its nature or source. Section 1957 prohibits monetary transactions exceeding $10,000 in property derived from such activity.

184. Upon information and belief, the Enterprise launders money through Maryland's tax-sale system as follows: it acquires properties at tax sale, then resells them through Ashland Auction Group at prices inflated on paper, with illicit cash injected into the deal as purported purchase money. The dirty money then re-emerges on the books as legitimate tax-sale investment profit.

185. For example, Ashland Auction Group auctioned Plaintiff's property on Vertex's behalf in an online auction that ran from April 28 to April 30, 2025, drawing a high bid of $120,000. Yet the Ashland Auction Group contract of sale for the Property, dated May 12, 2025, just twelve days after the auction ended, states a purchase price of $209,000. **(Exhibit 9.)**

186. Upon information and belief, the $89,000 premium over the high bid drawn at public auction less than two weeks earlier reflects the mechanism described in ¶184: illicit cash injected as purported purchase money, re-emerging as legitimate tax-sale profit.

187. Ashland Auction Group knowingly participated in the scheme, as shown by its principal Adam Shpritz attending the January 6, 2025 tax-sale strategy meeting with Councilmember Schleifer and Defendant Schaffel's employer. **(Exhibit 4.)** Upon information and belief, Ashland was involved in each one of Vertex's property transactions.

37

188. For reasons unknown to Plaintiff, Vertex ultimately recorded the sale of the Property for $190,000 rather than $209,000, still more than double the State Department of Assessments and Taxation valuation of $85,000.

189. Vertex sold the Property to Defendants Shahbain, Alsamet, and Alnisafi, who list a Colorado vape store as their tax mailing address and serve as officers of numerous LLCs. Plaintiff infers Shahbain, Alsamet, and Alnisafi were knowing participants in money laundering, as they appear to have no genuine interest in occupying or renting out the Property. Plaintiff was evicted on March 18, 2026, and as of August 3, 2026, the Property remains unoccupied.

190. A separate transaction also points to money laundering. Ashland Auction Group auctioned 2918 E. Madison Street on April 23, 2025, with a starting bid of $25,000, and drew no bids. Ten weeks later, on July 3, 2025, Vertex recorded a sale of the same property for $71,500, more than double its $32,000 assessed value.

191. Beyond these individual transactions, Vertex's overall investment returns do not reflect legitimate market activity. Between 2024 and 2025, Vertex acquired 26 properties for roughly $20,000 in delinquent taxes and recorded sales totaling $1.4 million.

## G. Continuity & Longevity

192. The predicate acts are continuous. Since joining the Maryland Bar in April 2024, Tessler has served as attorney of record in more than 600 tax-sale cases statewide, including more than 300 in Baltimore City. Not every tax-sale case requires unlawful tactics, but the Enterprise has shown it will deploy them when needed.

193. The Sheriff's Office employees who carried out the eviction remain on the force, Schleifer remains a City Councilmember, and Conaway remains Clerk of the Court. Vertex

38

continues to pursue tax-sale foreclosures, having filed a tax-sale foreclosure action as recently as May 2026. Nothing short of this Court's intervention, or a criminal investigation, can stop them.

194. Plaintiff was injured in his business and property by reason of the racketeering activity. The loss of his real property, his deli and convenience store business, and his personal property was all caused by the Enterprise's actions.

## COUNT XVI
## CIVIL RICO CONSPIRACY
### 18 U.S.C. § 1962(d)
**(Against All Defendants)**

195. The allegations set forth in all previous paragraphs are incorporated herein by reference.

196. Section 1962(d) makes it unlawful to conspire to violate § 1962(c). Each Defendant named in this Count agreed that the affairs of the tax-sale Enterprise would be conducted through the pattern of racketeering activity alleged in Count XV. A Defendant need not have personally committed, or agreed personally to commit, any predicate act; it is enough that he knowingly agreed to facilitate the scheme. *Salinas v. United States*, 522 U.S. 52 (1997).

197. The agreement is shown by the coordinated conduct alleged throughout this Complaint, including the issuance of premature writs, the non-standard scheduling of Vertex's evictions, the assurances that lulled Plaintiff into inaction, the coordinated arrival of Deputy McQueen and Vertex's representative to take the Property, and the financial and political relationships binding the members of the Enterprise.

198. Plaintiff was injured in his business and property by reason of the conspiracy, through the predicate acts of racketeering committed in furtherance of it, which dispossessed him of his property, business, and chattels.

39

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Fausto Gomez respectfully requests that the Court:

(a) Award compensatory damages in an amount to be determined at trial but no less than

$300,000;

(b) Award punitive damages in an amount to be determined at trial;

(c) Award threefold the damages Plaintiff sustained, together with the costs of suit and

reasonable attorney's fees, on the civil RICO claims;

(d) Issue a Declaratory Judgment that the Baltimore City Court Clerk's repeated issuance of

writs of possession in tax-sale cases to parties not entitled to them is unconstitutional

under the Fourth and Fourteenth Amendments; and

(e) Grant such other and further relief as the Court deems just.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury, under Federal Rule of Civil Procedure 38(b), on all issues so

triable.


Respectfully submitted,


Fausto Gomez
Plaintiff Pro Se
9315 Oak White Rd.
Nottingham, MD 21236
443-627-0201
FaustoGomez3080@hotmail.com