**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

FAUSTO GOMEZ
9315 Oak White Rd.
Nottingham, MD 21236

*Plaintiff,*

–v–

YISROEL ARYEH "ARI" SCHAFFEL
2814 Hanson Ave
Baltimore City, MD 21209

and

VERTEX TL LLC
C/O Registered Agents Inc
5000 Thayer Center, Ste C
Oakland, MD 21550
(Garrett County)

and

STEVEN TESSLER
2833 Smith Ave., #138
Baltimore City, MD 21209

and

EARL McQUEEN
Baltimore City Sheriff's Office
111 N. Calvert St.
Baltimore City, MD 21202

and

GLENDA HOLMAN
Baltimore City Sheriff's Office
100 N. Calvert St., Room 104
Baltimore City, MD 21202

and

XAVIER CONAWAY
Baltimore City Circuit Court Clerk

Civil Action No. ~~1:26-cv-01445-MJM~~
1:26-cv-01445-MJM

Elijah E. Cummings Courthouse, Room 412
111 North Calvert Street
Baltimore City, MD 21202

and

KENYATTA WASHINGTON
Baltimore City Sheriff's Office
111 N. Calvert St.
Baltimore City, MD 21202

and
~~YITZCHOK ISAAC "YITZY" SCHLEIFER~~
~~6712 Westbrook Rd~~
~~Baltimore City, MD 21215~~
~~and~~

MOHAMED DAHAN SHAHBAIN
4225 S Buckley Rd
Aurora, CO 80013

and

HADAF ANWAR ALSAMET
4225 S Buckley Rd
Aurora, CO 80013

and

MOHAMED ABDO ALNISAFI
4225 S Buckley Rd
Aurora, CO 80013

and
~~JOHN DOES 1-10~~

<u>THE MAYOR AND CITY COUNCIL OF BALTIMORE</u>
<u>c/o Ebony Thompson, City Solicitor</u>
<u>Baltimore City Department of Law</u>
<u>City Hall, 100 N. Holliday Street</u>
<u>Baltimore, MD 21202</u>

<u>and</u>

<u>TESS LAW LLC</u>

C/O Registered Agents Inc.
306 W. Redwood St., Ste 200
Baltimore City, MD 21201

*Defendants.*

**~~SECOND~~ THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Fausto Gomez, pro se, files this ~~Second~~ Third Amended Complaint against the Defendants and states as follows:

## INTRODUCTION

1. Plaintiff brings this civil action over a surprise eviction. Plaintiff ran a deli and convenience store on the ground floor of a building in Baltimore and kept an apartment upstairs and living space in the basement. On March 18, 2026 he was evicted from the property without the notice the law requires. The Sheriff's Office employees who carried it out had told him, repeatedly, that the eviction was cancelled; while they were telling him that, they arranged the eviction with the tax-sale investor and its lawyer behind his back on behalf of the private Defendants. The tax-sale investor, its lawyer, and the purchasers who had bought the building from the investor took everything inside the building, and then offered to return the property inside only if he would drop his appeal to recover title and abandon all future legal claims. Plaintiff alleges this was one instance of a broader scheme and seeks damages under 42 U.S.C. § 1983, Maryland law, and the federal RICO statute.

~~1.~~ 2. On March 18, 2026, the Baltimore City Sheriff's Office and Private Defendants evicted Plaintiff ~~Fausto Gomez was the lawful occupant and possessor of~~ from 229 N. Monroe Street, Baltimore, Maryland 21223 ("the Property"). He ~~operated~~ ran a deli and convenience store on the ground floor, ~~maintained an~~ kept a residential apartment on the upper floor, and used the basement as ~~a~~ living space.

~~2. On March 18, 2026, employees of~~ 3. The eviction was carried out for the ~~Baltimore City Sheriff's Office evicted Plaintiff from the Property at the direction of "the private Defendants":~~ tax-sale investor Vertex TL LLC ~~(the tax-sale investor);~~ ("Vertex"); its principal, Yisroel Aryeh "Ari" ~~Schaffel (its principal);~~ Schaffel; its lawyer, Steven ~~Tessler (attorney for~~ Tessler, and his firm, Tess Law LLC; and the three people to whom Vertex ~~TL LLC and for~~ had sold the ~~buyers named below); and~~ Property, Mohamed Dahan Shahbain, Hadaf Anwar Alsamet, and Mohamed Abdo Alnisafi. This Complaint calls all of them "the private Defendants" and calls Shahbain, Alsamet, and Alnisafi ~~(the individuals to whom the investor sold the Property before the eviction). The eviction dispossessed Plaintiff of the building, its contents, and his ability to operate his business.~~ "the purchasers."

~~3. The eviction was unlawful for at least three reasons. First, the eviction occurred without the notice required by Md. Code, Tax-Prop. § 14-836(b)(7). Second, the eviction occurred without the notice required by Baltimore City Code Article 13 § 8B-2. Third, the Defendants executed the eviction on a writ of possession a judge had quashed.~~

~~4. The eviction was also unlawful because it was carried out by surprise. Prior to the eviction, Sheriff's Office personnel gave Plaintiff multiple assurances that no eviction would occur on March 18. They also removed the Property from the Sheriffs Office's official eviction website, which Baltimore residents rely on to track scheduled evictions. Plaintiff did not know the eviction would occur on March 18.~~

4. Plaintiff did not receive the notice that Maryland and Baltimore City law require before a tax-sale purchaser takes possession: 30 days' written notice under Md. Code, Tax-Prop. § 14-836(b)(7), and notice of the scheduled eviction date mailed at least 14 days in advance

under Baltimore City Code Art. 13 § 8B-2. The only letter he received was postmarked March 6, 2026, twelve days before the eviction, and stated no date.

5. The eviction was a surprise because the Sheriff's Office told Plaintiff it would not happen. On March 4, 2026, the Circuit Court for Baltimore City quashed the writ of possession on which the March 18 date had been set. That afternoon, the Sheriff's Office employee who schedules evictions, Glenda Holman, told Plaintiff's representative the eviction was "cancelled." Approximately two hours later, the private Defendants, through Tess Law, wrote to Holman: "The owner would like to keep the March 18, 2026 date." Five minutes later, Holman forwarded that request to her supervisor, Lieutenant Kenyatta Washington: "We will discuss tomorrow. Quashed 3/4/26." (Exhibit 1; Exhibit 14.)

6. The Sheriff's Office kept the March 18 date and told Plaintiff the opposite. Over the next two weeks, Washington told Plaintiff's representative in writing and by phone that no eviction would take place on March 18, and the Sheriff's Office removed the Property from its public eviction website. On March 18, Deputy Earl McQueen evicted Plaintiff, presenting as his authority the writ the court had quashed on March 4. (Exhibit 5.)

~~5.~~ 7. Because Plaintiff did not know the eviction was ~~a surprise, all of Plaintiff's personal and business property~~ coming, everything he owned was ~~still~~ inside the ~~building when the sheriff arrived. Plaintiff lost~~ building: merchandise, cash, and refrigeration ~~units. He lost~~ units; furniture, electronics, and items of sentimental ~~value. He lost~~ value; personal documents, including tax returns bearing his Social Security ~~number. He was also left exposed~~ number; and equipment belonging to ~~liability for property inside the building~~ vendors that he ~~did not own but~~ was responsible ~~for, including a point-of-sale system and an ATM.~~ for returning.

~~6.~~ 8. When Plaintiff asked for his belongings back, ~~Defendant~~ Tessler, acting for the private ~~Defendants' attorney, refused. Tessler stated he would return Plaintiff's property only if~~ Defendants, set two conditions: Plaintiff ~~dismissed~~ had to dismiss his pending appeal against Vertex to ~~reclaim~~ recover title to the ~~Property~~ Property, and ~~waived~~ he had to waive all future legal claims relating to the Property.

~~7. As of August 3, 2026, the Sheriffs Office has not filed the legally required post-eviction paperwork with the Baltimore City Circuit Court. Plaintiff believes the paperwork has not been filed because the Sheriff's Office employees know the eviction was illegal and do not want a record of it in publicly accessible court files.~~

9. As of August 3, 2026, the Sheriff's Office had not filed with the Circuit Court the return that Maryland Rule 2-126 requires after a writ is executed, and the Property stood empty.

10. Plaintiff alleges that this eviction was one instance of a broader scheme, described below, and seeks damages under 42 U.S.C. § 1983, Maryland law, and the federal RICO statute, 18 U.S.C. § 1964.

## JURISDICTION AND VENUE

~~8.~~ 11. This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiff's federal civil-rights claims, and under 18 U.S.C. § 1964 over his civil RICO claims. The Court has supplemental jurisdiction over his related state-law and Maryland constitutional claims under 28 U.S.C. § 1367.

~~9.~~ 12. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred here.

**THE PARTIES**

~~10.~~ 13. Plaintiff Fausto Gomez is an ~~individual who~~ individual. On March 18, 2026, he was the lawful occupant and possessor ~~and occupant~~ of ~~229 N. Monroe Street, Baltimore, Maryland,~~ the Property, where he operated his deli and convenience store and ~~maintained a residential apartment.~~ lived.

~~11.~~ 14. Defendant Vertex TL LLC ~~("Vertex")~~ is a private entity that acquires Baltimore City tax-sale certificates and pursues foreclosure of the right of redemption and ~~eviction~~ possession of the affected ~~property owners, including Plaintiff.~~ properties. Vertex acquired the tax-sale certificate for the Property, obtained the judgment foreclosing Plaintiff's right of redemption, and obtained the January 23, 2026 writ of possession in its own name. Upon information and belief, Vertex employees receive bonuses for ~~achieving~~ meeting quarterly or annual revenue targets. Schaffel, Tessler, Tess Law, and Vertex are all part of the same organization, which pursues tax-sale foreclosures in Baltimore City.

~~12.~~ 15. Defendant Yisroel Aryeh "Ari" Schaffel is a principal and operator of Vertex. At the same time, he has identified himself as a clerk for Defendant Tessler, Vertex's attorney. Upon information and belief, ~~Defendant~~ Schaffel ~~directs~~ and Tessler operate as a partnership: the ~~strategy~~ client runs the business, works inside his lawyer's office, and ~~actions of Vertex and Defendant Tessler.~~ shares in directing both.

~~13.~~ 16. Defendant Steven Tessler is ~~the attorney for~~ an attorney. He represented Vertex and the purchasers in the Circuit Court for ~~Defendants Shahbain, Alsamet, and Alnisafi, the individuals who bought the deed to the Property from Vertex. Tessler~~ Baltimore City. He obtained ~~an unlawful writ~~ both writs of possession for the ~~Property from~~ Property, one in Vertex's name and one in the ~~Clerk's office and, together~~ purchasers' names, and arranged the March 18 eviction with the Sheriff's ~~Office, executed the unlawful eviction on behalf of his~~

~~clients.~~ Office through Tess Law. Upon information and belief, Tessler lives in Illinois and is paid a percentage of Vertex's profits.

17. Defendant Tess Law LLC is the law firm that employed Tessler at all relevant times. Tessler filed the writ applications and communicated with the Sheriff's Office through the firm. Schaffel works there as a clerk for Tessler. Upon information and belief, Tessler owns the firm.

~~14.~~ 18. Defendant Earl McQueen is a Deputy Sheriff of Baltimore ~~City who~~ City. He delivered the March 6, 2026 eviction notice and executed the March 18, 2026 ~~eviction using a writ of possession that a judge had quashed.~~ eviction. He is sued in his individual capacity.

~~15.~~ 19. Defendant Glenda Holman is an employee of the Baltimore City Sheriff's Office who ~~served as~~ schedules evictions. She was Vertex's point of contact for ~~scheduling evictions. She afforded Vertex preferential eviction scheduling, which aided it in scheduling and executing evictions before notice requirements were met.~~ scheduling. She is sued in her individual capacity.

~~16. Defendant Xavier Conaway is the Clerk of the Circuit Court for Baltimore City. Under Conaway's leadership, the Court Clerk's office unlawfully issued numerous writs of possession. He is sued in his individual capacity.~~

~~17.~~ 20. Defendant Kenyatta Washington is a Lieutenant ~~with~~ in the Baltimore City Sheriff's ~~Office. He is Defendant~~ Office and McQueen's supervisor. ~~Washington gave Plaintiff multiple assurances that the eviction would not take place on March 18 and refused to stop the eviction when it was underway, even though it was within his power. Washington~~ He is sued in his individual capacity.

~~18. Defendant Yitzchok Isaac "Yitzy" Schleifer is an elected member of the Baltimore City Council. Upon information and belief, Schleifer facilitated and quarterbacked the corrupt, favorable treatment of Vertex by the Baltimore City Sheriff's Office and others, and he is named as a Defendant in the conspiracy claims on that basis. He is sued in his individual capacity.~~

~~19. Defendants Mohamed Dahan Shahbain, along with Defendants Alsamet and Alnisafi, purchased the deed for 229 N. Monroe from Vertex on December 3, 2025.~~

~~20. Defendant Hadaf Anwar Alsamet, along with two other Defendants, purchased the deed for 229 N. Monroe from Vertex on December 3, 2025.~~

~~21. Defendant Mohamed Abdo Alnisafi, along with two other Defendants, purchased the deed for 229 N. Monroe from Vertex on December 3, 2025.~~

~~22. John Does 1-10 are unknown persons who may have participated in the unlawful acts and conspiracy, and whose identities may be uncovered in discovery. After discovery, Plaintiff may seek leave to add them to the suit under Rule 15.~~

**~~Maryland Tax-Sale Law and Baltimore City Code: Notice Requirements for Taking Possession~~**

~~23. In 2024, Defendant Vertex acquired a tax-sale certificate for 229 N. Monroe Street and on March 6, 2025 obtained a judgment foreclosing Plaintiff's right of redemption. Under Maryland and Baltimore City law, a judgment alone does not entitle a party to take possession of a property.~~

21. This Complaint calls McQueen, Holman, and Washington "the Sheriff's Office Defendants."

22. Defendants Mohamed Dahan Shahbain, Hadaf Anwar Alsamet, and Mohamed Abdo Alnisafi bought the Property from Vertex on December 3, 2025. They list a Colorado

address. Tessler obtained the March 4, 2026 writ of possession in their names and stated on the record in the Circuit Court that he acted as their agent.

23. Defendant the Mayor and City Council of Baltimore ("the City") is the municipal corporation that governs Baltimore City. The City enacted and maintains Baltimore City Code Article 13, Subtitle 8B, which governs tax-sale foreclosure evictions and treats an occupant's personal property as abandoned once a writ of possession is executed. The City is sued under 42 U.S.C. § 1983 in Count III for injuries caused by that ordinance and by the policies and practices the City relies on to carry it out.

## LEGAL FRAMEWORK

24. ~~To take possession,~~ A tax-sale certificate holder that obtains a ~~tax-sale foreclosure plaintiff like Vertex~~ judgment foreclosing the right of redemption is not entitled to possession on the judgment alone. It must ~~first~~ pay certain costs to the Baltimore City Department of ~~Finance. Upon payment, the Department~~ Finance, which then conveys a deed. Only a deed ~~to the investor. Only then does the investor become~~ holder is entitled to a writ of-~~possession.~~ possession, and the writ may not be executed until the notice required by State and City law has been given.

~~25. With a writ in hand, the tax-sale investor must then provide the property owner with notice, in accordance with the law, before the writ may be executed.~~

25. Md. Code, Tax-Prop. § 14-836(b)(7) provides that "after issuance of the judgment foreclosing right of redemption and at least 30 days before taking possession of the property, the plaintiff shall give any tenant of the property written notice of the plaintiff's intention to obtain possession of the property and that the tenant must vacate the property within 30 days after the

notice." The notice "shall also be posted on the property within 5 days of first being sent." § 14-836(b)(7)(iv).

26. Baltimore City Code ~~Article~~ Art. 13 § 8B-2 ~~states~~ provides that the tax-sale "foreclosure purchaser shall notify any occupant of the property of the date on which the writ of possession is first scheduled to be executed by the Sheriff." ~~That~~ The notice must therefore state the specific date the eviction is scheduled for, not merely that one will occur. It must be mailed at least 14 days before ~~the scheduled eviction~~ that date and posted on the property at least 7 days ~~before. The notice must state the eviction date. Under § 8B-3, a sheriff is prohibited from executing a writ of possession if the sheriff "reasonably believes" that the notice requirements were not met.~~ before it.

~~27. Separately, Md. Code, Tax-Prop. § 14-836(b)(7) requires the tax-sale foreclosure plaintiff give at least 30 days' written notice before taking possession of property. Within 5 days of mailing that notice, another notice must be physically posted on the property.~~

~~28. These laws were broken to evict Plaintiff.~~

**~~The Eviction~~**

27. Baltimore City Code Art. 13 § 8B-3(a) provides: "If the Sheriff reasonably believes that neither the Sheriff nor the foreclosure purchaser provided the occupant with the notice required by § 8B-2, the Sheriff shall notify the Circuit Court and may not execute the writ of possession until further order of the Court." Under § 8B-3(b), if the Circuit Court finds that neither the foreclosure purchaser nor the Sheriff provided the notice required by § 8B-2, "the Circuit Court shall vacate the writ of possession." Under § 8B-3(c), "there is a rebuttable presumption that the occupant was notified" if the foreclosure purchaser provides a copy of the

notice, a certificate of mailing, and a signed affidavit by the person who posted the property, "all of which are dated within the proper time periods required by § 8B-2."

28. Maryland Rule 1-203(a) provides that in computing a period of time, "the day of the act, event, or default after which the designated period of time begins to run is not included," and that for periods longer than seven days, intermediate Saturdays, Sundays, and holidays are counted.

29. Maryland Rule 2-126 requires the sheriff to file a return with the court after executing a writ.

30. COMAR 01.01.2023.01, Governor Wes Moore's Executive Order "Standards of Conduct for Executive Branch Employees," states that "[t]he citizens of Maryland deserve a Government where State business is conducted truthfully and honestly, free of the existence or the perception of any corruption or misconduct." Section F provides: "Employees shall act impartially in all their affairs and shall not give preferential treatment to any private organization or individual."

31. The Sheriff's Office's published materials state that at a warrant-of-restitution eviction, "[t]he Sheriff's Office representative will verify that the landlord provided sufficient notice to tenants. Tenants may challenge whether the appropriate notices were properly sent."[1]

32. The Maryland Judiciary's Warrant of Restitution form (DC-CV-081, Rev. 07/01/2026) tells Baltimore City tenants that the landlord must give notice of the first scheduled eviction date by first-class mail at least 14 days before the eviction and by posting on the premises at least 7 days before, and states: "If you or the sheriff believe the notices were not

[1] A warrant of restitution is the court order directing the Sheriff to execute an eviction in a landlord-tenant case. A writ of possession is its counterpart that enforces a judgment awarding possession of real property, as in mortgage and tax-sale foreclosure cases. Both direct the Sheriff's Office to remove a property's occupants and deliver possession.

properly provided, the sheriff may refer the issue to a judge to decide." It continues: "If the judge determines that the landlord did not give proper notice, the eviction will be vacated/cancelled," and if proper notice was given, "the sheriff will execute the eviction immediately."

33. The earlier version of that form, in use during the events in Todman v. Mayor & City Council of Baltimore, 104 F.4th 479 (4th Cir. 2024), carried a "BALTIMORE CITY ONLY — IMPORTANT NOTICE TO DEFENDANTS" stating that the landlord "must provide notice to the tenant of the first scheduled eviction date in two separate ways" and that "[t]he tenant may challenge whether the notices were properly given."

34. In a YouTube interview with Midfield Real Estate, Sheriff Samuel Cogen and the Sheriff's Office's Legal Advisor, Nicholas Blendy, described the Office's eviction practices. They did not specifically address tax-sale foreclosure evictions, which are less common than failure-to-pay-rent evictions. Although not every type of eviction legally requires 14 days' notice, the Office treats 14 days as a minimum for consistency. Blendy said the "Sheriff's department prefers uniformity with notice," that "[w]e've actually scheduled some [evictions] on the first lawful day – 15 days out," and that "[w]e're not giving you a date within 14 days."

35. Applied here: the March 4, 2026 writ issued at 4:17 PM. Under Rule 1-203(a), March 5 was day one and March 18 was day fourteen. Fourteen days' mailed notice of an eviction under that writ could not have been complete before March 19, 2026, and thirty days' notice under § 14-836(b)(7) could not have run before April 3, 2026. By the Sheriff's Office's own math (¶ 34), March 18 was one day early, and that is before accounting for the fact that no notice was sent until March 6.

## FACTS

### A. Vertex acquires and sells the Property

36. In 2024, Vertex acquired a tax-sale certificate for the Property.

37. On March 6, 2025, Vertex obtained a judgment foreclosing Plaintiff's right of redemption.

38. On May 4, 2025, Vertex applied for a writ of possession for the Property, and the Clerk's office issued it the next day. By May 8, 2025, Tessler and Holman had scheduled an eviction for May 28, 2025.

39. On May 14, 2025, a deputy sheriff posted a notice on the Property stating the May 28 eviction date. On May 23, 2025, the Circuit Court quashed the writ. The eviction was cancelled, and no eviction occurred on May 28, 2025.

~~29.~~ 40. On December 3, 2025, Vertex obtained a deed to the ~~Property. That~~ Property from the City. The same day, it conveyed the ~~deed and title to Mohamed Dahan Shahbain, Hadaf Anwar Alsamet, and Mohamed Abdo Alnisafi. From that moment, Vertex had no possessory rights~~ Property to the ~~Property.~~ purchasers for $190,000.

41. That price was $70,000 above the highest bid at the public auction Vertex had held for the Property and more than double the State Department of Assessments and Taxation's valuation.

42. Tessler later stated on the record in the Circuit Court that Vertex's sale to the purchasers was conditioned on Vertex pursuing possession for them, and that he was acting as the purchasers' agent. He and Tess Law represented Vertex and the purchasers in that court and filed motions on behalf of each.

**B. The January 23 writ and the March 18 date**

30. Despite holding 43. On January 23, 2026, Vertex, which no longer held a deed, Vertex obtained a writ of possession in its own name from the Baltimore City Court Clerk's office on January 23, 2026, and used it to schedule an eviction for March 18, 2026. office.

44. On February 11, 2026, at 5:42 PM, Holman emailed Schaffel proposing "Wednesday, 03/18/2026 – 11 am – 1 pm" for the Property and asked him to confirm. At 5:43 PM, Schaffel replied: "This is good (if there is earlier we can be ready then also)." (Exhibit 14.)

**C. March 4, 2026**

45. On March 4, 2026, the Circuit Court quashed the January 23 writ because Vertex was not the deed holder.

31. On March 4, 2026, the Circuit Court quashed the writ because Vertex was not the deed holder. 46. That same day, Plaintiff's representative emailed Defendants Holman, Washington, and the head of the Baltimore City Sheriff's Office, Sheriff Samuel Cogen, informing told them the writ had been quashed quashed, and asking asked that the March 18 eviction be cancelled. Defendant Holman replied: "cancelled." (Exhibit 1.)[2]

32. Within an hour of being served the March 4, 2026 order quashing the writ, Defendant Tessler filed a new writ application, this time purporting to act on behalf of the current deed holders (i.e., Defendants Shahbain, Alsamet and Alnisafi). The Clerk's office issued the new writ roughly 90 minutes later, at 4:17 PM on March 4.

---

[2]This was not the first instance Vertex obtained an unlawful writ for the Property, only to have it quashed and the eviction cancelled. Specifically, on May 4, 2025, Vertex applied for a writ of possession for the Property and the Clerk issued the writ the next day. On May 7, Defendants Tessler and Holman scheduled an eviction for May 28. On May 14, a deputy sheriff posted an eviction notice on the Property stating a May 28, 2025 eviction date. On May 23, the writ was quashed. The eviction was cancelled and no eviction occurred on May 28, 2025.

47. Within an hour of being served with the order, Tessler filed a new writ application through Tess Law, stating that he acted for the current deed holders, Shahbain, Alsamet, and Alnisafi.

48. The application cited the deed Vertex had held, not the deed the purchasers held.

49. The exhibit attached to the application was labeled "JUDGEMENT AWARDING POSSESSION" in the comment field of Maryland's Electronic Document Submission system. The document itself was Vertex's Judgment Foreclosing the Right of Redemption.

50. The Clerk's office issued the new writ at 4:17 PM.

51. At 4:24 PM, the private Defendants, through Tess Law, replied in the February 11 email thread, addressed to Holman: "For technical reasons the Court issued a new Writ of Possession today (attached). The owner would like to keep the March 18, 2026 date." Schaffel and Tessler were on the email.

52. At 4:29 PM, Holman forwarded that email to Washington: "We will discuss tomorrow. Quashed 3/4/26." (Exhibit 14.)

53. Later that day, Plaintiff's representative emailed Holman, Washington, and Cogen asking whether the newly issued writ would affect the eviction schedule. None of them responded.

**D. March 5, 2026**

~~33.~~ 54. On March ~~4,~~ 5, 2026, Plaintiff's representative ~~emailed Defendants Washington and Holman and Sheriff Cogen asking whether the newly issued writ would affect the eviction schedule. They did not respond. The next day, Plaintiff's representative noticed the eviction still appeared on~~ saw that the Sheriff's Office website still listed the March 18 eviction and ~~sent another email:~~ emailed Holman, Washington, and Cogen: "Yesterday you cancelled the March 18 eviction. However, according [to] the Baltimore City Sheriff website, the eviction is still

scheduled for March 18. May you please advise on if the eviction is cancelled or scheduled?”- ~~Defendant Washington replied: “our system was updated showing the warrant was quashed. I recommend refreshing the browser then selecting it again. For some reason if you don’t see it removed please call me direct.” Within the hour, the eviction was removed from the website.~~ <u>(Exhibit 1.)</u>

<u>55. Washington replied: “our system was updated showing the warrant was quashed. I recommend refreshing the browser then selecting it again. For some reason if you don’t see it removed please call me direct.” (Exhibit 1.)</u>

<u>56. Within the hour, the listing for the Property was removed from the Sheriff’s Office website.</u>

<u>57. March 5 was the day Holman had said she and Washington would discuss the private Defendants' request. They kept the March 18 date. (Exhibit 14.)</u>

<u>58. Neither told Plaintiff. At no time between March 4 and March 18 did Holman or Washington tell Plaintiff or his representative that the private Defendants had asked to keep the date, that the Office was considering the request, or that the date had been kept. Holman never corrected her "cancelled," and Washington went further: on March 5, on March 9, and by phone in the days before March 18, he assured Plaintiff's representative that no eviction would take place on March 18 (¶¶ 55, 61, 66). For two weeks, Plaintiff believed the eviction was off because the Sheriff's Office told him it was.</u>

**<u>E. March 6 through March 9, 2026</u>**

<u>59. On March 6, 2026, McQueen came to the Property and delivered a written eviction notice. The notice was based on the January 23 writ that the court had quashed two days earlier. (Exhibit 2.)</u>

60. Plaintiff's representative emailed Holman, Washington, and Cogen asking what the notice meant.

34. On March 6, Defendant McQueen arrived at the Property and delivered a written eviction notice which referenced the January 23 writ that the court had already quashed. Plaintiff's representative again emailed Defendants Washington, Holman and Sheriff Cogen. 61.

On March 9, 2026, Washington replied: "that posting had already been assigned to the deputy's workload but yes that Writ of Possession has been canceled. We apologize for any confusion this may have caused." (Exhibit 1.)

35. On 62. Also on March 9, Plaintiff received a letter from Defendant Tessler stating that his clients intended to take possession of the Property. The letter was postmarked March 6, only twelve days before 6. It did not say whether the March 18 eviction. That was two days short of clients were Vertex, the fourteen days' notice required by Baltimore City Code Article 13 § 8B-2 purchasers, or both, and eighteen days short of the thirty days' notice required by Md. Code, Tax-Prop. § 14-836(b)(7). The letter also failed to it did not state the an eviction date. (Exhibit 3.)

36. The 63. Tessler's letter and McQueen's March 6 notice were the only eviction-related papers Plaintiff received leading up to the before March 18 eviction were McQueen's March 6 delivery citing a quashed writ and Tessler's letter postmarked that same day. 18.

64. Upon information and belief, Vertex, Shahbain, Alsamet, and Alnisafi each authorized Tessler and Tess Law to obtain possession of the Property on their behalf on March 18, 2026, and Tessler and Tess Law acted as their agents in doing so. Tessler had told the Circuit Court that the sale was conditioned on Vertex pursuing possession for the purchasers and that he acted as their agent (¶ 42); the March 4 application was filed in the purchasers' names on

Vertex's deed (¶¶ 47–48); and his March 6 letter referred to his clients without naming them (¶ 62). Each stood to benefit: Vertex by keeping the $190,000 purchase price, and the purchasers by obtaining the Property.

65. Vertex and the purchasers pursued possession of the Property as one. The March 18 date was set on a writ Vertex obtained in its own name after it had sold the Property (¶¶ 40, 43–44). The replacement writ was in the purchasers' names but cited Vertex's deed (¶¶ 47–48). On March 18, Vertex was still the only plaintiff of record in the Circuit Court case, yet the writ in hand was the purchasers'. Vertex, Schaffel, Tessler, Tess Law, Shahbain, Alsamet, and Alnisafi shared the single objective of taking possession of the Property and acted through Tessler and Tess Law to get it. Neither Vertex nor the purchasers can escape responsibility for the eviction by pointing to the other.

**F. March 9 through March 18, 2026**

~~37.~~ 66. Between March 9 and March 18, ~~Defendant~~ Washington ~~gave~~ told Plaintiff's representative ~~additional assurances~~ by phone that the eviction would not proceed on March 18. He ~~stated that~~ said his office controlled the scheduling and that he would not allow a March 18 eviction to happen.

~~38. Plaintiff relied on the Sheriff's Office employees' emails and assurances and was convinced no eviction would occur on March 18.~~

67. Plaintiff relied on Holman's and Washington's statements. He kept operating his business and did not remove his property from the building.

**G. March 18, 2026**

~~39.~~ 68. On March 18, 2026, ~~the Sheriff's Office executed the eviction anyway. Defendant~~ McQueen arrived at the Property in uniform and armed. (Exhibit 4.) A representative of ~~the private entity~~ party taking possession was ~~present; upon~~ present with him. Upon information and

belief, that representative was ~~Defendant Tesstler.~~ Tessler, who traveled from Illinois to Baltimore for the eviction.

69. McQueen presented Plaintiff with the January 23 writ as the legal basis for the eviction. (Exhibit 5.) The Sheriff's Office's own system had recorded that writ as quashed since at least March 5.

~~40. Defendant McQueen presented Plaintiff with~~ 70.Upon information and belief, McQueen's use of the quashed January 23 writ ~~as the purported legal basis for the eviction. That choice~~ was not an accident. ~~Proceeding under the~~ The March 4 writ ~~would~~ could not ~~have exposed the notice violations on the face of the documents. A sheriff is legally prohibited from executing a writ of possession when the sheriff "reasonably believes" the notice requirements have not~~ been ~~met. (Baltimore City Code Art. 13 § 8B-3.) A writ issued at 4:17 PM on March 4 and~~ lawfully executed on March 18 ~~makes compliance with the 30-day notice requirement of Md. Code, Tax-Prop.~~ (¶ 35), and under § ~~14-836(b)(7) mathematically impossible, and compliance with the 14-day requirement of Baltimore City Code Art. 13 § 8B-2 virtually impossible.~~ 8B-3 a deputy holding it would have been barred from proceeding (¶ 27). By using the quashed January 23 writ instead, McQueen could carry out the eviction and later claim he did not know the notice requirements had not been met.

~~41. While the eviction was underway,~~ 71. Plaintiff called his representative and ~~then~~ handed the phone to ~~Defendant~~ McQueen. ~~Plaintiff's~~ The representative told ~~Defendant~~ McQueen the eviction was a mistake ~~—~~ and that ~~Defendant~~ Washington had assured them it would not take place on March 18. ~~Defendant~~ McQueen ~~stated Defendant~~ said Washington was aware of the ~~eviction,~~ eviction and that ~~Defendant McQueen~~ he would stop ~~the eviction upon orders from Defendant Washington.~~ it if Washington ordered him to.

~~42.~~ 72. Plaintiff's representative then called ~~Defendant~~ Washington and asked him to reschedule the eviction. Washington ~~refused, stating~~ refused. He said he could not intervene because ~~Deputy~~ McQueen and the ~~Vertex~~ private Defendants' representative were already on-~~site. Washington stated~~ site, and that he could stop the eviction only ~~upon~~ on a court ~~order, which~~ order. Plaintiff could not ~~possibly~~ have obtained a court order in time because the eviction was already underway.

~~43. The eviction was a surprise. Because the Defendants convinced Plaintiff the eviction was cancelled, never provided the legally required notice, and never provided an official eviction date, Plaintiff had no opportunity to remove his belongings from the Property before they were seized.~~

73. Neither McQueen nor Washington asked Plaintiff whether he had received the notices required by § 8B-2 or § 14-836(b)(7), neither stopped the eviction when they realized it was a surprise, and neither referred the question to a judge.

74. The Sheriff's Office has an established procedure for a notice dispute at the door: pause the eviction and refer the question to a judge (¶¶ 31–33). That procedure was available on March 18, 2026, and for a writ of possession § 8B-3 made it mandatory (¶ 27). Because property left in the building was treated as abandoned the moment the writ was executed, skipping that procedure took away the only chance Plaintiff had to contest the eviction before he lost everything inside.

75. The eviction went forward. Plaintiff surrendered possession, and the building's contents remained inside.

**H. After the eviction**

76. Plaintiff asked for his belongings back. Tessler, acting for the private Defendants, conditioned their return on Plaintiff dismissing his appeal against Vertex to recover title and waiving all future legal claims relating to the Property.

77. As of August 3, 2026, the Sheriff's Office had not filed the return required by Rule 2-126 with the Circuit Court, and the Property remained unoccupied.

~~44. As of August 3, 2026, the Sheriffs Office had still not filed the required post-eviction paperwork with the Baltimore City Circuit Court.~~ 78. Upon information and belief, the Sheriff's Office has not filed the ~~paperwork~~ return because its employees know the eviction was unlawful and do not want it ~~memorialized~~ recorded in publicly accessible court ~~records.~~ files.

~~**Corrupt Favors for Vertex by Public Officials**~~

~~45. The corrupt favorable treatment for Vertex extends beyond the Sheriff's Office.~~

~~46. Under Defendant Conaway's leadership, the Clerk's office issued writs of possession to Vertex on at least seven occasions when Vertex held no deed, in violation of clearly established law. (Baltimore City Circuit Court cases C-24-CV-24-004386, -004422, -004451, -004454, -004719, -004740, and -004747.) In most of these instances Vertex did not even claim to have a deed. Moreover, multiple "no-deed" writs were issued after the Court published orders that such writs were unlawful. Upon information and belief, Defendant Conaway directed the practice of unlawfully issuing "no-deed" writs of possession to Vertex. In the alternative, he acted with deliberate indifference to his employees' misconduct. Maryland Public Information Act ("MPIA") requests for employee logs relating to writs issued to Vertex were denied; the specific employees involved may be established through discovery.~~

~~47. The unlawfully issued "no-deed" writs are sometimes quashed before a property owner is dispossessed, but not always. A property owner must know to file a motion to quash,~~

~~file it in time, and hope the judge rules before the eviction date arrives. In case C-24-CV-24-004747, for example, the Clerk unlawfully issued a writ of possession; Vertex used it to schedule an eviction, the property owner in that case vacated, and Vertex changed the locks, all before the writ was eventually quashed.~~

~~48. Defendants Vertex, Tessler, and Schaffel appear to have even cultivated favorable treatment from the bench. On September 16, 2025, Defendant Tessler emailed the presiding trial court judge ex parte, asking for "any assistance [the judge] can render" on pending motions. The judge ruled the next day. Tessler replied: "An order was issued today. Both I and my client are grateful for the prompt response." (Exhibit 1.)~~

~~49. On March 19, 2026, a second trial court judge denied a motion to quash the writ of possession issued to the third-party deed purchasers, Defendants Shahbain, Alsamet and Alnisafi. His ruling was plainly at odds with the governing statute; to reach it, the judge treated a key clause of the statute as if it did not exist. (Exhibit 2.) Sheriff Cogen and Defendant Schleifer appear to be political allies of that judge. (Exhibit 3 shows Sheriff Cogen and Defendant Schleifer as two of the only recognizable elected officials at the judge's inauguration party.)~~

~~50. Additionally, Defendant Holman provided preferential scheduling for the private Defendants, as evidenced by private emails between her and Defendant Tessler. (Exhibit 7.) Holman's special treatment helped the private Defendants schedule and execute evictions before notice requirements were met, including Plaintiff's March 18 eviction. Her preferential treatment for Vertex was in direct violation of COMAR 01.01.2023.01F which states, "Employees shall act impartially in all their affairs and shall not give preferential treatment to any private organization or individual."~~

~~51. Plaintiff alleges that Defendants Schaffel, Tessler, and Vertex cultivated relationships with public officials who used their offices to unlawfully bend the rules in exchange for financial and political benefits. Defendants Schaffel, Tessler, and Vertex took these unlawful actions for their own benefit and for the benefit of Defendants Shahbain, Alsamet, and Alnisafi.~~

**~~Statement of Compliance with Maryland Statutes~~**

**I. The Sheriff's Office's departures from its own policies**

79. In Plaintiff's case, the Sheriff's Office Defendants departed from each of the Office's own policies described in ¶¶ 31–34: they scheduled the eviction inside the notice period; they did not verify notice; they did not refer the notice dispute to a judge; and they coordinated the eviction with Tessler and his clients while telling Plaintiff it was cancelled.

80. Each departure benefited the private Defendants by letting them take possession before Plaintiff could remove his property. Departing from the Office's policies for a private party's benefit violates Governor Wes Moore's Executive Order 01.01.2023.01, "Standards of Conduct for Executive Branch Employees," now codified at COMAR 01.01.2023.01 (¶ 30).

**PLAINTIFF'S LITIGATION IN THE STATE OF MARYLAND COURT SYSTEM**

81. No state-court case raises the claims in this Complaint. The claims here arise from the failure to give the notice required before the March 18, 2026 eviction and from the eviction being carried out by surprise. Neither the notice failures nor the injuries related to the surprise eviction have been raised in state court.

**STATEMENT OF COMPLIANCE WITH MARYLAND STATUTES**

~~52.~~ 82. Plaintiff has complied with the Maryland Tort Claims Act and the Local Government Tort Claims Act, having mailed the required notice letters on June 9, 2026.

~~53.~~ 83. Plaintiff asserts that damages for all counts exceed $75,000, in an amount to be determined at trial, making Plaintiff compliant with Maryland Rule 2-305.

**COUNT I**
**UNREASONABLE SEIZURE OF PROPERTY**
*42 U.S.C. § 1983 — Fourth Amendment*
**(Against Defendants McQueen, Holman, ~~Conaway,~~ Washington, Vertex, Schaffel, Tessler, Tess Law LLC, Shahbain, Alsamet and Alnisafi)**

~~54.~~ 84. The allegations set forth in all previous paragraphs are incorporated herein by reference.

~~55.~~ 85. Plaintiff had protected property interests in the real property at 229 N. Monroe Street, in the deli and convenience store business he operated there, and in the personal and business property within the building.

~~56.~~ 86. The March 18, 2026 eviction was a seizure of that property under color of law.

~~57. The private Defendants (Vertex, Schaffel, Tessler, Shahbain, Alsamet and Alnisafi) acted under color of state law by organizing the unlawful eviction with State officials, namely the Sheriff's Office Defendants (Washington, Holman and McQueen). While the Sheriff's Office assured Plaintiff the eviction was cancelled, the private Defendants and the Sheriff's Office planned the eviction behind Plaintiff's back. Their coordination is evidenced by, among other things, the coordinated arrival of the private Defendants' agent, Defendant Tessler, and Defendant McQueen at the eviction.~~

~~58.~~ 87. The seizure was unreasonable. Plaintiff did not receive the notice required by Md. Code, Tax-Prop. § ~~14-836(b)(7); Plaintiff did not receive the notice required~~ 14-836(b)(7) or by Article 13 § 8B-2 of the Baltimore City Code; the eviction was scheduled on a January 23 writ of possession that was quashed on March 4; the ~~Clerk unlawfully issued when Vertex held no deed;~~

quashed writ was presented at the eviction ~~was carried out under a writ of possession which had been quashed;~~ as its purported basis; and the eviction came as a surprise because ~~the~~ Sheriff's Office employees had told Plaintiff ~~the eviction~~ it would not take place ~~on~~ that day. As professional tax-sale investors, court officers, and law enforcement, every Defendant knew or should have known that carrying out an eviction under these conditions violated Plaintiff's constitutional and statutory property rights.

88. Defendant Holman was Vertex's point of contact for scheduling evictions and had set the March 18 date directly with Schaffel on February 11, 2026. On March 4, after the writ was quashed, she told Plaintiff's representative the eviction was "cancelled." Approximately two hours later, the private Defendants, through Tess Law, wrote to her in the same February 11 thread asking to keep the March 18 date. Five minutes later, Holman forwarded the request to Defendant Washington: "We will discuss tomorrow. Quashed 3/4/26." They kept the March 18 eviction date.

89. Having kept the date, neither told Plaintiff. Washington instead assured Plaintiff's representative, on March 5, on March 9, and by phone between March 9 and March 18, that the eviction would not take place on March 18. Holman never corrected her "cancelled," and never answered Plaintiff's March 4 email asking whether the new writ affected the schedule. Both knew the date was being kept at Vertex's request and knew Plaintiff believed the eviction was off. Either could have told him the truth at any point before March 18, including the day before. Instead, they evicted him by surprise. Keeping the date at the private Defendants' request, after the writ it had been set on was quashed, was preferential treatment of Vertex in violation of COMAR 01.01.2023.01F and shows improper motive.

90. Washington backed up his March 5 assurance by taking the eviction off the Sheriff's Office's public website. That day, Plaintiff's representative emailed him that the Sheriff's Office website still showed the March 18 eviction. Washington replied that the system had been updated to show the writ was quashed and to refresh the browser. Within the hour, the listing was gone from the official public website that Baltimore City residents rely on to know when evictions will occur. On information and belief, Washington directed its removal.

91. The Sheriff's Office's own policy is not to schedule an eviction until the 15th day after a writ of possession or warrant of restitution issues. The March 4 writ issued at 4:17 PM; under that policy the earliest eviction date was March 19.

92. At the eviction, Defendant McQueen presented the quashed writ of possession to Plaintiff as the justification for the eviction, though the Sheriff's Office's own system had recorded it as quashed for nearly two weeks.

93. Baltimore City Code Article 13 § 8B-3(a) bars the sheriff from executing a writ of possession if he reasonably believes the City's notice requirements have not been met, and the Sheriff's Office's own practice at warrant-of-restitution evictions is to check whether notice was proper. On March 18, it was apparent to both McQueen and Washington that Plaintiff was surprised by the eviction, i.e., that proper notice likely had not been given; Washington himself had told Plaintiff's representative days earlier that no eviction would take place that day. McQueen said he would stop the eviction if Washington ordered it. When called, Washington said he could stop it only with a court order. That was wrong: § 8B-3(a) gave him the authority to halt it himself and refer the notice question to a judge. He did neither.

~~59. Upon information~~ 94. Based on the facts above, Defendants Holman, Washington, ~~and belief, the Sheriff's Office personnel who scheduled and executed the eviction~~ McQueen acted with malice or gross negligence and without reasonableness ~~as described below.~~ in scheduling and executing the eviction.

~~60. Defendants Washington and Holman, as well as Baltimore City Sheriff Samuel Cogen, knew Plaintiff believed the eviction had been cancelled. Any of them could have corrected that belief before March 18, including the day before. Instead, they chose to evict Plaintiff by surprise, to ensure he would not remove his personal and business property beforehand. Defendant Tessler then used that property as leverage to pressure Plaintiff into dropping his appeal in the Appellate Court of Maryland, where Plaintiff is seeking to recover title to the Property.~~

~~61. Defendant Holman acted with malice by affording Vertex preferential eviction scheduling, in clear violation of State law including COMAR 01.01.2023.01F.~~

~~62. Defendant Washington acted with malice by repeatedly assuring Plaintiff the eviction would not happen on March 18, then allowing it to proceed anyway, and refusing to reschedule it when it was underway.~~

~~63. Defendant McQueen acted with malice by presenting a writ of possession he knew had been quashed as the pretext for the eviction.~~

~~64. The Sheriffs Office Defendants acted with malice by removing the eviction listing from the official public website that Baltimore City residents rely on to know when evictions will occur, then proceeding with the eviction anyway.~~

~~65. The Sheriffs Office Defendants acted with malice by willfully violating Baltimore City Code Article 13 § 8B-3(a) which requires them not to execute a writ of possession if they reasonably believe the City's notice requirements have not been met.~~

~~66. The~~ 95. Upon information and belief, the Sheriff's Office Defendants ~~executed the eviction~~ evicted Plaintiff in the manner most damaging to ~~Plaintiff~~ him not out of legal ~~necessity,~~ necessity but for two reasons: to retaliate ~~against him~~ for his advocacy against the private Defendants, and to ~~help~~ hand the private Defendants ~~use~~ his personal and business property as leverage to ~~force~~ make him ~~to~~ drop his ~~legal~~ claims ~~related~~ to the Property, including his pending appeal in the Appellate Court of Maryland to recover title. Tessler in fact used that property as leverage to pressure Plaintiff to drop the appeal. The Sheriff's Office Defendants had nothing lawful to gain from any of this. Evicting on March 18 cost them their own scheduling policy; evicting by surprise cost them their own word; refusing to stop cost them their duty under § 8B-3(a). On information and belief, they did it because they were getting an improper reward.

~~67.~~ 96. The ~~retaliatory and ill-willed~~ malicious character of the eviction is consistent with a documented culture within the Sheriff's Office. The Sheriff's own union, the Fraternal Order of Police, has stated that retaliation is a significant part of the Office's culture under ~~Baltimore City~~ Sheriff ~~Samuel Cogen. Sheriff Cogen~~ Cogen, who is currently a defendant in three other lawsuits alleging that he abused his office in a malicious and retaliatory manner.

~~68. Upon information and belief, based on the unlawful preferential treatment Vertex received, Sheriff Cogen received or was promised political favors and campaign contributions from Vertex's financiers, and rank-and-file Sheriff's Office employees received or were promised career advancement from Cogen, cash from Vertex, or both. The Sheriff's Office has~~

~~refused MPIA requests for communications related to Plaintiffs eviction; those records could provide concrete evidence of motive and will be sought in discovery.~~

~~69. Upon information and belief, Defendant Conaway acted with malice by knowingly facilitating the issuance of improper writs of possession to Vertex by his office. In the alternative, Defendant Conaway acted with deliberate indifference to his office's many instances of improperly issuing writs of possession, including the writ used against Plaintiff.~~

~~70. Defendant Tessler is liable as the private Defendants' agent who directly participated in carrying out the unlawful eviction.~~

~~71. Defendant Schaffel is liable as the principal and ead operator of Vertex; he directs Vertex's and Tessler's strategy and operations.~~

97. Plaintiff requested the Sheriff's Office's communications about the eviction under the Maryland Public Information Act ("MPIA"). The Sheriff's Office denied his requests.

97. The Sheriff's Office granted the private Defendants' MPIA requests for the same subject. The records it produced to them (Exhibit 14) end with Holman's 4:29 PM email of March 4 forwarding Tess Law's request to Washington, "We will discuss tomorrow. Quashed 3/4/26" (¶ 52). They contain nothing dated March 5 or later: no record of the March 5 discussion (¶ 57), and no email from Holman or any other Sheriff's Office employee confirming to the private Defendants that the eviction would proceed on March 18. Yet the private Defendants' representative was at the Property with McQueen on March 18 (¶ 68). The records withheld from Plaintiff will be sought in discovery.

98. The private Defendants (Vertex, Tess Law, Schaffel, Tessler, Shahbain, Alsamet and Alnisafi) acted under color of state law by invoking the State's eviction process and carrying out the eviction jointly with the Sheriff's Office Defendants (Washington, Holman and McQueen).

The joint action is shown by Holman's direct scheduling with Schaffel; the private Defendants' March 4 request, through Tess Law and that same channel, to keep the March 18 date after the writ was quashed; the Sheriff's Office's decision to keep that date while telling Plaintiff the eviction would not take place on it; and the private Defendants' representative and McQueen arriving at the Property together on March 18.

99. Defendant Schaffel is Vertex's principal and operator and its lead decision-maker for the Property, and he works as a clerk for Tessler and Tess Law, the firm that prepared and filed the writ applications. On information and belief, Schaffel and Tessler operate as partners in pursuing possession of Vertex's tax-sale properties, including this one. Under Schaffel, Vertex obtained the January 23, 2026 writ in its own name after it had already sold the Property. When Holman proposed March 18, Schaffel confirmed it within a minute. He was on the March 4 email in which the private Defendants, through Tess Law, asked Holman to keep the March 18 date.

100. Defendant Tessler is liable as a direct participant and as the private Defendants' agent. He obtained both writs; through Tess Law, he asked the Sheriff's Office to keep the March 18 date the same afternoon the first writ was quashed; he mailed the March 6 letter that gave no eviction date; on information and belief, he attended the eviction; and afterward he conditioned the return of Plaintiff's property on Plaintiff dropping his appeal. Defendant Tess Law is liable because Tessler filed the writ applications and communicated with the Sheriff's Office through the firm, within the scope of his employment by it.

~~72.~~ 101. Defendants Shahbain, Alsamet and Alnisafi are liable because the ~~unlawful property~~ seizure was carried out on their behalf and, on information and belief, with their ~~knowledge~~ knowledge. They bought the Property on the condition that possession be obtained, the March 4 writ was issued in their names, and ~~on their behalf, as shown by Defendant Tessler's~~

~~acknowledgment~~ Tessler acknowledged in the Baltimore City Circuit Court that he was acting as their agent.

~~73.~~ 102. As a direct result, Plaintiff lost his real property, his deli and convenience store business, and his ~~chattels,~~ personal and business property, and he suffered economic harm and severe emotional distress.

**COUNT II**
**UNREASONABLE SEIZURE OF PROPERTY**
*Maryland Constitutional Tort — Declaration of Rights, Articles 19 and 26*
**(Against Defendants McQueen, Holman, ~~Conaway, Washington, Vertex, Schaffel, Tessler, Shahbain, Alsamet~~ and ~~Alnisafi)~~ Washington)**

~~74.~~ 103. The allegations set forth in all previous paragraphs are incorporated herein by reference.

~~75.~~ 104. Article 26 of the Maryland Declaration of Rights prohibits unreasonable seizures. Article 19 guarantees a remedy for injuries to person or property. Maryland recognizes a direct cause of action for damages arising from violations of the Declaration of Rights.

~~76.~~ 105. The seizure of Plaintiff's property as described herein was unreasonable for the same reasons set forth in Count I, and violated Article 26, entitling Plaintiff to damages under Article 19.

**COUNT III**
**DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS OF LAW**
*42 U.S.C. § 1983 — Fourteenth Amendment*
**(Against Defendants The Mayor and City Council of Baltimore, McQueen, Holman, ~~Conaway,~~ Washington, Vertex, Schaffel, Tessler, Tess Law LLC, Shahbain, Alsamet and Alnisafi)**

~~77.~~ 106. The allegations set forth in all previous paragraphs are incorporated herein by reference.

78. Under Maryland law, the Baltimore City Court Clerk may issue a writ of possession in a tax-sale case without a judge's order. That ministerial power carries a due process obligation: the Clerk must issue writs only to parties legally entitled to them. When the Clerk issues writs to parties who are not entitled to them, property owners face the loss of their homes and businesses without due process of law.

79. Under Defendant Conaway, the Baltimore City Court Clerk's office has routinely issued writs of possession to Vertex in violation of the law, i.e., when Vertex had no deed. This occurred at least seven times. In at least five of these instances, Vertex had not even claimed to the Clerk's office that it held a deed.

80. Some of the unlawfully issued writs are quashed before the property owner is dispossessed, but not necessarily all. The property owner must file a motion to quash and hope the judge acts in time.

81. For example, in Baltimore City Circuit Court case C-24-CV-24-004747, the Clerk unlawfully issued a writ of possession to Vertex, Vertex used it to schedule an eviction, the property owner vacated, and Vertex changed the locks, all before the writ was eventually quashed.

82. In Plaintiff's case, the Clerk's office issued a writ to Vertex on January 23, 2026. Vertex used it to schedule the March 18 eviction before any judge had reviewed its validity. When a court finally reviewed the writ, it was quashed, but the eviction proceeded on that scheduled date anyway. If not for the improperly issued writ, Plaintiff would not have been evicted on March 18.

83. Defendant Conaway is liable for his malice or deliberate indifference to his office's repeated unlawful issuances of writs of possession.

~~84. The Sheriff's Office Defendants also denied Plaintiff due process by concealing the true eviction date, removing the eviction from the public website residents rely on, and carrying out the eviction under a void writ of possession.~~

107. Defendants Holman and Washington denied Plaintiff due process by concealing the true eviction date from him. Notice of that date is what every other pre-eviction protection depends on; without it, Plaintiff could neither contest the eviction in court or at the door nor remove his property before it was deemed abandoned.

~~85. Plaintiff's due process rights were also violated because he~~ 108. Plaintiff was never given the opportunity to challenge the eviction on the ground that Defendants ~~failed to comply~~ had not complied with the statutory pre-eviction notice requirements. The Sheriff’s Office’s own published materials state that at a warrant of restitution[3] eviction, “[t]he Sheriff’s Office representative will verify that the landlord provided sufficient notice to tenants. Tenants may challenge whether the appropriate notices were properly sent.” In Plaintiff’s case, the Sheriff’s Office employees knew the eviction was a surprise to ~~Plaintiff but~~ Plaintiff, never asked whether he had received proper notice, and did not stop it. ~~And they never asked~~ McQueen compounded this by presenting the quashed writ of possession as the basis for the eviction, which hid the notice failures Plaintiff ~~if he received proper notice.~~ could otherwise have raised on the spot.

~~86.~~ 109. The ~~issuance of writs to parties not entitled to them, the use of those writs to schedule and execute evictions, and the denial~~ absence of any opportunity to challenge the notice failures ~~together~~ deprived Plaintiff, and similarly situated property owners, of their property without due process of law.

[3] ~~A warrant of restitution is the court order directing the Sheriff to execute an eviction in a landlord-tenant case. A writ of possession is its counterpart that enforces a judgment awarding possession of real property, as in mortgage and tax-sale foreclosure cases. Both direct the Sheriff's Office to remove a property’s occupants and deliver possession,~~

~~87.~~ 110. The private Defendants (Vertex, Schaffel, Tessler, Tess Law, Shahbain, Alsamet and Alnisafi) ~~are liable as~~ acted under color of state ~~actors because they invoked~~ law for the reasons stated in ¶ 98 including by invoking the State's ~~processes to violate Plaintiff's Fourteenth Amendment rights. They obtained writs of possession through the Court Clerk's office despite being legally prohibited from doing so,~~ eviction process and ~~they executed~~ carrying out the eviction ~~through~~ jointly with the Sheriff's Office Defendants, before ~~satisfying~~ the mandatory pre-eviction notice ~~requirements.~~ had been given.

111. In the alternative, if § 8B-3's notice-verification requirement does not apply here, the Mayor and City Council of Baltimore is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for violating Plaintiff's procedural due process rights under the Fourteenth Amendment. This claim concerns the personal and business property inside the building, not the building itself. If § 8B-3 does not apply, the only notice required before Plaintiff was dispossessed was under Md. Code, Tax-Prop. § 14-836(b)(7) (¶ 25), which says nothing about abandonment; the only required abandonment warning is the City's own, in § 8B-2(c)(4).

112. Baltimore City Code Art. 13 § 8B-4(a) (¶ 28) deemed Plaintiff's property abandoned the moment the writ was executed, with no notice, no reclamation period, and no procedure to contest abandonment. The Fourth Circuit held the City liable for the same defect in *Todman v. Mayor & City Council of Baltimore*, 104 F.4th 479, 488–95 (4th Cir. 2024), under Subtitle 8A, the landlord-tenant counterpart to Subtitle 8B. An ordinance enacted by the City Council is official municipal policy, and this one "directly commands or authorizes constitutional violations." Id. at 495 (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987)).

113. If the City has not corrected its law in light of *Todman* and instead relies on an agreement with the Baltimore City Sheriff's Office to ensure that occupants receive the § 8B-2

notice, including its abandonment warning, the City has delegated that function and the Sheriff's Office's notice practices are the City's policy. The City would then be liable under *Monell* for the Sheriff's Office's failure to give Plaintiff that notice before his property was deemed abandoned.

**COUNT IV**
**DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS**
*Maryland Constitutional Tort — Declaration of Rights, Articles 19 and 24*
**(Against Defendants McQueen, Holman, ~~Conaway, Washington, Vertex, Schaffel, Tessler, Shahbain, Alsamet~~ and ~~Alnisafi)~~ Washington)**

~~88.~~ 114. The allegations set forth in all previous paragraphs are incorporated herein by reference.

~~89.~~ 115. Article 24 of the Maryland Declaration of Rights guarantees that no person shall be deprived of property except by due process of the law of the land. Article 19 guarantees every person a remedy for injuries to their person or property. For the reasons stated in Count III, Defendants deprived Plaintiff of his property in violation of Article 24, entitling Plaintiff to damages under Article 19.

**COUNT V**
**TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONS**
*Maryland Common Law*
**(Against Defendants McQueen, Holman, ~~Conaway,~~ Washington, Vertex, Schaffel, Tessler, Tess Law LLC, Shahbain, Alsamet and Alnisafi)**

~~90.~~ 116. The allegations set forth in all previous paragraphs are incorporated herein by reference.

~~91.~~ 117. Plaintiff operated a going-concern deli and convenience store at 229 N. Monroe Street with a regular customer base and established vendor ~~relationships.~~ relationships, including food distributors, an ATM provider, a point-of-sale vendor, and the Maryland Lottery Commission (¶¶ 120, 122). Those relationships had economic value.

~~92.~~ 118. The private ~~and Sheriff's Office~~ Defendants knew Plaintiff operated a deli and convenience store at the Property. That the Property housed an active business was evident from the underlying tax-sale foreclosure litigation and from a cursory visual inspection: the awning reads "Deli & Grocery." Defendant McQueen and Defendant Schaffel had each visited the Property before the eviction.

~~93.~~ 119. The ~~private and Sheriff's Office~~ Defendants knew that ~~Plaintiff, like any deli and convenience store owner,~~ Plaintiff's business depended on ~~vendor relationships~~ those relationships. Upon information and ~~customer sales to operate his business. They~~ belief, they sought to destroy ~~those relationships,~~ them, to harm Plaintiff financially and ~~to~~ weaken his ability to fund his ~~litigation~~ pending appeal in the Appellate Court of Maryland ~~where he seeks~~ to recover title to the Property.[4] The means they used — the unlawful eviction described throughout this Complaint — were independently wrongful.

120. Defendants' actions caused harm. For example, the Maryland Lottery Commission has obtained a judgment lien against Plaintiff (Case No. C-03-JG-26-013016) because lottery equipment was seized in the eviction and he cannot reach it to return it.

~~94.~~ 121. Before the eviction, Plaintiff was actively exploring a move to a nearby location at 200 N. Monroe Street. Had Defendants provided the legally required notice, he could have relocated, preserved his vendor and customer relationships, and limited his losses. ~~But because~~ Because the eviction came without warning, he had none of those opportunities.

~~95.~~ 122. The damage is not undone by restoration. Even if Plaintiff were restored to the Property tomorrow, he would have to rebuild his customer base and repair his standing with

[4] ~~Defendants succeeded in weakening Plaintiff's ability to fund his appeal to recover title. Plaintiff cannot afford counsel for oral argument at the appeal hearing and intends to proceed pro se.~~

vendors ~~who once regarded him as a reliable partner.~~ he had dealt with for years. One vendor, whose point-of-sale system remains locked inside the building, has already threatened to fine him for ~~failure~~ failing to return ~~the~~ equipment he cannot reach.

~~96.~~ 123. The unlawful interference caused Plaintiff substantial damages.

~~97.~~ 124. All Defendants named in this count are liable because they jointly ~~caused~~ acted to bring about the ~~tortious interference to occur.~~ eviction.

**COUNT VI**
**CONVERSION**
*Maryland Common Law*
**(Against Defendants McQueen, Holman, ~~Conaway,~~ Washington, Vertex, Schaffel, Tessler, Tess Law LLC, Shahbain, Alsamet and Alnisafi)**

~~98.~~ 125. The allegations set forth in all previous paragraphs are incorporated herein by reference.

~~99.~~ 126. Plaintiff owned and possessed business-related and personal property inside 229 N. Monroe Street and on the day of the eviction was operating his business as usual. The surprise eviction dispossessed Plaintiff of ~~his~~ that property and placed it within Defendants' control.

~~100.~~ 127. Defendants had no right to it. Baltimore City Code Art. 13 § 8B treats an occupant's property as abandoned only upon execution of a writ of possession, and the eviction here was unlawful for the reasons described throughout this Complaint, including that Plaintiff had not received legally sufficient notice. Defendant Tessler ~~expressly~~ then conditioned the return of Plaintiff's ~~personal and business~~ property on Plaintiff dismissing his appeal and waiving all future legal ~~claims.~~ claims relating to the Property. That demand shows Defendants acted ~~maliciously, willfully,~~ willfully and with ~~reckless disregard for~~ malice: they held Plaintiff's

~~rights, intending~~ property to ~~punish Plaintiff for exercising those rights and to leverage his property as a means of coercing Plaintiff~~ coerce him to abandon his legal claims.

~~101.~~ 128. By seizing and retaining Plaintiff's belongings without legal justification, Defendants engaged in conversion of Plaintiff's property.

~~102.~~ 129. All Defendants named in this count are liable because they jointly caused the conversion to occur.

**COUNT VII**
**TRESPASS TO CHATTELS**
*Maryland Common Law*
**(Against Defendants McQueen, Holman, ~~Conaway,~~ Washington, Vertex, Schaffel, Tessler, Tess Law LLC, Shahbain, Alsamet and Alnisafi)**

~~103.~~ 130. The allegations set forth in all previous paragraphs are incorporated herein by reference.

~~104.~~ 131. Plaintiff owned perishable goods consistent with operating a deli and convenience store, as well as household and business property. By dispossessing Plaintiff without legally sufficient notice and taking control of the building's contents, Defendants intentionally interfered with that property. As a result, Plaintiff's property spoiled, was lost, or was stolen.

~~105.~~ 132. All Defendants named in this count are liable because they jointly caused the trespass to chattels to occur.

**COUNT VIII**
**TRESPASS TO LAND**
*Maryland Common Law*
**(Against Defendants McQueen, Holman, Washington, Vertex, Schaffel, Tessler, Tess Law LLC, Shahbain, Alsamet and Alnisafi)**

133. The allegations set forth in all previous paragraphs are incorporated herein by reference.

134. On March 18, 2026, Plaintiff was in actual and exclusive possession of 229 N. Monroe Street. He operated his deli and convenience store on the ground floor and maintained a residential apartment on the top floor, and a living space in the basement.

135. On March 18, 2026, Defendant McQueen and the private Defendants' agent physically entered the Property without Plaintiff's consent. Defendants Holman and Washington scheduled and authorized that entry. Defendants Vertex, Schaffel, Tessler, Tess Law, Shahbain, Alsamet and Alnisafi requested and/or caused it.

136. The entry was not authorized by law. The writ presented to Plaintiff at the door, the January 23, 2026 writ, had been quashed by the Circuit Court on March 4, 2026. The March 4, 2026 writ could not lawfully be executed on March 18, 2026 because the notice required by Md. Code, Tax-Prop. § 14-836(b)(7) and Baltimore City Code Art. 13 § 8B-2 had not been given, and Baltimore City Code Art. 13 § 8B-3(a) prohibits the sheriff from executing a writ of possession when the sheriff reasonably believes the notice requirements have not been met. No lawful writ authorized entry onto the Property on March 18, 2026.

137. The entry was intentional, not accidental: Defendants scheduled it, and McQueen and the private Defendants' agent arrived together.

138. The unauthorized entry dispossessed Plaintiff of the Property, ended his business operations and residence there, and resulted in the seizure of everything inside the building. Plaintiff suffered damages as a result.

139. All Defendants named in this count are liable because they jointly caused the trespass to land to occur.

**COUNT IX**
**UNJUST ENRICHMENT**
*Maryland Common Law*
**(Against Defendants Vertex, Schaffel~~, and Tessler,~~ Tessler & Tess Law, or, in the alternative, against Defendants Tessler, Tess Law, Shahbain, Alsamet, and Alnisafi)**

~~106.~~ 140. The allegations set forth in all previous paragraphs are incorporated herein by reference.

~~107.~~ 141. Through the March 18, 2026 eviction, Defendants Vertex, Schaffel, Tessler, and~~-~~ ~~Tessler~~ Tess Law took possession of Plaintiff's real property and of all property inside it. In the alternative, Defendants Shahbain, Alsamet,~~ Alnisafi~~ Alnisafi, Tessler, and~~ Tessler~~ Tess Law took possession of Plaintiff's real property and all property inside it.

~~108.~~ 142. Defendants obtained a concrete benefit at Plaintiff's expense: premature possession of the real property and the value of everything inside it. They obtained a second benefit as well: by cutting off Plaintiff's income, the eviction left him unable to afford the attorney representing him in state court, weakening his appeal against Vertex to reclaim title. The surprise eviction was carried out on an ordinary business day while Plaintiff was operating normally,~~ ensuring~~ so the property and its contents~~ would be~~ were there for the taking. Defendants knew and appreciated~~-~~ ~~that benefit.~~ both benefits.

~~109.~~ 143. Defendants have retained~~ that benefit~~ those benefits under circumstances that make keeping~~ it~~ them inequitable. They gave Plaintiff nothing in return and have conditioned the return of his seized personal and business property on his dismissing his appeal and waiving all legal claims relating to the~~ property.~~ Property.

~~110.~~ 144. It would be unjust to allow Defendants to retain that benefit without compensating Plaintiff.

**~~COUNT IX~~**

**~~TRESPASS TO LAND~~**

**~~Maryland Common Law~~**

**~~(Against Defendants McQueen, Holman, Conaway, Washington, Vertex, Schaffel, Tessler, Shahbain, Alsamet and Alnisafi)~~**

~~111. The allegations set forth in all previous paragraphs are incorporated herein by reference.~~

~~112. Defendants Tessler and McQueen entered 229 N. Monroe Street and dispossessed Plaintiff using a quashed writ of possession as their purported authority. Because the writ had been quashed, it conferred no legal right to enter.~~

~~113. The entry was also a trespass on the independent ground that Defendants failed to provide the statutorily required pre-possession notice, which was a prerequisite to any lawful right to enter.~~

~~114. All Defendants named in this count are liable because they jointly caused the trespass to occur.~~

**COUNT X**
**COMMON LAW FRAUD**
*Maryland Common Law*
**(Against Defendants McQueen, Holman~~, Conaway,~~ Washington, Vertex, Schaffel, Tessler, Tess Law LLC, Shahbain, Alsamet and Alnisafi)**

~~115.~~ 145. The allegations set forth in all previous paragraphs are incorporated herein by reference.

~~116. Defendants Holman and Washington misled Plaintiff into believing the eviction would not occur on March 18, 2026, through repeated assurances to that effect.~~

146. Defendants Holman and Washington falsely represented to Plaintiff that the eviction would not occur on March 18, 2026: Holman's March 4 email stating "cancelled"; Washington's

March 5 email that the system had been updated to show the writ was quashed; Washington's March 9 email that the writ "has been canceled"; and Washington's phone assurances between March 9 and March 18 that he would not allow a March 18 eviction. Each was false when made: by 4:29 PM on March 4, both knew the private Defendants had asked to keep the March 18 date, and on March 5 they decided to keep it.

~~117.~~ 147. The Sheriff's Office's removal of the eviction from its official public website ~~reinforced~~ on March 5 was a further false representation that ~~deception and independently constitutes fraud.~~ no eviction was scheduled.

~~118. Defendant McQueen used a fraudulent instrument, the quashed writ of possession, to justify the eviction and seize the property and its contents.~~

~~119. Under Defendant Conaway's leadership, the Clerk's office issued the unlawful writ of possession used to schedule the eviction. His malice or deliberate indifference enabled the fraud, and the issuance of an unlawful writ is itself a fraudulent act.~~

148. On March 18, Defendant McQueen presented the quashed January 23 writ to Plaintiff as the legal authority for the eviction, representing it to be valid when he knew it had been quashed.

~~120.~~ 149. Defendants Vertex, Tessler, Tess Law, Schaffel, Shahbain, Alsamet and Alnisafi, acting jointly with the Sheriff's ~~Office,~~ Office and through Defendant Tessler, falsely represented to Plaintiff that they had lawful authority to take possession of the ~~property~~ Property on March ~~18.~~ 18, by presenting the quashed writ at the eviction and despite the notice failures.

~~121.~~ 150. Defendants made these ~~false~~ representations knowingly, intending ~~for~~ Plaintiff to rely on them. ~~Plaintiff~~ He did rely on ~~them~~ them: believing the eviction was off, he kept operating his business and did not remove his property, and on March 18 he surrendered

possession to McQueen because he believed McQueen was acting with lawful authority. He was harmed as a result. The purpose of the fraud was to remove Plaintiff from the ~~real property~~ Property so Defendants could take premature possession of it and everything inside.

**COUNT XI**
**GROSS NEGLIGENCE**
*Maryland Common Law*
**(Against Defendants McQueen, Holman, ~~Conaway,~~ Washington, Vertex, Schaffel, Tessler, Tess Law LLC, Shahbain, Alsamet and Alnisafi)**

~~122.~~ 151. The allegations set forth in all previous paragraphs are incorporated herein by reference.

~~123.~~ 152. Each Defendant identified in this Count failed to perform a manifest duty in reckless disregard of the consequences to Plaintiff's property rights as described below.

~~124. Defendant Conaway owed a duty to ensure his office issued writs of possession only to parties who held a deed to the property. Allowing his office to routinely issue unlawful writs constitutes gross negligence and reckless disregard for Plaintiff's property rights.~~

~~125.~~ 153. Defendant McQueen, as a Deputy Sheriff, owed a duty to execute only lawful process. He acted with gross negligence by executing the eviction ~~under~~ on a writ the Sheriff's Office's own system had shown as quashed for nearly two weeks, and by executing it without legally sufficient notice, in defiance of § 8B-3 and the Sheriff's Office's own policy of not executing an eviction until the fifteenth day after the writ ~~and in the absence of notice required by law.~~ issues.

~~126.~~ 154. Defendant Washington, as a Sheriff's Office supervisor, owed a duty to ensure evictions were carried out lawfully and with proper notice. He acted with gross negligence by ordering, or failing to prevent, the unlawful ~~eviction, and~~ eviction; by repeatedly assuring

Plaintiff the eviction was cancelled and then allowing it to ~~proceed.~~ proceed; and by refusing to stop the eviction once it was underway despite having the authority under § 8B-3 to do so.

~~127.~~ 155. Washington and McQueen each acted with gross negligence by ~~failing~~ not referring potential notice violations to ~~inquire if~~ a Baltimore City judge when they realized the ~~notice requirements had been met before executing~~ eviction was a surprise to Plaintiff, as § 8B-3 and the ~~eviction.~~ Office's own procedure required.

~~128. Defendant Holman was responsible for scheduling evictions for the Sheriff's Office and had a duty to schedule them lawfully and transparently. She acted with gross negligence by telling Plaintiff the March 18 eviction was cancelled, then letting it proceed on that date anyway.~~

156. Defendant Holman was responsible for scheduling evictions for the Sheriff's Office and had a duty to schedule them lawfully and transparently. On March 4, she told Plaintiff's representative the March 18 eviction was "cancelled." That afternoon, the private Defendants, through Tess Law, asked her to keep the date, and five minutes later she forwarded that request to Washington to discuss the next day. (Exhibit 14.) They kept the date. Holman never corrected her "cancelled," never answered Plaintiff's March 4 email asking whether the new writ would change the schedule, never told Plaintiff the private Defendants had asked to keep March 18, and let the eviction go forward on the date she had told him was off. That was gross negligence.

~~129.~~ 157. Defendants Vertex, Tessler, Tess Law, Schaffel, Shahbain, Alsamet, and Alnisafi owed a duty to ~~refrain from procuring and acting on writs they knew were invalid and to~~ comply with the statutory notice ~~requirements.~~ requirements before taking possession. They acted with gross negligence by ~~procuring invalid writs~~ mailing a notice on March 6 that was short of both the 14-day and ~~scheduling~~ 30-day periods and ~~executing an~~ stated no eviction ~~in defiance~~ date,

by taking possession on March 18 anyway, and more generally by pursuing possession with reckless disregard of ~~notice requirements.~~ Plaintiff's rights.

~~130.~~ 158. Each Defendant's gross negligence was a direct and proximate cause of Plaintiff's injuries, including the loss of his real property, his business, his personal and business property, and the financial and emotional harm resulting from the unlawful eviction.

**COUNT XII**
**ABUSE OF PROCESS**
*Maryland Common Law*
**(Against Defendants McQueen, Holman, ~~Conaway,~~ Washington, Vertex, Schaffel, Tessler, Tess Law LLC, Shahbain, Alsamet and Alnisafi)**

~~131.~~ 159. The allegations set forth in all previous paragraphs are incorporated herein by reference.

160. Defendants Vertex, Tessler, Tess Law, Schaffel, Shahbain, Alsamet, and Alnisafi used the eviction and writ of possession processes in ways the law does not permit. They scheduled and executed an eviction on a quashed writ and in defiance of the statutory notice requirements. Within an hour of the January 23 writ being quashed, Tessler filed a new writ application in the names of Shahbain, Alsamet, and Alnisafi, but the application relied on the deed Vertex had held rather than the deed his named clients held.

~~132. Defendants Vertex, Tessler, Schaffel, Shahbain, Alsamet, and Alnisafi used the eviction and writ of possession processes in ways the law does not permit. They scheduled and executed an eviction on a quashed writ and in defiance of the statutory notice requirements.~~ 161. Their goal was to dispossess Plaintiff of the Property before the law allowed, and then to use that premature dispossession to make it harder for ~~Plaintiff~~ him to ~~defend~~ pursue his pending legal claims to reclaim ~~title to the Property:~~ title: by holding his seized belongings hostage to coerce

him to abandon those claims, and by ~~stopping~~ shutting down his business ~~to damage him financially~~ so he could not ~~effectively~~ afford to pursue ~~his legal claims.~~ them.

~~133. Under Defendant Conaway's leadership, the Clerk's office repeatedly issued writs of possession to Vertex when Vertex held no deed, enabling the unlawful eviction.~~

~~134. Defendant McQueen executed the eviction using a writ he knew had been quashed, and. under conditions he knew did not satisfy the statutory notice requirements.~~

162. The Sheriff's Office Defendants carried out the private Defendants' misuse of process and added their own. Defendant McQueen executed the eviction by presenting a writ that had been quashed, under conditions that could not have satisfied the statutory notice requirements and that were contrary to the Sheriff's Office's own scheduling policies. Moreover, a quashed writ carries no authority; McQueen used it as if it did, to take possession of the Property.

~~135.~~ 163. Defendants Holman and Washington used the eviction scheduling process to deceive Plaintiff into believing the eviction had been cancelled, then ~~allowed~~ let it ~~to~~ proceed ~~on a quashed writ of possession. They removed~~ that date anyway. Removing the eviction from the official website residents rely on ~~as~~ was part of the deception. They also scheduled an eviction that could not satisfy the statutory notice requirements. The scheduling process exists to tell occupants when an eviction will occur; Holman and Washington used it to make sure Plaintiff did not know.

~~136.~~ 164. Upon information and belief, the Sheriff's Office Defendants participated in the unlawful eviction in exchange for preferential career ~~favors~~ treatment or other benefits; they had nothing lawful to gain from ~~their superiors, cash from Vertex, or both.~~ it.

~~137.~~ 165. The Sheriff's ~~Office's failure to file~~ Office has not filed the ~~legally~~ return required ~~post-eviction paperwork is itself an abuse of process and~~ by Maryland Rule 2-126. That omission reflects consciousness of ~~guilt. It suggests~~ guilt: on information and belief, the Office knows the eviction was unlawful and is avoiding the creation of a public record.

~~**INTRODUCTION TO CONSPIRACY CLAIMS**~~

~~138. Plaintiff's eviction was no mistake. Upon information and belief, it was the product of a coordinated scheme involving the Baltimore City Court Clerk's office, Sheriff Samuel Cogen and his subordinates, Councilmember Yitzchok Isaac "Yitzy" Schleifer, the private Defendants, and other individuals not yet identified but ascertainable through discovery.~~

~~139. Defendant Schleifer sits at the center of the scheme as the political broker who connected the private Defendants to the public officials whose cooperation made it work. Upon information and belief, he encouraged those officials and their staff to act in furtherance of the scheme.~~

~~140. Schleifer was motivated by the financial and political backing of Ronald Wilheim. Wilheim is a major donor to State Senate President Bill Ferguson, Governor Wes Moore, and President Donald Trump, giving him influence across the political spectrum. From July 2021 through September 2024, Wilheim, members of his family, and his employer CommuniCare donated approximately $23,100 to Schleifer.~~

~~141. Schleifer attempted to deliver a return on Wilheim's investment. Starting in 2022, Schleifer pushed to demolish Grove Park Elementary School to make way for a CommuniCare facility. He pressed the project for years despite the sustained opposition of his constituents. The facility was never built, and in October 2024 Schleifer publicly conceded defeat. If he wanted Wilheim's support in the future, Schleifer needed to prove he could deliver results.~~

~~142. Fortunately for Defendant Schleifer, Ronald Wilheim's interests extend beyond CommuniCare. Wilheim had cofounded a real estate investment business with his son, Sholom Tibor Wilheim. Defendant Schaffel served as the CEO of that company's tax-sale business and held a 20% ownership stake.~~

~~143. In December 2024, despite CommuniCare's business having nothing to do with tax-sale investing, its Government Relations lead brokered a meeting between Defendant Schleifer, Sholom Tibor Wilheim, and others to discuss Wilheim's tax-sale business. The meeting took place on January 6, 2025. (Exhibit 4.) With the CommuniCare deal dead, tax sales became Schleifer's chance to prove himself worthy of Wilheim's financial and political support.~~

~~144. Shortly after the meeting, an individual named "Yitzchok," Defendant Schleifer's first name, appeared in a group chat with Sholom Tibor Wilheim and Defendant Schaffel. The chat is titled "Tax Lien Tachlis," meaning "the Tax Lien Bottom Line." Among the topics discussed are conversations with Baltimore City court clerks. (Exhibit 5.)~~

~~145. Defendant Schleifer's ties to Defendant Schaffel go beyond the tax-sale business. In 2014, Schleifer purchased a home for $226,000. In 2019, he sold it to Defendant Schaffel for $379,000.~~

~~146. Upon information and belief, Defendant Schleifer's relationship with Baltimore City Sheriff Cogen was an asset he put to work for the scheme. Schleifer is one of Cogen's largest donors. And Cogen employed Schleifer's cousin, Ronald Rosenbluth, in the Sheriff's Office to manage "landlord-tenant" matters, which upon information and belief means evictions. (Rosenbluth later resigned after his name surfaced in filings in United States v. Attar (1:25-cr-00324), a federal prosecution for corruption and extortion involving a State Senator, a law enforcement officer, and a private businessman.)~~

~~147. Cogen and Defendant Xavier Conaway are also directly connected; they are political allies who ran on the same re-election slate. (Exhibit 6.)~~

~~148. In summary, upon information and belief: Schaffel operates and manages Vertex, the business entity executing the scheme. Tessler is the lawyer who abuses court process to advance it. Cogen is "the muscle": his department executes evictions. Holman schedules them; McQueen carries them out on the ground. Washington is the supervisor who provides cover, insulating Cogen from issuing direct commands. Conaway is the political ally who enabled the scheme by allowing his office to issue unlawful writs of possession. Schleifer is the political broker and quarterback, a bridge between Schaffel, Wilheim, Cogen, and Conaway. Wilheim is the scheme's financier: he purchases political influence and reaps the financial rewards. The scheme also serves as a vehicle for money laundering.~~

~~149. Cogen and Wilheim are not named as Defendants because Plaintiff lacks documentary evidence of their direct participation in the scheme. Plaintiff may seek to add them as defendants if such evidence surfaces during discovery.~~

**COUNT XIII**
**CIVIL CONSPIRACY**
*Maryland Common Law*

~~**(Against All Defendants)**~~
**(Against Defendants McQueen, Holman, Washington, Vertex, Schaffel, Tessler, Tess Law LLC, Shahbain, Alsamet and Alnisafi)**

~~150.~~ 166. The allegations set forth in all previous paragraphs are incorporated herein by reference.

~~151.~~ 167. The surprise eviction could not have occurred without the private Defendants and the Sheriff's Office Defendants acting in concert. ~~As~~ The object of their agreement was to prematurely take possession of the Property: to evict Plaintiff on March 18 even though the writ

scheduled for that date had been quashed, the statutory notice had not been given, and the Sheriff's Office's own policy did not allow execution of the March 4 writ until March 19. While the Sheriff's Office Defendants assured were assuring Plaintiff no eviction would take place on March 18, they planned the eviction were planning it with the private Defendants behind Plaintiff's back. Defendant McQueen and Defendant Tessler arrived at and executed the eviction together.

152. Overt acts in furtherance of the conspiracy include, but are not limited to: the Clerk's unlawful issuance of a writ of possession; Holman's preferential scheduling of an eviction on that writ; Holman and Washington assuring Plaintiff the eviction was cancelled; Defendants proceeding with the eviction anyway even though Holman and Washington knew Plaintiff believed the eviction was cancelled; the coordinated arrival of Defendant McQueen and Defendant Tessler on the day of the eviction; and Defendant Washington's refusal to stop the eviction once it was underway despite having the legal authority to do so.

153. Upon information and belief, Defendant Schleifer brokered and quarterbacked the relationships that enabled Vertex to secure unlawful Writs of Possession and to receive preferential treatment from the Sheriff's Office. Schleifer used his influence over Cogen, and Cogen used his influence over the Sheriff's Office employees.

168. The agreement between the private Defendants and the Sheriff's Office Defendants is shown by their communications. On February 11, 2026, at 5:42 PM, Holman emailed Schaffel proposing "Wednesday, 03/18/2026 – 11 am – 1 pm" for the Property and asked him to confirm; he confirmed at 5:43 PM. On March 4, the Circuit Court quashed the writ on which that date had been set, and Holman told Plaintiff's representative the eviction was "cancelled." (Exhibit 1.) At 4:24 PM that day, seven minutes after a new writ issued, the private Defendants, through Tess

Law, wrote to Holman in the same thread asking to keep the March 18 date. At 4:29 PM, Holman forwarded the email to Washington: "We will discuss tomorrow. Quashed 3/4/26." (Exhibit 14.) On March 5, Holman and Washington discussed the request and kept March 18 as the eviction date. Neither told Plaintiff; instead, Washington told him repeatedly that no eviction would occur on March 18. On March 18, McQueen and the private Defendants' representative arrived at the Property together, and McQueen executed the eviction.

169. The communications in ¶ 168 were themselves overt acts in furtherance of the conspiracy. There were others. On March 4, within an hour of the quash, Tessler filed a new writ application in the names of Shahbain, Alsamet, and Alnisafi that cited Vertex's deed rather than theirs. On March 5, the Sheriff's Office removed the eviction from its public website. On March 6, Tessler mailed a notice that neither identified which of his clients intended to take possession nor stated the eviction date. At no point before March 18 did Holman correct her "cancelled." On March 18, McQueen executed the eviction displaying the January 23 writ — which the Sheriff's Office's own system had recorded as quashed since at least March 5, and which Washington had acknowledged in writing on March 9 was canceled — a day before the Sheriff's Office's own policy allowed execution of the March 4 writ. When called that day, Washington refused to stop the eviction despite having the authority to do so. Afterward, Tessler conditioned the return of Plaintiff's belongings on Plaintiff abandoning his appeal.

170. Each private Defendant stood to gain from taking possession early: Vertex and Schaffel by keeping the $190,000 purchase price; Shahbain, Alsamet, and Alnisafi by obtaining possession; and Tessler and Tess Law, on information and belief, by receiving a percentage of Vertex's profits. What Shahbain, Alsamet, and Alnisafi paid further shows their knowing participation. Ashland Auction Group auctioned the Property on Vertex's behalf in an online

auction that ran from April 28 to April 30, 2025, drawing a high bid of $120,000. Yet on May 12, 2025, twelve days after the auction ended, Vertex signed an Ashland Auction Group contract of sale at a price Tess Law's own employee affirmed was $209,000 (Exhibit 7), and the sale Vertex recorded to Shahbain, Alsamet, and Alnisafi on December 3, 2025 was for $190,000 — $70,000 above the highest bid at public auction and more than double the State Department of Assessments and Taxation valuation of $85,000. It is unusual for a buyer to pay that premium for a property the seller does not possess, and more unusual still when, as here, the buyers are not using it; the Property remains empty as of August 3, 2026. On information and belief, the premium reflects Shahbain, Alsamet, and Alnisafi's reliance on Tessler, Tess Law, and Vertex's commitment to deliver possession.

~~154.~~ 171. The desire to conceal the conspiracy is evident in the Sheriff's Office's ~~response to public-records requests. The Sheriffs Office~~ handling of public records. It has ~~produced nothing in response to multiple~~ denied Plaintiff's Maryland Public Information Act requests for email records related to the eviction. It granted the private Defendants' MPIA requests, but the records they received appear to omit key documents: they end with Holman's March 4 note that she and Washington would "discuss tomorrow" and contain nothing from March 5 onward — not even a reply to the private Defendants confirming that the March 18 eviction would go forward. Yet the private Defendants' representative was at the Property on March 18. The Sheriff's Office also has not filed the ~~legally~~ return required ~~post-eviction return paperwork~~ by Maryland Rule 2-126 with the Baltimore City Circuit Court.

~~155. The object of the conspiratorial agreement was to launder money and generate financial returns for Vertex, Wilheim and his agents. In exchange, upon information and belief, Wilheim provided and would continue to provide campaign contributions and political support to~~

~~Schleifer and Cogen, who used their respective influence to keep the scheme running. Rank-and-file Sheriff's Office employees participated in exchange for career favors from Cogen, cash from Vertex, or both.~~

~~156.~~ 172. Each Defendant is liable for the acts of every other co-conspirator taken in furtherance of the conspiracy. As a direct result of ~~Defendants'~~ the conspiracy, Plaintiff suffered the damages described herein, including the loss of his real property, his business, and his personal and business property.

**COUNT XIV**
**CONSPIRACY TO DEPRIVE CIVIL RIGHTS, FOURTH AND FOURTEENTH AMENDMENTS**

~~**AMENDMENTS**~~
*42 U.S.C. § 1983*

~~**(Against All Defendants)**~~
**(Against Defendants McQueen, Holman, Washington, Vertex, Schaffel, Tessler, Tess Law LLC, Shahbain, Alsamet and Alnisafi)**

~~157.~~ 173. The allegations set forth in all previous paragraphs are incorporated herein by reference.

~~158.~~ 174. The same conduct alleged in Count XIII also constitutes a conspiracy ~~to deprive civil rights~~ under 42 U.S.C. § ~~1983.~~ 1983 to deprive Plaintiff of his Fourth Amendment right against unreasonable seizure (Count I) and his Fourteenth Amendment right to due process (Count III), and they resulted in those deprivations.

~~159.~~ 175. The Sheriff's Office Defendants (Holman, McQueen, and ~~Washington), Court Clerk Conaway and Councilmember Schleifer~~ Washington) are state ~~actors; the~~ actors. The private Defendants (Vertex, Tess Law, Schaffel, Tessler, Shahbain, Alsamet, and Alnisafi) acted

under color of state law because they acted jointly with the state Sheriff's Office Defendants to deprive Plaintiff of his rights. bring about the eviction, as alleged in ¶ 98.

**PREFERENTIAL TREATMENT OF VERTEX BEYOND THE SHERIFF'S OFFICE**

176. The preferential treatment of Vertex extends beyond the Sheriff's Office.

177. Under Baltimore City Court Clerk Conaway's leadership, the Clerk's office issued writs of possession to Vertex on at least seven occasions when Vertex held no deed, although a deed is a prerequisite to a writ (¶ 24). (Baltimore City Circuit Court cases C-24-CV-24-004386, -004422, -004451, -004454, -004719, -004740, and -004747.) In most of these instances Vertex did not even claim to have a deed. Several of these "no-deed" writs issued after the Circuit Court had published orders stating that such writs are unlawful. Maryland Public Information Act ("MPIA") requests for the Clerk's employee logs relating to writs issued to Vertex were denied; the specific employees involved may be established through discovery.

178. The unlawfully issued "no-deed" writs are sometimes quashed before a property owner is dispossessed, but not always. A property owner must know to file a motion to quash, file it in time, and hope the judge rules before the eviction date arrives. In case C-24-CV-24-004747, for example, the Clerk unlawfully issued a writ of possession; Vertex used it to schedule an eviction, the property owner in that case vacated, and Vertex changed the locks, all before the writ was eventually quashed.

179. Tessler, Tess Law, and Vertex appear to have cultivated favorable treatment from the bench as well. On September 16, 2025, Defendant Tessler emailed the presiding trial court judge ex parte, asking for "any assistance [the judge] can render" on pending motions. The judge ruled

the next day. Tessler replied: "An order was issued today. Both I and my client are grateful for the prompt response." (Exhibit 8.)

**INTRODUCTION TO RICO CLAIMS**

180. Plaintiff's eviction was no mistake. Upon information and belief, it was the product of a coordinated scheme involving the Baltimore City Court Clerk's office, Sheriff Samuel Cogen and his subordinates, Councilmember Yitzchok Isaac "Yitzy" Schleifer, the private Defendants, and other individuals not yet identified but ascertainable through discovery.

181. Schleifer sits at the center of the scheme as the political broker who connected the private Defendants to the public officials whose cooperation made it work. Upon information and belief, he encouraged those officials and their staff to act in furtherance of the scheme.

182. Schleifer was motivated by the financial and political backing of Ronald Wilheim. Wilheim is wealthy and politically connected, and his giving follows access rather than ideology: nearly $500,000 to Republican national committees and PACs, including a pro-Trump super PAC, alongside substantial support for Democrats Governor Wes Moore and State Senate President Bill Ferguson. From July 2021 through September 2024, Wilheim, members of his family, and his employer CommuniCare donated approximately $23,100 to Schleifer.

183. Starting in 2022, Schleifer pushed to demolish Grove Park Elementary School to make way for a CommuniCare facility. He pressed the project for years over the sustained opposition of his constituents. The facility was never built, and in October 2024 Schleifer publicly conceded defeat. On information and belief, Schleifer pursued the project to deliver a return on Wilheim's support, and its failure left him needing another way to do so.

184. Wilheim's interests extend beyond CommuniCare. He had cofounded a real estate investment business with his son, Sholom Tibor Wilheim. Defendant Schaffel served as the CEO of that company's tax-sale business and held a 20% ownership stake.

185. In December 2024, CommuniCare's Government Relations lead brokered a meeting between Schleifer, Sholom Tibor Wilheim, and others to discuss Wilheim's tax-sale business — a business CommuniCare has nothing to do with. The meeting took place on January 6, 2025. (Exhibit 11.) On information and belief, after that meeting Schleifer's efforts on Wilheim's behalf shifted to tax sales.

186. Shortly after the meeting, an individual named "Yitzchok," Schleifer's first name, appeared in a group chat with Sholom Tibor Wilheim and Defendant Schaffel. On information and belief, that individual is Schleifer. The chat is titled "Tax Lien Tachlis," meaning "the Tax Lien Bottom Line." Among the topics discussed are conversations with Baltimore City court clerks. (Exhibit 12.)

187. Schleifer's ties to Defendant Schaffel go beyond the tax-sale business. In 2014, Schleifer purchased a home for $226,000. In 2019, he sold it to Defendant Schaffel for $379,000.

188. Schleifer is one of Sheriff Cogen's largest donors. Cogen employed Schleifer's cousin, Ronald Rosenbluth, in the Sheriff's Office to manage "landlord-tenant" matters, which on information and belief means evictions. Rosenbluth resigned after his name surfaced in filings in United States v. Attar, No. 1:25-cr-00324, a federal prosecution for corruption and extortion involving a State Senator, a law enforcement officer, and a private businessman. On information and belief, Schleifer put his relationship with Cogen to work for the scheme.

189. Cogen and Baltimore City Circuit Court Clerk Xavier Conaway are political allies who ran on the same re-election slate. (Exhibit 13.)

190. In summary, upon information and belief: Schaffel operates and manages Vertex, the entity through which the scheme is carried out. Tessler is its lawyer and obtains the writs. Cogen's office executes the evictions: Holman schedules them, McQueen carries them out, and Washington supervises and, on information and belief, serves as the layer between Cogen and the deputies so that Cogen need not give direct commands. Conaway allowed his office to issue writs of possession to Vertex when it held no deed. Schleifer connects Schaffel, Wilheim, Cogen, and Conaway to one another. Wilheim funds the scheme, purchases political influence for it, and takes its financial returns. Upon information and belief, the scheme also serves as a vehicle for money laundering.

191. Cogen and Wilheim are not named as Defendants at this time. Plaintiff may seek leave to add them if discovery supports it.

**COUNT XV**
**CIVIL RICO — CONDUCTING AN ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY**

**~~RACKETEERING ACTIVITY~~**

*18 U.S.C. § 1962(c)*
**(Against Defendants McQueen, Holman, Washington, Vertex, Schaffel, Tessler, Tess Law LLC, Shahbain, ~~Alsamet, Alnisafi~~ Alsamet and ~~Schleifer)~~ Alnisafi)**

~~160.~~ 192. The allegations set forth in all previous paragraphs are incorporated herein by reference.

~~161.~~ 193. Section 1962(c) prohibits any person associated with an enterprise affecting interstate commerce from conducting that enterprise's affairs through a pattern of racketeering

activity. To state a civil claim, a plaintiff must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) that caused injury to the plaintiff's business or property.

~~162.~~ 194. Each Defendant named in this Count is a "person" under 18 U.S.C. § 1961(3), meaning an individual or entity capable of holding a legal or beneficial interest in property. Each is distinct from the RICO enterprise whose affairs they conducted.

~~163.~~ 195. The Defendants named in this Count, together with Ronald Wilheim, Samuel Cogen, Yitzchok Schleifer, Xavier Conaway, and unknown persons identified as John Does 1 through 10, form an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4). The Enterprise has the three required structural features. First, a common purpose: exploiting Baltimore City's tax-sale system for the financial and political enrichment of its members ~~and the laundering of money.~~ money laundering. Second, relationships among its members: the financial and political ties among Wilheim, Schleifer, Cogen, Conaway, the Sheriff's Office Defendants, and the private Defendants, as alleged above. Third, longevity sufficient to pursue that purpose: the Enterprise has operated across hundreds of tax-sale cases and continues to the present.

~~164.~~ 196. The Enterprise's activities affect interstate commerce: Vertex sells properties to out-of-state ~~buyers;~~ buyers, including Shahbain, Alsamet, and Alnisafi, who list a Colorado address; Vertex draws capital from out-of-state investors; Tessler conducts the Enterprise's legal work from Illinois; and, on information and belief, Defendant Schaffel receives payment through YAS Consulting, an Illinois-registered entity he owns.

~~165. The~~ 197. Upon information and belief, Defendants conducted the Enterprise's affairs through a pattern of racketeering activity consisting of repeated, related acts of mail fraud, wire

fraud, honest-services fraud, extortion under color of official right, extortion under Maryland law, transportation of stolen goods and money laundering, as set forth below.

**A. Mail and Wire Fraud — 18 U.S.C. §§ 1341, 1343**

~~166.~~ 198. Upon information and belief, The Enterprise furthered its scheme to defraud through repeated use of the mails and interstate wires. The scheme's goal was to maximize the Enterprise's tax-sale profits and to launder money through tax-sale transactions. Its methods, used as needed, included applying for writs of possession without holding a deed; misleading property owners about when evictions would occur; sending eviction notices based on unlawful writs so that owners would move out without knowing they could challenge them; using the writ and eviction process for purposes it does not serve, including to seize owners' property as leverage against their claims; and litigating owners into exhaustion so they could no longer mount a full defense. The communications identified below are those within Plaintiff's knowledge or available in public court records; communications in Defendants' exclusive possession will be sought in discovery.

~~167.~~ 199. Defendants committed wire fraud through the request and issuance of unlawful writs of possession. This occurred at least twice in Plaintiff's Baltimore City Circuit Court case and at least once in each of the following Baltimore City Circuit Court cases: C-24-CV-24-004386, C-24-CV-24-004422, C-24-CV-24-004454, C-24-CV-24-004719, C-24-CV-24-004740, and C-24-CV-24-004747.

~~168.~~ 200. Defendants committed mail fraud by causing the transmission of at least six eviction notices based on these unlawful writs of possession.

~~169.~~ 201. Defendants Holman and Tessler committed wire fraud by scheduling evictions- ~~based~~ on ~~those~~ unlawful writs through private ~~one-on-one emails. (Exhibit 7.)~~ emails between

them, including in three of the cases identified in ¶ 177, the May 2025 scheduling of Plaintiff's eviction (¶ 38), and the March 18, 2026 eviction (¶¶ 51, 168). (Exhibits 6, 14.)

~~170.~~ 202. Defendants Washington and Holman committed wire fraud through emails and phone conversations designed to convince Plaintiff he would not be evicted on March 18. These were lulling communications: they kept Plaintiff passive and forestalled protective action while the scheme to take his property proceeded to completion. **(Exhibit ~~8.)~~ 1.)**

~~171.~~ 203. Defendant McQueen ~~aided and abetted~~ furthered the ~~Enterprise's mail and wire fraud~~ scheme by executing the March 18, 2026 eviction on a writ he knew had been ~~quashed.~~ quashed — the act the fraudulent writ applications and lulling communications were designed to bring about.

~~172.~~ 204. Defendants Vertex and Schaffel committed wire fraud when they ~~recorded~~ transmitted deeds for 26 properties obtained through the Enterprise's ~~scheme, transmitting those deeds~~ scheme into Maryland's electronic land records ~~database by wire.~~ database, completing the transfers through which the scheme's proceeds were realized and, on information and belief, laundered (¶ 216).

~~173.~~ 205. As attorney of record in roughly 300 Vertex tax-sale cases, Tessler caused hundreds, if not thousands, of emails, physical mailings, and electronic filings in furtherance of the scheme. Tessler's conduct does not merit Petition Clause immunity because it was made in furtherance of a fraudulent scheme.

**B. Honest Services Fraud — 18 U.S.C. §§ 1341, 1343, 1346**

~~174.~~ 206. In the alternative and in addition, upon information and belief, Defendants Holman and Washington committed honest services fraud through the communications described in ~~§[]~~

~~169-170.~~ ¶¶ 201–202. Upon information and belief, Holman and Washington received financial benefits from Vertex and/or preferential career treatment from Sheriff Cogen in exchange for depriving the public of their honest services as sheriff's office employees.

~~175. Defendant~~ 207. Schleifer committed wire and honest services fraud by using his City Council position to benefit the Enterprise. Upon information and belief, he did so in exchange for political and financial benefits from ~~Wilheim.~~ Wilheim (¶ 182). Wires in furtherance include: (1) his participation in ~~a~~ the January 6, 2025 tax-sale strategy ~~Zoom~~ meeting with ~~one or more~~ Sholom Tibor Wilheim ~~tax-sale agents;~~ and others, held by video conference (¶ 185); and (2) his messages in the "Tax Lien Tachlis" WhatsApp group with Defendant Schaffel and other Enterprise ~~agents.~~ agents (¶ 186).

**C. Extortion Chargeable Under Maryland Law — Md. Code, Crim. Law §§ 3-701 and 3-702**

~~176.~~ 208. Racketeering activity includes any act of extortion chargeable under state law and punishable by more than one year's imprisonment. 18 U.S.C. § 1961(1)(A). Maryland prohibits obtaining property from another person where consent is induced by the wrongful use of actual or threatened force, violence, or economic injury (§ 3-701), or by a public officer acting under color of official right (§ 3-702). Because the value of the ~~Property~~ real property and property seized within it exceeds $100,000, the offense is a felony punishable by up to twenty-five years' imprisonment and qualifies as a predicate act. No state charge or conviction is required.

~~177.~~ 209. On March 18, 2026, Defendant McQueen, acting as a Deputy Sheriff under color of official right, obtained Plaintiff's surrender of 229 N. Monroe Street by presenting ~~a~~ the quashed January 23 writ ~~of possession~~ as state authority and directing Plaintiff to leave. Plaintiff was lawfully present on his property and complied because he believed McQueen was acting

with lawful authority. He was not told, and did not know, he was being evicted on a quashed writ of possession. McQueen had no lawful right to compel the surrender. That wrongful taking of property under color of official right constitutes extortion under § 3-702 and a predicate act of racketeering.

178. 210. The same conduct independently constitutes extortion under § 3-701. Plaintiff surrendered possession because he feared the consequences of defying an armed state officer presenting what appeared to be valid legal process. of the state. Because the writ was void, using that fear to obtain Plaintiff's property was wrongful and violated § 3-701.

179. Vertex, Schaffel, Tessler, Shahbain, Alsamet and Alnisafi caused, or aided and abetted, these extortionate acts by procuring a writ to which they were not entitled and by coordinating and helping execute the eviction.

211. Vertex, Schaffel, Tessler, Tess Law, Shahbain, Alsamet and Alnisafi caused and participated in these extortionate acts. They scheduled the eviction on a writ the Circuit Court then quashed, asked the Sheriff's Office to keep that date the same afternoon as the quash, did not give the notice the law required before possession could be taken, and sent their representative to the Property to take possession as McQueen executed the eviction on the quashed writ.

180. 212. This conduct is not limited to Plaintiff's case. Upon information and belief, in Baltimore City Circuit Court case C-24-CV-24-004747, the property owner in that case vacated his property based on an improperly issued writ of possession and a Sheriff's Office-scheduled eviction. The writ was eventually quashed, but only after Vertex had locked him out.

**D. Hobbs Act Extortion — 18 U.S.C. § 1951**

~~181.~~ 213. The extortionate acts listed in ¶¶ ~~177-178~~ 209–210 also constitute Hobbs Act Extortion.

**E. Transportation of Stolen Goods — 18 U.S.C. § 2314**

~~182.~~ 214. Upon information and belief, Vertex distributed to its ~~investors proceeds from fraudulently obtained properties, including Plaintiff's, through~~ out-of-state investors, by interstate wire ~~transfers.~~ transfer, proceeds of properties obtained through the scheme, including the $190,000 Vertex received for Plaintiff's Property. Between 2024 and 2025, Vertex bought and sold 26 properties.

**F. Money Laundering — 18 U.S.C. §§ 1956, 1957**

~~183.~~ 215. Section 1956 prohibits conducting financial transactions involving proceeds of specified unlawful activity with intent to promote that activity or conceal its nature or source. Section 1957 prohibits monetary transactions exceeding $10,000 in property derived from such activity.

~~184.~~ 216. Upon information and belief, the Enterprise launders money through Maryland's tax-sale system as follows: it acquires properties at tax sale, then resells them through Ashland Auction Group at prices inflated on paper, with illicit cash injected into the deal as purported purchase money. The ~~dirty money~~ illicit funds then ~~re-emerges~~ re-emerge on the books as legitimate tax-sale investment profit.

~~185.~~ 217. For example, Ashland Auction Group auctioned Plaintiff's property on Vertex's behalf in an online auction that ran from April 28 to April 30, 2025, drawing a high bid of $120,000. Yet ~~the Ashland Auction Group contract of sale for the Property, dated~~ on May 12, 2025, just twelve days after the auction ended, ~~states~~ Vertex signed an Ashland Auction Group

contract of sale for the Property at a ~~purchase~~ price ~~of~~ Tess Law's own employee affirmed was $209,000. (Exhibit ~~9.)~~ 7.)

~~186.~~ 218. Upon information and belief, the $89,000 premium in the May 12 contract over the high bid ~~drawn~~ at public auction less than two weeks earlier (and the $70,000 premium in the price ultimately recorded, ¶ 170) reflects the mechanism described in ~~¶184:~~ ¶ 216: illicit cash injected as purported purchase money, re-emerging as legitimate tax-sale profit. It is unusual for a buyer to pay such a high premium, let alone when the seller does not even have possession.

~~187.~~ 219. Ashland Auction ~~Group knowingly participated in the scheme, as shown by its principal~~ Group's principal, Adam ~~Shpritz attending~~ Shpritz, attended the January 6, 2025 tax-sale strategy meeting with ~~Councilmember~~ Schleifer and ~~Defendant Schaffel's employer.~~ Sholom Tibor Wilheim. (Exhibit ~~4.)~~ 11.) Upon information and belief, Ashland ~~was involved in~~ handled each ~~one~~ of Vertex's property ~~transactions.~~ sales and was aware of the pricing mechanism described in ¶ 216.

~~188.~~ 220. For reasons unknown to Plaintiff, Vertex ultimately recorded the sale of the Property for $190,000 rather than $209,000, still more than double the State Department of Assessments and Taxation valuation of $85,000.

~~189.~~ 221. Vertex sold the Property to Defendants Shahbain, Alsamet, and Alnisafi, who list a Colorado vape store as their tax mailing address and serve as officers of numerous LLCs. Plaintiff infers Shahbain, Alsamet, and Alnisafi were knowing participants in money ~~laundering, as~~ laundering: they paid $70,000 above the highest bid at public auction (¶¶ 170, 220) for a property the seller did not possess and whose title was on appeal, and they appear to have no

genuine interest in occupying or renting out the Property. it out. Plaintiff was evicted on March 18, 2026, and as of August 3, 2026, the Property remains unoccupied.

190. 222. A separate transaction also points to money laundering. Ashland Auction Group auctioned 2918 E. Madison Street on April 23, 2025, with a starting bid of $25,000, and drew no bids. Ten weeks later, on July 3, 2025, Vertex recorded a sale of the same property for $71,500, more than double its $32,000 assessed value.

191. Beyond these individual transactions, Vertex's overall investment returns do not reflect legitimate market activity. 223. Between 2024 and 2025, Vertex acquired 26 properties for roughly $20,000 in delinquent taxes and recorded sales totaling $1.4 million. Plaintiff has compared that return to those of other Baltimore tax-sale investors over the same period; Vertex's is substantially higher in Plaintiff's sample. On information and belief, the difference reflects the above-market pricing described in ¶¶ 217–222, recurring across Vertex's transactions.

**G. Continuity & Longevity**

192. 224. The predicate acts are continuous. They span from at least the spring 2025 no-deed writs and eviction scheduling (¶¶ 177, 201) through the March 2026 eviction of Plaintiff and the post-eviction demand for his appeal. Since joining the Maryland Bar in April 2024, Tessler has served as attorney of record in more than 600 tax-sale cases statewide, including more than 300 in Baltimore City. Not every tax-sale case requires unlawful tactics, but the Enterprise has shown it will deploy them when needed.

193. 225. The Sheriff's Office employees who carried out the eviction remain on the force, Schleifer remains a City Councilmember, and Conaway remains Clerk of the Court. Vertex continues to pursue tax-sale foreclosures, having filed a tax-sale foreclosure action as recently as

May 2026. Tessler through Tess Law still serves as attorney for Vertex. Nothing short of this Court's intervention, or a criminal investigation, can stop them.

194. 226. Plaintiff was injured in his business and property by reason of the racketeering activity. The loss of his real property, his deli and convenience store business, and his personal property was all caused directly by the Enterprise's actions. predicate acts described in ¶¶ 199–210.

**COUNT XVI**
**CIVIL RICO CONSPIRACY**
*18 U.S.C. § 1962(d)*

**(Against All Defendants)**
**(Against Defendants Conaway, McQueen, Holman, Washington, Vertex, Schaffel, Tessler, Tess Law LLC, Shahbain, Alsamet and Alnisafi)**

195. 227. The allegations set forth in all previous paragraphs are incorporated herein by reference.

196. 228. Section 1962(d) makes it unlawful to conspire to violate § 1962(c). Each Defendant named in this Count agreed that the affairs of the tax-sale Enterprise would be conducted through the pattern of racketeering activity alleged in Count XV. A Defendant need not have personally committed, or agreed personally to commit, any predicate act; it is enough that he knowingly agreed to facilitate the scheme. *Salinas v. United States,* 522 U.S. 52 (1997).

197. The agreement is shown by the coordinated conduct alleged throughout this Complaint, including the issuance of premature writs, the non-standard scheduling of Vertex's evictions, the assurances that lulled Plaintiff into inaction, the coordinated arrival of Deputy McQueen and Vertex's representative to take the Property, and the financial and political relationships binding the members of the Enterprise.

229. The agreement was to an ongoing arrangement. Holman scheduled Vertex's evictions through a private channel with Tessler and Tess Law from at least April 2025 to March 2026, including in multiple cases where Vertex held no deed (¶¶ 177, 201); the Clerk's office, under Conaway, issued no-deed writs to Vertex in at least seven cases (¶ 177); and in C-24-CV-24-004747, an owner vacated on such a writ before it was quashed (¶ 178). Plaintiff's eviction is the instance in which the arrangement is documented: approximately two hours after Holman told Plaintiff the eviction was "cancelled," the private Defendants, through Tess Law, asked her to keep the date; she and Washington kept it; Washington then told Plaintiff repeatedly that no eviction would occur on March 18; and on March 18 McQueen and Vertex's representative arrived together to carry it out. (¶¶ 168–171; see also ¶¶ 48–58, 64–65, 79–80, 88–99, 163–164, 195, 206–207, 216–223.) The agreement is shown further by the purchasers' premium for a property the seller did not possess (¶ 170); Tessler's post-eviction demand (¶ 8); Schleifer's participation in the "Tax Lien Tachlis" group with Schaffel, in which conversations with Baltimore City court clerks were discussed (¶ 186); and the financial and political relationships binding the members of the Enterprise (¶¶ 180–189).

~~198.~~ 230. Plaintiff was injured in his business and property by reason of the conspiracy, through the predicate acts of racketeering committed in furtherance of it, which dispossessed him of his property, business, and chattels.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Fausto Gomez respectfully requests that the Court:

(a) Award compensatory damages in an amount to be determined at trial but no less than $300,000;

(b) Award treble damages for the RICO claims;

~~(b)~~ (c) Award punitive damages in an amount to be determined at trial; and

~~(c) Award threefold the damages Plaintiff sustained, together with the costs of suit and reasonable attorney's fees, on the civil RICO claims;~~

~~(d) Issue a Declaratory Judgment that the Baltimore City Court Clerk's repeated issuance of writs of possession in tax-sale cases to parties not entitled to them is unconstitutional under the Fourth and Fourteenth Amendments; and~~

~~(e)~~ (d) Grant such other and further relief as the Court deems just.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury, under Federal Rule of Civil Procedure 38(b), on all issues so triable.

Respectfully submitted,

Fausto Gomez
Plaintiff Pro Se
9315 Oak White Rd.
Nottingham, MD 21236
443-627-0201
FaustoGomez3080@hotmail.com